IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | | |
|---|---|---|
| Connelly Management, Inc., | ) | Civil Action: 2:02-CV-2440-PMD-GCK |
| Connelly Management Employee | ) | |
| Welfare Benefit Plan, | ) | |
| James B. Connelly, individually | ) | |
| James B. Connelly, as a participant under | ) | |
| the Connelly Management Employee | ) | |
| Welfare Benefit Plan and all participants | ) | |
| similarly situated, | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | **ORDER** |
| | ) | |
| Euan David McNicoll, | ) | |
| John Fowler Anderson, | ) | |
| Marsh Investment Corporation, | ) | |
| McSooner, Inc., | ) | |
| Marketrends Financial Services Ltd., | ) | |
| Marketrends Insurance, Ltd., | ) | |
| Michael Arthur Reeve, | ) | |
| Saint John Management Services, Ltd., | ) | |
| Michael Reeve & Associates, et al. | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## I.  INTRODUCTION

**THIS CAUSE** comes before the Court following the Order of Reference to a Magistrate

Judge signed by United States District Judge David C. Norton to "[c]onduct a hearing for default

judgment"[1] pursuant to accordance with 28 U.S.C.§ 636(b)(1) and Local Civil Rule 73.02 DSC.[2]

Based upon the procedural, factual and legal bases set forth herein, and pursuant to Rule 55(b)(2)

F.R.C.P., it is ordered that a default judgment be entered against the defaulting Defendants: Euan

David McNicoll (hereafter "McNicoll"), John Fowler Anderson (hereafter "Anderson"), Marsh

Investment Corporation (hereafter "Marsh"), McSooner, Inc. (hereafter "McSooner"), Marketrends

Financial Services Ltd. (hereafter "MTFS") and Marketrends Insurance, Ltd. (hereafter "MT"),

Michael Arthur Reeve (hereafter "Reeve"), and Saint John Management Services, Ltd. (hereafter

"St. John").

## II.     PROCEDURAL BACKGROUND

1.     Plaintiffs, Connelly Management, Inc. (hereafter "Connelly"), Connelly Management

Employee Welfare Benefit Plan (hereafter "CMEWBP"), James B. Connelly, individually, (hereafter

"Mr. Connelly"), James B. Connelly as a participant under the Connelly Management Employee

Welfare Benefit Plan and all participants similarly situated[3] filed a First Amended Complaint on

---

[1] See, Docket Entry 133, Order of Reference to a Magistrate Judge.  United States District Judge Norton also entered an Order of Reference to a Magistrate Judge which referred this case to United States Magistrate Judge Kosko to "[h]ear and determine all pretrial matters with the exception of dispositive motions."  See, Docket Entry 11.  On October 17, 2003 this case was assigned to the undersigned United States District Judge Patrick Michael Duffy.

[2] The recommendation has no presumptive weight, and the responsibility for making a final determination remains with the United States District Court.  See, Matthews v. Weber, 423 U.S. 261, 270-71 (1976).  The court is charged with making a de novo determination of those portions of the Report and Recommendation to which specific objection is made.  The court may accept, reject, or modify, in whole or in part, the recommendation made by the Magistrate Judge or recommit the matter with instructions.  28 U.S.C. §636(b)(1).  Objections to a Report and Recommendation must be specific.  Failure to file specific objections constitutes a waiver of a party's right to further judicial review, including appellate review, if the recommendation is accepted by the district judge.  See, United States v. Schronce, 727 F.2d 91, 94 & n. 4 (4th Cir. 1984).  In the absence of specific objections to the Report and Recommendation of the Magistrate Judge, the United States District Court is not required to give any explanation for adopting the recommendation.  See, Camby v. Davis, 718 F.2d 198, 199 (4th Cir. 1983).

[3] Connelly Management, Inc. (hereafter "Connelly") is a South Carolina corporation that manages 9 nursing home facilities in South Carolina.  James B. Connelly (hereafter "Mr. Connelly") is its president.  The Connelly Management Employee Welfare Benefit Plan (hereafter "CMEWBP") provides that Connelly is the plan sponsor and the plan administrator.  In 2001, Connelly, as the "plan sponsor" and the "plan administrator,"

March 7, 2003[4] asserting civil causes of action against twenty-four (24) Defendants.  The First

established  the CMEWBP to provide "group health benefits" to Connelly employees and their dependents who participated in the CMEWBP.  The similarly situated participants are the 264 participants of the CMEWBP who had unpaid covered medical claims for services rendered between January 1, 2001 and December 31, 2001.  An ERISA employee benefit plan may sue as an entity.  29 U.S.C. §1132 (d) (1).  This litigation seeks to recover damages arising from a fraudulent insurance scheme which harmed Connelly and the CMEWBP participants.  "[A] plan sponsor is entitled to wear two different hats: it may perform some functions as fiduciary to the plan, while it may perform other functions on its own behalf, i.e. in a non-fiduciary capacity." See, Sonoco Products Company v. Physicians Health Plan, 338 F.3d 36, 373 (4th Cir. 2003).  Connelly entered into a Reinsurance Agreement with North American Indemnity, N.V. (hereafter "NAI"), a reinsurer, which required NAI to pay 100% of Connelly's liability to the CMEWBP for the covered medical expenses of the participants.  The participants of the CMEWBP group health plan were the intended beneficiaries of the Reinsurance Agreement.  NAI was a fraudulent company, as described in detail in the main text of this Order.  The Reinsurance Agreement was used as an instrumentality by McNicoll, Anderson, Reeve and others to perpetrate a civil conspiracy to defraud Connelly and the participants in the CMEWBP by way of an ERISA health insurance scam.  State law contract and tort claims against a reinsurance company and its principals are not pre-empted by ERISA because the reinsurer is not a plan fiduciary.  See, Vescom Corporation v. American Heartland Health Administrators, Inc., 251 F.Supp.2d 950, 964 (D.Maine 2003).  Connelly and CMEWBP's common law civil conspiracy claim against the defaulting Defendants is founded upon traditional state-based laws of general applicability that do  not implicate the relations among the traditional ERISA plan entities, including the principals, the employer, the plan, the plan fiduciaries, and the beneficiaries. LeBlanc v. Cahill, 153 F.3d 134, 148 (4th Cir. 1998) (state law fraud claim brought by ERISA trustee for benefit of the Plan against investment advisor to employee pension plan is not preempted by ERISA).  The fact that Connelly and CMEWBP is subject to ERISA is of no consequence to its common law civil conspiracy claim against the defaulting Defendants.  With respect to this state based common law tort claim, Connelly and CMEWBP act simply "in the role of a victim" allegedly wronged by an insurance scam.  LeBlanc 153 F.3d at 148.  Connelly and the CMEWBP can go forward on their traditional state-based civil conspiracy claim.  Id. at 147.  A plan administrator on behalf of the plan or the plan may sue a third-party, who is neither a fiduciary nor a party in interest with respect to the plan under state common law for damages allegedly flowing from a civil conspiracy perpetrated on the plan by the third party. Id.  Rule 17 (a), F.R.C.P. permits CMEWBP as a plan authorized by the ERISA statute to pursue this action, and Connelly as plan administrator and a party in whose name a contract was made for the benefit of the participants to pursue this action, as the real party in interest without the requirement that CMEWBP or Connelly join as parties Plaintiff each of  the 264 individual participant beneficiaries for whose benefit certain damage claims raised in  the action were brought.  Rule 17 (a) provides that "[n]o action shall be dismissed on the ground that it is not prosecuted by the real party in interest until a reasonable time has been allowed after objection for ratification of commencement of the action by, or joinder or substitution of, the real party in interest; and such ratification, joinder or substitution shall have the same effect as if the action had been commenced in the name of the real party in interest."  Rule 9 (a) provides that "[w]hen a party desires to raise an issue as to . . . . the capacity of a party to sue . . . or the authority of a party to sue . . . in a representative capacity,  the party desiring to raise the issue shall do so by specific negative averment, which shall include such supporting particulars as are peculiarly within the pleader's knowledge."  No objection was made by any Defendant as to CMEWBP or Connelly's standing to bring this action; thus such objection was waived.  Had such an objection been made it would not have resulted in the dismissal of the action.  In addition, in this Order the Court has separately addressed the damage claims.  Rule 20 (a) provides that "[a]ll persons may join in one action as plaintiffs if they assert any right to relief jointly, severally, or in the alternative in respect of or arising out of the same transaction, occurrence, or series of transactions or occurrences and if any question of law or fact common to all these persons will arise in the action."  Accordingly, the Court concludes that  CMEWBP and Connelly are the real parties in interest entitled to prosecute this action in the manner in which it was brought.  This action is not a class action subject to the requirements of Rule 23, F.R.C.P.

[4] First Amended Complaint, Docket Entry 15.  The original Complaint was filed in the Court of Common Pleas for Charleston County, South Carolina on June 4, 2002.  On July 22, 2002 the case was removed to this

Amended Complaint alleged that twenty-four (24) Defendants played a material role in an ERISA health insurance scam[5] which failed to pay $927,600.67 in covered medical claims submitted by two hundred and sixty-four (264) of the three hundred (300) participants in the CMEWBP between the

District Court pursuant to 28 U.S.C. §1441 and §1446 by Oklahoma attorney John A. Claro who was admitted pro hac vice to represent Defendant American Heartland Health Administrators, Inc. (hereafter "AHHA") in this action. Subject-matter jurisdiction was based upon 28 U.S.C. §1331 (general federal question jurisdiction), 28 U.S.C. §1367 (supplemental jurisdiction) and 28 U.S.C. §1332 (jurisdiction based on diversity of citizenship and amount in controversy).

[5] In assessing the evidence, this Court considered expert testimony from Mila Kofman, J.D., an assistant research professor at Georgetown University's Health Policy Institute. She published a peer reviewed article entitled "Health Insurance Scams: How Government is Responding and What Further Steps are Needed," The Commonwealth Fund (August 2003). She also published a peer review article entitled "Association Health Plans: Loss of State Oversight Means Regulatory Vacuum and More Fraud," (Summer 2005), Georgetown University Health Policy Institute. She has testified and published writings subject to peer review on the subject of unauthorized health insurance. Her methods have been generally accepted by her respective discipline, which includes the National Association of Insurance Commissioners, to whom she has given presentations. She has drafted or reviewed "consumer alerts" which, following peer review, were posted to alert consumers of health insurance scams. She has testified before state and federal legislative bodies. Before joining the faculty at Georgetown she was a federal regulator with the USDOL who dealt specifically with the interplay between state departments of insurance and the USDOL. The Court found that Professor Kofman possessed specialized knowledge that assisted the Court as trier of fact to determine facts in issue. Professor Kofman was qualified as an expert by knowledge, skill, experience and training on the subject of unauthorized health insurance, including health insurance scams under the requirements of Rule 702, F.R.E. and Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1997). She reviewed the facts of this case. Her testimony was the product of reliable principles and methods, and she applied those principle and methods reliably to the facts of the case. Professor Kofman rendered the opinion, to a reasonable degree of certainty, more probably than not, that Plaintiffs were the victims of an ERISA health insurance scam. Professor Kofman described in detail how the scam alleged by Plaintiffs possessed essentially all of the characteristics which she had identified in her peer reviewed article and writings and about which she had previously testified before state and federal legislative bodies were common to ERISA health insurance scams. Those characteristics included: the use of a foreign, unlicensed, and grossly undercapitalized company selling 100% reinsurance to small businesses and falsely claiming the product was not regulated by state departments of insurance because it was sold to an ERISA plan; the use of prescription cards and provider networks to make the plan appear legitimate; the payment of initial smaller claims in order to collect substantial premiums before claims payment stops altogether; delays and redundant requests for additional information to buy time to collect additional premiums; a refusal without justification to pay covered claims, followed by civil litigation which involved false claims of ERISA preemption; the use of the courts in furtherance of the scam; and, the repeat involvement of the same persons, who she referred to as "repeat offenders," to execute the scams. The Court relied in part, upon the body of specialized knowledge testified to by Professor Kofman, in evaluating the evidence and in reaching its own conclusion that Plaintiffs' were victims of an elaborate ERISA health insurance scam. The use of the term "ERISA health insurance scam" has been adopted by the Court from Professor Kofman's writings and her testimony on the subject. Oxford English Dictionary, 2nd Edition 1989, defines "scam" as (a) "a trick, a ruse; a swindle, a racket." The Court concludes the term "ERISA health insurance scam" appropriately describes the methods employed. Therefore, in the text of this Order the Court will refer to the conduct as an "ERISA health insurance scam." This scam is described in specific factual detail in Section III, Findings of Fact and Conclusions of Law.

dates of January 1, 2001 and December 31, 2001 which resulted in specified damages to Connelly and the CMEWBP participants.

2.     The First Amended Complaint alleged causes of action for (a) professional negligence; (b) negligent misrepresentation; (c) a statutory cause of action based on a South Carolina statute which imposed personal liability on persons who directly or indirectly assist in any manner in the sale of unauthorized insurance; (d) civil conspiracy; (e) claims under the Employment Retirement Income Security Act, 29 U.S.C.A. §1001 *et.seq.*, (hereafter "ERISA") to recover benefits due under the terms of the plan (29 U.S.C.§1132(a)(1)) and for breach of fiduciary duty (29 U.S.C.§1109); (f) improper claims practices; and (g) unfair and deceptive trade practices.

3.     The First Amended Complaint sought money damages in the amount of the unpaid claims, pre-judgment interest, administrative fees, costs and expenses associated with the resolution of claims, professional fees associated with the resolution of claims, damage to the credit reputation of CMEWBP participants, other similar actual, compensatory and consequential damage, treble damages, punitive damages and attorneys' fees.

4.     During the pendency of the litigation, seventeen (17) of the Defendants named in the First Amended Complaint were dismissed from the litigation because of voluntary settlements,[6]

---

[6] Defendants Ferguson Marketing Group, Inc., Ferguson Waldron Communications, Inc., John Lewis Ferugson, Jr., Shirley C. "Shan" Ferguson, Robert Waldron, Sharon Waldron and W. Markus Frye were alleged to have provided insurance and benefit consultation to Connelly and acted as local agent in connection with the sale of the failed health plan.  They settled with Plaintiffs and were dismissed from this action with prejudice on March 4, 2004.  Docket Entry 214. Defendants Mid-South Benefits Group, James A. Glidewell, Brian S. Glidewell and Kay Glidewell, who were alleged to have acted as insurance agents in the solicitation of the Connelly business, settled with Plaintiffs in October 2005.

bankruptcy,[7] or voluntary non-suit without prejudice.[8]

      5.      On July 14, 2003, pursuant to Rule 55 (a), F.R.C.P., the Clerk entered a default against Defendants Anderson,[9] Marsh, [10] McSooner,[11] MTFS and MT.[12]

      6.      On August 6, 2003, pursuant to Rule 55 (a), F.R.C.P., the Clerk entered a default

---

[7] Defendant Jack H.M. Ferguson filed bankruptcy on September 3, 2003 and his third-party claims administration company American Heartland Health Administrators, Inc. filed bankruptcy on May 7, 2003.

[8] Edwin W. Ehler (CFO for AHHA and Southern Plan Administrators (hereafter "SPA")), Patricia E. Lupher (AHHA and SPA head of claims), Southern Plan Administrators, Inc. (AHHA's "sister company" or successor) were dismissed without prejudice from this action on April 18, 2005. Docket Entry 279. John E.J. King and Arlene G. Cleare of Worldwide Trust Services Limited (Bahamian corporate formation and trust services company) were dismissed from this action without prejudice on August 27, 2003. Docket Entry 125.

[9] On April 10, 2003 Defendant John Fowler Anderson was personally served with the Summons and First Amended Complaint by a private legal process server who handed the said documents to John Fowler Anderson at his residence in Scotland. See, Docket Entry 108. Anderson is a citizen of the United Kingdom who at the time service was effectuated resided in Scotland. The United Kingdom and the United States of America are signatories to the Convention on Service Abroad of Judicial and Extrajudicial Documents in Civil and Commercial Matters (hereafter the "Hague Service Convention."). 20 U.S.T. §1361. Pursuant to the Hague Service Convention and Rule 4(f)(1), F.R.C.P., service was properly perfected upon Anderson. See, Docket Entry 114, Plaintiffs' Memorandum of Law relating to service of process.

[10] On March 24, 2003 Marsh Investment Corp. was personally served with the Summons and First Amended Complaint by a private legal process server who delivered the same to the office of the registered agent Jerome E. Pyfrom in Nassau, Bahamas. See, Docket Entry 110. Marsh Investment Corp. is a Bahamian International Business Company. The Commonwealth of the Bahamas and the United States of America are signatories to the Hague Service Convention. 20 U.S.T. §1361. Pursuant to the Hague Service Convention and Rule 4(h)(2), F.R.C.P., service was properly perfected upon Marsh Investment Corp.

[11] On March 24, 2003 McSooner, Inc.was personally served with the Summons and First Amended Complaint by a private legal process server who delivered the same to the office of the registered agent Worldwide Trust Services Limited. See, Docket Entry 111. McSooner, Inc. is a Bahamian International Business Company. The Commonwealth of the Bahamas and the United States of America are signatories to the Hague Service Convention. 20 U.S.T. §1361. Pursuant to the Hague Service Convention and Rule 4(h)(2), F.R.C.P., service was properly perfected upon McSooner, Inc.

[12] On April 17, 2003 Marketrends Financial Services Limited and Marketrends Insurance Limited were served pursuant to S.C. Code Ann §15-9-280 (1976, as amended) by delivery of the Summons and First Amended Complaint to the South Carolina Secretary of State as their lawful agent for service of process who then forwarded the pleadings to the said Defendants by certified mail. See, Docket Entry 106 and 107. The Marketrends Defendants are Cypriot companies. Cyprus and the United States are signatories to the Hague Service Convention. 20 U.S.T. §1361. Pursuant to the Hague Service Convention and Rule 4(h)(2), F.R.C.P. service was properly perfected on the Marketrend Defendants. Marketrends Insurance Limited is a wholly owned subsidiary of Marketrends Financial Services Limited.

against Defendant McNicoll.[13]

7.    On October 28, 2003 the Court issued an Order Sequestering Assets which enjoined McNicoll, Anderson, McSooner, Marsh and Lyford Investment Corp. from transferring or secreting any asset, and enjoined any attorney or bank from assisting said Defendants in said actions[14] for the

---

[13] On May 1, 2003 Defendant Euan David McNicoll was personally served with the Summons and First Amended Complaint by a private legal process server who handed the said documents to Euan David McNicoll at his residence in Scotland. See, Docket Entry 109. McNicoll is a citizen of the United Kingdom who at the time service was effectuated resided in Scotland. The United Kingdom and the United States of America are signatories to the Hague Service Convention. 20 U.S.T. §1361. Pursuant to the Hague Service Convention and Rule 4(f)(1), F.R.C.P., service was properly perfected upon Anderson. See, Docket Entry 114, Plaintiffs' Memorandum of Law relating to service of process.

[14] On November 4, 2003 the Court received a letter from Belgian attorney Vincent Busschaert who represented North American Indemnity, N.V., the entity utilized by McNicoll, Anderson, Reeve and others as a front to execute the ERISA health insurance scam. Mr. Busschaert stated:

> Connelly Management, Inc., represented by Mr. Mason, is falsely informing your Court that NAI is stripping its assets; public records such as i.a. annual accounts indicate that the social capital of NAI still amounts to 11,254,000 EUR (13,054,640 US$).

On November 3, 2003 and November 5, 2003 the Court received by fax a copy of a letter California attorney Kevin R. Marchese had written to Plaintiffs' counsel after having received a copy of the Order Sequestering Assets and notice of the default judgment damages hearing. Mr. Marchese, then or at one time, represented NAI and/or its principals McNicoll and Anderson. Mr. Marchese took the position that the Order Sequestering Assets prevented him from representing NAI or its principals McNicoll and Anderson "in the matter of the sequestration order" at the default judgment damages hearing. As should have been clearly apparent to Mr. Marchese, the Order Sequestering Assets only prevented attorneys from assisting Anderson and McNicoll in "transferring, secreting or encumbering any asset" until the hearing could be held to determine whether the Order Sequestering Assets should be terminated, modified or extended. Mr. Marchese did not seek to be admitted pro hac vice to practice before this Court pursuant to Local Rule 83.I.05, nor did he file a written motion which sought an order from the court as required by Rule 7 (b), F.R.C.P. The Court concludes that Mr. Marchese failed to follow the procedure for seeking a ruling by the court; that being the filing of a motion. If Mr. Marchese had followed the proper procedure, the court would have ruled that the Order Sequestering Assets clearly did not prevent Mr. Marchese from representing NAI, McNicoll or Anderson at the default judgment damages hearing. It should have been obvious to Mr. Marchese that the Order Sequestering Assets only prevented him from assisting in "transferring, secreting or encumbering" any asset pending the hearing. In addition, had proper procedure been followed, the Court would have addressed Mr. Marchese's request that McNicoll and Anderson be authorized to pay Mr. Marchese from the funds which had been sequestered. Such a motion would have required Mr. Marchese to disclose the location of the sequestered funds from which he was seeking payment. The Court concludes that Mr. Marchese did not make a formal motion to bring these matters before the Court because a formal motion would have required that Mr. Marchese disclose the location of the sequestered funds. The Court concludes Mr. Marchese, NAI, Anderson and McNicoll did not want to provide this information to Plaintiffs or to the Court. Evidence of the location of the sequestered funds would have been subject to disclosure and discovery in this action because such evidence is "reasonably calculated to lead to the discovery of admissible evidence." Rule 26 (b) (1), F.R.C.P. On April 19, 2004, the United States District Court in

purpose of preserving the status quo until the default judgment damages hearing.

8.     On October 30, 2003 Plaintiffs filed a Second Amended Complaint to add new Defendants to the case.  The Second Amended Complaint asserted the same causes of action alleged in Paragraph 2 (a) through (g) above against newly added Defendants Reeve, St. John, Reeve & Associates and others.

9.     Plaintiffs' claims against Defendants Anderson, McNicoll, Marsh ,  McSooner, MTFS and MT, who had been held in default for failing to appear, plead or otherwise defend against the allegations contained in the First Amended Complaint were severed and set for a default judgment damages hearing scheduled for November 24, 2003.

---

the Eastern District of California enforced a subpoena in this action which required Mr. Marchese to produce records relating to NAI.  Those records revealed that Mr. Marchese had received wire transfers in payment for his services from Credit Agricole Indosuez Luxembourg (hereafter "CA-LUX") on 10/2/01, 10/18/01, 10/31/01, 11/8/01, 11/20/01, 12/14/01, 1/14/02, 1/28/02, 2/20/02 and 3/26/02.   Bank records established that CA-LUX was the bank initially utilized by NAI and its intermediary to deposit premiums to the account of Marsh.  In addition, the records obtained from Mr. Marchese established that on March 22, 2002, Mr. Marchese authored a legal opinion which stated NAI, McNicoll and Anderson could strip NAI and Marsh of its assets (which they thereafter proceeded to do) notwithstanding that they were Defendants in pending litigation which sought to require that those assets be used to satisfy the medical claims of the victims of the ERISA health insurance scam.  Mr. Marchese had already done that which the October 28, 2003 Order Sequestering Assets sought to prevent and this may have played a role in his decision not to seek to enter an appearance in this Court.  Evidence also tends to indicate that Mr. Busschaert, who on November 24, 2003 assured this Court NAI had not been stripped of its assets and that it had $13,054,640 in social capital, had knowledge of the actions of McNicoll and Anderson in stripping NAI of its assets.  The Court concludes Mr. Marchese, Mr. Busschaert, Anderson and McNicoll did not wish to disclose the location of the sequestered money and their legal strategy was to contest personal jurisdiction. The Court concludes that this is the reason Mr. Marchese did not file a formal motion seeking the unnecessary clarification of the Order Sequestering Assets or requesting that the sequestered assets be used to pay attorneys' fees and be used to obtain legal representation for McNicoll and Anderson at the default judgment damages hearing.  The Court further concludes that McNicoll and Anderson had an opportunity to hire legal counsel to represent their interests at the default judgment damages hearing and to have addressed before the hearing any matter which they sought to raise to the Court by following Rule 7(b)(1), F.R.C.P., just as any other litigant who comes before this Court.

10.    Defendants Anderson,[15] McNicoll,[16] Marsh,[17] McSooner,[18] MTFS and MT[19] were served with written notice that a hearing would be held at which the Court would receive evidence to make a judicial assessment of damages to be awarded Plaintiffs in connection with the entry of a default judgment against said Defendants and to determine whether the Order Sequestering Assets

_____

[15]  On November 7, 2003 a private legal process server personally served John Fowler Anderson with the Order Sequestering Assets, a copy of the Pre-Hearing Order and a copy of the Notice of Default Judgment Damages Hearing by delivering the said documents to John Fowler Anderson at his residence in Scotland.

[16]  On November 7, 2003 a private legal process server personally served Euan David McNicoll with the Order Sequestering Assets, a copy of the Pre-Hearing Order and a copy of the Notice of Default Judgment Damages Hearing by delivering the said documents to Euan David McNicoll at his residence in Scotland.

[17]  On November 7, 2003 Anderson was served individually and on behalf of Marsh Investment Corp.  On November 21, 2003 Notice of the Default Judgment Damages Hearing was served by hand delivery of the said notice by a process server to the offices of Jerome E. Pryfrom.

[18]  On November 7, 2003 McNicoll was served individually and on behalf of McSooner, Inc.  On November 21, 2003 Notice of the Default Judgment Damages Hearing was served on McSooner, Inc. by hand delivery of the said notice by a process server to the officers of Worldwide Trust Services Limited.

[19]  On November 20, 2003 Marketrends Insurance Limited was served with the Notice of Default Judgement Damages Hearing.  The Company's general manager sent a fax to the Court and asked that it "examine the possibility" of a continuance of the hearing.  The fax stated the company was wrongly accused and that "[t]he people that got the Company involved had no authority or instructions and the Company had no knowledge of their actions."  See, Docket Entry 164.  This communication related to the liability of MT which was established as a matter of law when MT was deemed to have admitted the allegations of the complaint (except as to damages) when the clerk made the entry of default.  The request was not based upon a desire to be heard on the assessment of damages.  In the case of West v. Service Life & Health Ins. Co., 220 S.C. 198, 66 S.E.2d 816 (1951) an insurance agent obtained money from the insurance company that was to be used to pay claims and converted the money to his own use.  The South Carolina Supreme Court found that:

It is a general doctrine of law that although the principal is not ordinarily liable . . . in a criminal suit, for the acts or misdeeds of his agent, unless, indeed, he has authorized or co-operated in them, yet he is held liable to third persons in a civil suit for the frauds, deceits, concealments, misrepresentations, negligences, and other malfeasances and omissions of duty of his agent in the course of his employment, although the principal did not authorize or justify or participate in, or indeed know of such misconduct, or even if he forbade the acts or disapproved them.  66 S.E.2d 817.  This rule 'is founded upon public policy and convenience, for in no other way could there be any safety to third persons in their dealings with the principal . . . through the instrumentality of agents.'  Id.  Also, 'the principal holds out his agent as competent and fit to be trusted, and thereby, in effect, he warrants his fidelity and good conduct in all matters within the scope of the agency.'  Id.

As addressed in Section III, Findings of Fact and Conclusions of Law, there is ample evidence in the record that MT appointed Reeve to develop MT's medical insurance business in the U.S., to act as its agent in binding coverage, collecting premiums and coordinating the administration of claims.

should be terminated, modified or extended.

      11.    Plaintiffs' claims against Defendants sought damages for a sum certain, or for a sum which by computation could be made certain[20] (unpaid medical claims), and for unliquidated damages (the specified damages sought by Plaintiffs) which required that the court conduct a hearing to assess damages. In cases seeking unliquidated damages Rule 55(b)(2), F.R.C.P. provides that "... [i]f the party against whom judgment by default is sought has appeared in the action, the party (or, if appearing by representative, the party's representative) shall be served with written notice of the application for judgment at least 3 days prior to the hearing on such application ..." This gives a party in default who has appeared in the action the right to be heard on the assessment of damages to be awarded by the Court. A party who is in default and who has not appeared is deemed to have waived the right to be heard on the assessment of damages to be awarded by the Court. Therefore, Rule 55(b)(2) does not require that notice of the hearing to assess damages be given to a party that has not appeared. Regardless of whether or not the party in default has appeared the Court is required to conduct such hearings or order such references as it deems necessary and proper to assess damages. Rule 55(b)(2), F.R.C.P. This Order is issued pursuant to a reference to conduct a hearing to determine damages.[21]

---

[20] Pursuant to Rule 55(b)(1), F.R.C.P. the Clerk of Court, based upon an affidavit of the amount due, has authority to enter judgment by default on claims against a defendant for a sum certain or for a sum which can by computation be made certain. The court is not required to conduct a hearing as to default judgments involving a sum certain.

[21] This Court has made an objective assessment of the quantum of damages as hereafter set forth in this Order. Under United States law (as under English law) the assessment of damages is effected (even in cases of default) by the Court based upon an objective assessment of the evidence by the Judge. In the case of Adams v. Cape Industries plc, (1990) Ch. 433, 569 (C.A.) an English court refused to enforce a U.S. default judgment on an unliquidated claim where the U.S. judge did not hold a hearing to make an objective assessment of the damages based upon the evidence as required by U.S. law. The English court reasoned it was a breach of natural justice not to make a judicial assessment of damages where the law gave the judgment debtor a reasonable expectation there would be a judicial assessment.

12.    None of the defaulting Defendants "appeared in the action." Thus, Rule 55(b)(2), F.R.C.P. did not require they be served with written notice of application for judgment. Regardless, notice of the default judgment damages hearing was served on the said defaulting Defendants.

13.    On November 24, 2003, pursuant to Rule 55(b)(2), F.R.C.P., a default judgment damages hearing was held to take evidence to assess and determine the amount of damages in connection with Plaintiffs' application for entry of judgment by default against Defendants Anderson, McNicoll, Marsh, McSooner, MTFS and MT. None of the defaulting Defendants attended the hearing, nor did they file with the Court any motions relating to the same. Plaintiffs introduced as evidence 186 exhibits and the testimony of 10 witnesses. A transcript of the hearing was prepared.[22] The Court took the matter under advisement pending the conclusion of Plaintiffs' claims against the other Defendants.

14.    On April 28, 2004, pursuant to Rule 55 (a), F.R.C.P., the Clerk entered a default against Defendants Reeve, St. John and Reeve & Associates.[23]

15.    By letter dated February 25, 2004, London solicitor Colin Harvey of Weightman Vizards, acting on behalf of Defendant Reeve and St. John, acknowledged by letter that Reeve had

---

[22]  Docket Entry 185 is a copy of the transcript from the November 24, 2003 default judgment damages hearing.

[23]  See, Docket Entry 242. On February 9, 2004 Michael Arthur Reeve was personally served with a Summons and Second Amended Complaint and Second Sealed Order by a private legal process server who hand-delivered the said documents to Michael Arthur Reeve at his residence at Whytethorn, Walpole Avenue, Chipstead, Surrey. See, Docket Entry 211. Defendant Reeve was also served with the same documents in his capacity as agent and managing director of Defendant Saint John Management Services Limited and as managing partner of Defendant Michael Reeve & Associates. Reeve is a citizen of the United Kingdom who at the time service was effectuated resided in England. Saint John Management Services Ltd. is a company registered in the United Kingdom. The United Kingdom and the United States of America are signatories to the Hague Service Convention. 20 U.S.T. §1361. Pursuant to the Hague Service Convention and Rule 4(f)(1), F.R.C.P., service was properly perfected upon Reeve, St. John and Michael Reeve & Associates.

been personally served with the Second Amended Complaint and Second Sealed Order.[24]  Mr. Harvey's letter stated that "the position of both Saint John and Mr. Reeve is that the courts of South Carolina do not have jurisdiction over either of them.  Saint John and Mr. Reeve do not submit to the jurisdiction of South Carolina and they do not propose to take part in the proceedings."[25]

16.    Rule 55(b)(2), F.R.C.P. provides that " . . . [i]f the party against whom judgment by default is sought has appeared in the action, the party (or, if appearing by representative, the party's representative) shall be served with written notice of the application for judgment at least 3 days prior to the hearing on such application . . ."

17.    Defendants Reeve, St. John and Reeve & Associates have not "appeared in the action."  Thus, Rule 55(b)(2), F.R.C.P. did not require that they be served with written notice of application for judgment.  Regardless, notice of the default judgment damages hearing was served on said defaulting Defendants.[26]

18.    On January 10, 2006, Defendants Reeve, St. John and Reeve & Associates[27] were served with a Notice of Default Judgment Damages Hearing.

19.    By letter dated January 11, 2006 Mr. Harvey, acting on behalf of Defendant Reeve

---

[24] _See_, Sadighi v. Daghighfekr, 66 F.Supp.2d. 752 (D.S.C. 1999)(a party is generally bound by stipulations made by their counsel).

[25] See, Letter of Colin Harvey dated February 25, 2004.  See, Docket Entry 314 and 315.

[26] On January 10, 2006 Michael Arthur Reeve was personally served with a Notice of Default Judgment Damages Hearing by a private legal process server who delivered the said document to Michael Arthur Reeve at his residence at Whytethorn, Walpole Avenue, Chipstead, Surrey.  Defendant Reeve was served individually, as agent and managing director of Defendant Saint John Management Services Ltd. and as managing partner of Defendant Michael Reeve & Associates.

[27] It appears that Reeve & Associates was simply a trade name placed used in certain correspondence and not a legal entity.  Therefore, this Order does not separately address the liability of Reeve & Associates from that of Mr. Reeve.

and Defendant St. John, stated that "Mr. Reeve does not submit to the jurisdiction of South Carolina and he does not propose to take part in the proceedings."[28]  Mr. Harvey's letter further stated that there were errors contained in the report prepared by Plaintiffs' expert witness Trevor Jones[29] which was received into evidence at the November 24, 2003 default judgment damages hearing.  Mr. Harvey was requested to point out the errors in Mr. Jones' report and he declined to do so.[30]

20.     On January 17, 2006, pursuant to Rule 55(b)(2), F.R.C.P., a default judgment damages hearing was held to take evidence to assess damages in connection with Plaintiffs' application for entry of judgment by default against Defendants Reeve, St. John and Reeve & Associates, none of whom attended the hearing.  Plaintiffs offered into evidence documents which had previously been filed with the Court as reflected on the Docket Sheet in this action, including the documentary evidence and transcript and transcript from the November 24, 2003 default judgment damages hearing.  Plaintiffs also introduced a summary of documents related to the January 17, 2006 Default Judgment Damages Hearing together with a computer disk which hyperlinked the referenced documents to the summary.  Plaintiffs also offered into evidence excerpts from the video depositions of John Anthony Claro (hereafter "Claro"), Edwin W. Ehler and Patricia E. Lupher .  Plaintiffs called Mila Kofman, J.D., an associate research professor at the Health Policy Institute at Georgetown University, who the court found qualified as an expert on unauthorized

---

[28]  See, letter of Colin Harvey dated January 11, 2006.  Docket Entry 314 and 315.

[29]  The expert report of Trevor Jones, Docket Entry 166.

[30]  See, letter of Colin Harvey dated January 12, 2006.  Docket Entry 314 and 315.  At the January 17, 2006 hearing the Court was advised by Plaintiffs' counsel that the error of which Mr. Harvey apparently complained was that Mr. Jones' report stated Mr. Jones had talked to Mr. Anderson and he had not.  Given the substantial evidence presented by Plaintiffs to establish a civil conspiracy to effectuate a health insurance scam, Mr. Jones' report is cumulative and duplicative of other ample evidence in a record replete with fraud.  The Court would have made the same findings of fact and drawn the same conclusions from those facts had Mr. Jones' report been excluded from evidence.

health insurance; Michaele Russell Pena, a credit expert; Kenneth H. Holcomb, an accounting expert; Sally Young, a former Connelly employee and Beatrice McGirth, a former Connelly employee. The Court took the matter under advisement. This Order followed.

### III.    PERSONAL JURISDICTION

21.    This Court has carefully analyzed the facts to individually determine whether a sufficient legal and factual basis exists for this Court to exercise personal jurisdiction over Defendants McNicoll, Anderson, Marsh, McSooner, MTFS, MT, Reeve, St. John and Reeve & Associates (collectively referred to as the "defaulting Defendants") arising from their contacts with South Carolina.

#### A.    Service of Process

22.    Jurisdiction over the person of a defendant or over a corporation is initially established by service of process in accordance with Rule 4, F.R.C.P. Service of process upon individuals in a foreign country may be effected in a place not within any judicial district of the United States by any internationally agreed means reasonably calculated to give notice, such as those means authorized by the Hague Convention on Service. Rule 4(f)(1), F.R.C.P. As set forth above, each of the defaulting Defendants was properly served with the summons and complaint pursuant to the Hague Service Convention. In addition, each of the defaulting Defendants was properly served with the notice of Plaintiffs' application for the entry of a default judgment, even though the same was not required by Rule 55(b) (2), F.R.C.P. Service of process and of the notice of the application for entry of default judgment was effectuated by internationally agreed means of service which was reasonably calculated to, and did in fact, give notice of these proceedings to the defaulting Defendants. See, Rule 4(f), F.R.C.P.

#### B.    Adequate Notice of Suit and Time to Prepare and Arrange Defense

23.      The defaulting Defendants were duly served with and had adequate notice of the suit and sufficient time to arrange for and prepare and defend against the allegations made in the complaint brought against them had they chosen to do so.  The summons notified each Defendant that the failure to answer the complaint would result in a judgment by default for the relief demanded in the complaint in accordance with Rule 4, F.R.C.P.. The complaint specified the damages being claimed by the Plaintiffs in accordance with Rule 8(a) and 9(g), F.R.C.P.  The notice of the default judgment damages hearing notified each Defendant the Court would hold a hearing to assess damages in accordance with Rule 55(b)(2), F.R.C.P.  The Court then conducted the said hearing and took evidence to assess damages according to law.

**C.      Due Process Rights of Defendants**

24.      The rights of the Defendants have been respected by the Court in these proceedings. These proceedings comport with the principles of natural justice which were expressed in the English case of <u>Jacobson v. Frachon</u>, (1927) 138 L.T. 386, 390, 393 (C.A.), which described the principles of natural justice as follows:

> Those principles seem to me to involve this, first of all the court being a court of competent jurisdiction, has given notice to the litigant that they are about to proceed to determine the rights between him and the other litigant; the other is that having given him that notice, it does afford him an opportunity of substantially presenting his case before the court.

25.      The principles of natural justice are the foundation of the due process clause of the Fourteenth Amendment.  These principles were utilized by this Court in the conduct of these proceedings.  The defaulting Defendants had proper notice and an opportunity to be heard.  The exercise of personal jurisdiction over the defaulting Defendants was based upon a clear indication that the defaulting Defendants assented to this Court's jurisdiction by purposefully availing themselves of the opportunity to transact business in this State.

### D.    Specific Personal Jurisdiction Over Defendants

26.    It is fundamental that a court must have personal jurisdiction over a defendant before it can enter a valid judgment imposing a personal obligation on the defendant.  Kulko v. Superior Court, 436 U.S. 84 (1978).   In Pennoyer v. Neff, 95 U.S. 714 (1878) the Supreme Court of the United States set down the basic rule that a personal judgment against a nonresident defendant who was not served within the state, and who did not appear or otherwise assent to the jurisdiction of the court, is invalid.   However, under certain circumstances, a state court may properly acquire jurisdiction over a nonresident even through the defendant is not personally served within the forum state, provided the defendant has certain "minimum contacts" with the forum state "such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." International Shoe Co. v. Washington, 326 U.S. 310 (1945).  See also, Hanson v. Denckla, 357 U.S. 235 (1958); Shaffer v. Heitner, 433 U.S. 186 (1977); and World-Wide Volks-Wagen Corp. v. Woodson, 444 U.S. 286 (1980).

27.    To validly assert personal jurisdiction over a non-resident defendant, two conditions must be satisfied.  Christian Sci. Bd. of the First Church of Christ v. Nolan, 259 F.3d 209, 215 (4th Cir. 2001).  First, the exercise of personal jurisdiction over a defendant must be authorized by the long-arm statute of the forum state.  Specific jurisdiction over a cause of action arising from a defendant's contacts with the state is granted pursuant to the long-arm statute, S.C. Code Ann. § 36-2-803(1), which states in pertinent part that "[a] court may exercise personal jurisdiction over a person who acts directly or by an agent as to a cause of action arising from the person's (a) transacting any business in this State;... (c) commission of a tortious act in whole or in part in this State; . . . (g) entry into a contract to be performed in whole or in part by either party in this State."

Second, the exercise of personal jurisdiction must not "overstep the bounds" of Fourteenth Amendment due process. Anita's New Mexico Style Mexican Food, Inc. v. Anita's Mexican Foods Corp., 201 F.3d 314, 317 (4th Cir. 2000). South Carolina's long-arm statute has been construed to extend to the outer limits allowed by the Due Process Clause. Foster v. Arletty 3 Sarl, 278 F.3d 409, 414 (4th Cir. 2002). "Consequently, the statutory inquiry necessarily merges with the constitutional inquiry, and the two inquires essentially become one." ESAB Group, Inc. v. Centricut, Inc., 126 F.3d 617, 623 (4th Cir. 1997) (internal quotation marks omitted). The question, then, is whether the defaulting Defendants had sufficient "minimum contacts with [the forum] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." Int'l Shoe Co. v. Washington, 326 U.S. 310, 316 (1945) (internal citations omitted).

28.     The Fourth Circuit has applied a three-part test when evaluating the propriety of exercising specific jurisdiction: (1) whether and to what extent the defendant "purposefully availed" itself of the privileges of conducting activities in the forum state, and thus invoked the benefits and protections of its laws; (2) whether the plaintiff's claim arises out of those forum-related activities; and (3) whether the exercise of jurisdiction is constitutionally "reasonable." Nolan, 259 F.3d at 215-16 (citing Helicopteros Nacionales de Columbia, S.A. v. Hall, 466 U.S. at 415-16 (1984) and Burger King Corp. v. Rudzewicz, 471 U.S. 462, 376-77 (1988)). The "purposeful availment" requirement ensures that a defendant will not be haled into a jurisdiction solely as a result of random, fortuitous, or attenuated contacts. Burger King, 471 U.S. at 475 (internal quotation marks and citations omitted).

29.     In the context of international civil litigation the jurisdictional inquiry could be restated as follows: Is there a "clear indication" that the conduct of the national is such that he

assented to, or intended to, submit to the foreign court's jurisdiction? The test utilized by the Fourth Circuit calls for evaluation of factors which bear directly upon the question of whether there is a "clear indication" that the national intended to submit to the foreign court's jurisdiction. Intention is determined from conduct and acts which express a determination to purposefully engage in an activity directed at this State. Intent must be determined from the facts and circumstances at the time the conduct and acts took place, not after the suit arose, as quite obviously a defendant once sued would rarely intend to submit to a foreign court's jurisdiction.

### E. Defendants Transacted the Unauthorized Business of Insurance in South Carolina

30.    Plaintiffs' claims against the defaulting Defendants arise out of the defaulting Defendants' unauthorized transaction of the business of health insurance in South Carolina. The business of insurance is affected with a public interest. Hinds v. United Ins. Co. of America, 248 S.C. 285, 149 S.E.2d 771 (1966). Since 1896, South Carolina state courts have exercised jurisdiction over foreign insurance companies based upon the rationale that the failure of a foreign insurance company to pay a loss under a contract where the loss is payable in this state creates a cause of action "within the state." See, Carpenter v. American Acc. Co., 46 S.C. 541, 24 S.E. 500 (1896). The South Carolina Legislature has the power to define what acts occurring in the state would constitute transacting business therein, provided the definition is not arbitrarily unreasonable. Storey v. United Insurance Company, 64 F.Supp. 896, 900 (1946). Public policy is clearly to the effect that all contracts of insurance on property, lives and interests in this state are deemed made in and subject to the insurance laws of this state. Johnston v. Commercial Travelers Mut. Acc. Ass'n of America, 242 S.C. 387, 131 S.E.2d 91 (S.C. 1963). The purpose of this law is to permit the state

to regulate insurance.  Id.  Parties cannot contract contrary to the public policy of the state.  Security

General Ins. Co. v. Bill Vernon Chevrolet, Inc., 263 F.Supp. 74 (D.S.C. 1967), affirmed, 384 F.2d

1000 (4ᵗʰ Cir. 1967).  Persons and companies engaged in the business of insuring property, lives and

interests in South Carolina engage in an activity that constitutes a significant contact with the state.

Heslin-Kim v. CIGNA Group Ins., 377 F.Supp.2d 527 (2005); Sangamo Weston, Inc. v. National

Sur. Corp., 307 S.C. 143, 414 S.E.2d 127 (S.C. 1992).[31]

     31.     In 1943, the legislature passed the South Carolina Uniform Unauthorized Insurers

Act, now codified at S.C. Code Ann. §38-25-110, *et seq.*.  S.C. Code Ann. §38-25-110 defines what

acts constitute the transaction of "insurance business in this State" which require a certificate of

authority from the State Director of Insurance.  S.C. Code Ann. § 38-25-510 appoints the State

Director of Insurance as agent for service of process on an unauthorized insurer.  S.C. Code Ann.

§38-25-520 and §15-9-285 appoint the Secretary of State as agent for service of process on an

unauthorized insurer.

     S.C. Code Ann. §38-25-110 provides:

> It is unlawful for an insurer to transact insurance business in this State without a
> certificate of authority from the director or his designee. Any of the acts listed in
> items (1) through (8) in this State effected by mail or otherwise by or on behalf of
> an unauthorized insurer is considered to constitute the transaction of an insurance
> business in this State. The venue of an act committed by mail is at the point where
> the matter transmitted by mail is delivered and takes effect. Unless otherwise
> indicated, the term "insurer" as used in this section includes all corporations,
> associations, partnerships, and individuals engaged as principals in the business of
> insurance and also includes interinsurance exchanges and mutual benefit
> societies.

---

[31] S.C. Code Ann. § 38-61-10 provides: "All contracts of insurance on property, lives, or interests in this State are considered to be made in the State and all contracts of insurance the applications for which are taken within the State are considered to have been made within this State and are subject to the laws of this State."

(1) The making of or proposing to make, as an insurer, an insurance contract.

(2) The making of or proposing to make, as guarantor or surety, any contract of guaranty or suretyship as a vocation and not merely incidental to any other legitimate business or activity of the guarantor or surety.

(3) The taking or receiving of any application for insurance.

(4) The receiving or collection of any premium, commission, membership fees, assessments, dues, or other consideration for any insurance or any part thereof.

(5) The issuance or delivery of contracts of insurance to residents of this State or to persons authorized to do business in this State.

(6) Directly or indirectly acting as an agent for or otherwise representing or aiding on behalf of another, any person or insurer in the solicitation, negotiation, procurement, or effectuation of insurance or renewals thereof or in the dissemination of information as to coverage or rates, or forwarding of applications, or delivery of policies or contracts, or inspection of risks, a fixing of rates or investigation or adjustment of claims or losses or in the transaction of matters after effectuation of the contract and arising out of it, or in any other manner representing or assisting a person or insurer in the transaction of insurance with respect to subjects of insurance resident, located, or to be performed in this State. This section does not prohibit full-time salaried employees of a corporate insured from acting in the capacity of an insurance manager or buyer in placing insurance in behalf of their employer.

(7) The transaction of any kind of insurance business specifically recognized as transacting an insurance business within the meaning of the statutes relating to insurance.

(8) The transacting or proposing to transact any insurance business in substance equivalent to any of the foregoing in a manner designed to evade the insurance laws of this State.

The Unauthorized Insurers Act is valid and does not violate the due process clause of the Fourteenth Amendment, even as applied to a foreign insurer having no office, property, agents or solicitors in the State which issues and delivers by mail a single insurance policy to a resident of this State (decided under former law). Ross v. American Income Life Ins. Co., 232 S.C. 433, 102 S.E.2d 743 (1958); Williams v. Modern Home Life Ins. Co., 360 F.Supp. 649 (D.S.C. 1966). An action for fraudulent breach of an insurance contract arises out of the contract and personal jurisdiction may

be effected by substituted service (decided under former law). Id. A tort action, while ex delicto

"arises under the policy" if it involves fraudulent actions in connection with the breach of the policy.

Dawkins v. National Liberty Life Ins. Co., 252 F.Supp. 800 (D.S.C. 1966). In Storey, supra, 64

F.Supp at 898 (under former law) the Court stated:

> The primary purpose [of the Uniform Unauthorized Insurers Act] . . . is to afford to the parties to an insurance contract judicial facility for settling controversies concerning it without undue inconvenience to either party and 'according to our traditional conception of fair play and substantial justice'. The Act says that an insurer is amenable to the jurisdiction of the courts of the state if the insurer is engaged in transacting business in the state; and it in effect defines 'transacting business' as the issuing or delivering of a policy or contract of insurance to a citizen or resident of the state within the state which when accepted affords protection in the state to a citizen or resident thereof.

North American Indemnity, N.V. (hereafter "NAI"), MT and MTFS were unauthorized insurers that

transacted the business of insurance in South Carolina.

32.    Insurance companies, being artificial entities, transact business through persons.

Thus, the Unauthorized Insurers Act defines insurer as " . . . all corporations, associations,

partnerships, and individuals engaged as principals in the business of insurance . . ."(emphasis added

by the undersigned).  When a company, or an individual engaged as a principal in the business of

insurance, performs any of the specified acts set forth in S.C. Code Ann. §38-25-110 on behalf of

an unauthorized insurer, as a matter of law, they are deemed to have irrevocably appointed the

Secretary of State as their agent authorized to receive service of process of any law suit which arises

out of transacting any insurance business in this State by an unauthorized insurer.  S.C. Code

Ann.§38-25-510.[32]  Cognizant of the fact that unauthorized insurers transact business through

---

[32] S.C. Code Ann. §38-25-510 (e) provides that service of an unauthorized insurer can be perfected by substituted service on the secretary of state or "upon any person or insurer in any other manner permitted by law."

persons, the legislature passed S.C. Code Ann. §38-25-360, which makes persons who aid or assist unauthorized insurers personally liable on contracts of unauthorized insurers, and S.C. Code Ann. §38-25-130 which prohibits certain acts on behalf of unauthorized insurers.

S.C. Code Ann. §38-25-360 provides:

In the event of failure of an unauthorized insurer to pay any claim or loss within the provisions of the insurance contract, a person who assisted or in any manner aided directly or indirectly in the procurement of the insurance contract is liable to the insured for the full amount of the claim or loss in the manner provided by the insurance contract.

S.C. Code Ann. §38-25-130 provides:

No person may in this State aid an unauthorized insurer in effecting insurance or in transacting insurance business in this State, either by fixing a rate, or by adjusting or investigating losses, by inspecting or examining risks, by acting as attorney in fact or as attorney for service of process or otherwise, except as provided in §§ 38-25-510 and 38-25-520.

33.     There is no evidence that Anderson, McNicoll or Reeve have ever been physically present in South Carolina.  Neither Anderson, McNicoll nor Reeve was served with this lawsuit while present in the forum state.  There is, however, substantial evidence that Anderson, McNicoll and Reeve are individuals that engaged as principals in the business of insurance in South Carolina "effected by mail or otherwise" in violation of S.C. Code Ann. §§38-25-110 (1), (3), (4), (5), (6), (7) and (8).  The evidence established that NAI, a fraudulent and undercapitalized private Belgian Company of which McNicoll and Anderson were directors, which did not have a certificate of authority issued by the South Carolina Director of Insurance, and which was established by McNicoll, Anderson and Reeve as a front to perpetrate an ERISA health insurance scam, sold and

As described in above, service on McNicoll, Anderson and Reeve was accomplished pursuant to the Hague Service Convention and not by substituted service on the Secretary of State.  Marketrends Financial Services Limited and its wholly owned subsidiary Marketrends Insurance Limited were served according to law.

delivered a policy of  health insurance in South Carolina signed by McNicoll and Anderson on behalf of NAI which insured 300 persons under the group health plan of Connelly Management, Inc., a South Carolina corporation, and that the policy failed to pay the covered medical claims of 264 of the 300 South Carolina CMEWBP participants causing damage to Plaintiffs in South Carolina.  The ERISA health insurance scam, which is described in detail below, was carried out by McNicoll, Anderson and Reeve as part of a civil conspiracy to perpetrate insurance fraud on Plaintiffs and others which caused damage to Plaintiffs in South Carolina.

34.    The unauthorized and illegal sale of the fake health insurance to Connelly  in South Carolina, through the instrumentality of NAI, a fraudulent company established as a facade for the conduct of its principal actors, McNicoll, Anderson and Reeve,  established that McNicoll, Anderson and Reeve, in furtherance of the conspiracy, as principals of an unauthorized insurer, each purposefully availed themselves of the privilege of transacting the business of insurance in South Carolina in violation of S.C. Code Ann. §38-25-110.  The business of insurance is often transacted without the insured ever having a face to face meeting with an agent of the company and without the company having an office or employees in the forum state.  The reason for this is that the business of insurance involves the exchange of premium dollars for a contract which promises to pay covered claims.  The business of insurance is transacted through companies, its principals, brokers, general or local agents, through intermediaries, over the telephone, through the mail,[33] or

---

[33]    In Storey v. United Insurance Company, 64 F.Supp. 896 (1946) the court stated:   "[i]n recent years there has been quite an extension of the so-called mail order insurance business, and courts cannot be unmindful of the fact that, without such an Act, an insurer could say to an insured, or to his beneficiary, in case of a controversy respecting liability under a policy, that the issue between them could be settled in only one of two ways, first, by accepting the insurer's contention, or second, by suing the insurer in its own bailiwick.  It takes little imagination to perceive that in such a situation the insured or his beneficiary would be a distinct disadvantage, especially if the amount involved should be small and the distance great.  The coercive influence of such an attitude on the part of an insurer in most cases would result in the insurer having its own way."  Id. at 898.

over the internet.[34]  The same could be said of the sale of stock or other investments.  For this reason personal jurisdiction extends to individuals who transact the business of insurance as principals for unauthorized insurers in South Carolina "effected by the mail or otherwise."  S.C. Code Ann. §38-25-110.  This is a lawful exercise of personal jurisdiction.  Simply put, a person can avoid being haled into Court in this State by not acting as a principal in the sale of insurance to companies or individuals in this State.   However, jurisdiction cannot be avoided "merely because the defendant did not physically enter the forum state."  Burger King, 471 U.S. at 476.  "It is an inescapable fact of modern commercial life that a substantial amount of commercial business is transacted solely by mail and wire communications across state lines, thus obviating the need for physical presence within a State in which business is conducted."  Id.   This is especially true with the sale of insurance.  Traditionally, when a person or entity intentionally reaches beyond its boundaries to conduct business with foreign residents, the exercise of specific jurisdiction is proper.  Burger King, 471 U.S. at 475.   "In some instances, even a single contact by a nonresident defendant may, if sufficiently purposeful in its aim, supports a constitutional exercise of specific jurisdiction with respect to a claim arising from that contact."  ESAB, supra, 34 F.Supp.2d at 331.

35.     An insurance policy is easily delivered  across state and international boundaries.  An insurance policy is a  promise on a piece of paper which has no intrinsic value.  An insurance policy can be manufactured with a computer and a piece of paper.  The business of health insurance, when not subject to state regulation, has provided con men, crooks and hucksters, and the fraudulent

---

[34]  It has been held that if the defendant enters into contract with residents of a foreign jurisdiction that involve the knowing and repeated transmission of computer files over the Internet, personal jurisdiction is proper. Zippo Manufacturing Company v. Zippo Dot Com, Inc., 952 F.Supp. 1119, 1124 (WDPA 1997) cited with approval in ESAB, supra, 34 F.Supp.2d 323 at 330.  Thus, physical presence in the forum state is not a prerequisite to the exercise of personal jurisdiction over a defendant.

companies which they control, the opportunity to commit health insurance fraud across state and international borders using a piece of paper and the stroke of a pen.  See, Mila Kofman, J.D., Association Health Plans: Loss of State Oversight Means Regulatory Vaccum and More Fraud, Georgetown University Health Policy Institute (2005).  The business of health insurance is particularly susceptible to fraud. Id.   Every state in the U.S. has a law which regulates the sale of health insurance to persons located within the state and a law which authorizes the court of the forum state to exercise specific jurisdiction over unauthorized insurers and the persons who aid unauthorized insurers in the procurement of contract that insures property, lives or interests in the forum state.[35]  These laws were generally derived from the Uniform Unauthorized Insurers Act which were uniformly adopted by states in the early 1940's.  It is implicit that persons and companies engaged in transacting the business of insurance of risks located in the forum state have assented and agreed to the personal jurisdiction of the court in the forum state as to disputes arising out of the specific insurance transaction conducted in the forum state.  The public policy of the protection of persons and property in the forum state from becoming victims of insurance fraud is the public policy which is furthered by these laws.  As described by Professor Kofman "[b]usinesses and workers expect their covered claims to be paid when they have bought insurance. . . . They expect that government is watching out for them and is acting to prevent fraud and mismanagement by insurance entities." Id. at Page iv.

36.    The evidence established that Defendants McNicoll, Anderson, Reeve, Marsh, McSooner, St. John, MT and MTFS and others engaged in a civil conspiracy to sell fake health

---

[35]    By virtue of Public Law 79-15, 79th Congress of the United States, Chapter 20, 1st Session, S.340, 59 Stat. 33; 15 U.S.C., §§1011-1015, inclusive, as amended Congress declared that the business of insurance and every person engaged therein are subject to the laws of the several states.

insurance to small businesses, all of which were located in the U.S. The co-conspirators maintained they could sell their health plan in the U.S. nationwide without the various foreign companies that provided medical insurance to the company health plans being accredited, licensed or subject to regulation in any state. This theory was based upon the incorrect legal premise that the product the coconspirators were selling was not health insurance but was "100% reinsurance" sold to an employee welfare benefit plan governed by a federal law, ERISA. Therefore, the coconspirators maintained the unlicensed foreign company was not required to be accredited or licensed and was not subject to regulation by state departments of insurance, and therefore, was only subject to federal regulation by the United States Department of Labor (hereafter "USDOL"). The USDOL does not accredit, license or regulate health insurance companies. States accredit, license and regulate health insurance companies. States do not regulate ERISA plans. This regulatory structure was exploited by the coconspirators who seized the opportunity to "disguise" the unlawful sale of health insurance by unlicensed foreign companies by calling their product "100% reinsurance" sold to an ERISA plan. This is precisely the conduct perpetrated by principals acting for unauthorized insurers which S.C. Code Ann. §38-25-110 (8) was intended to reach by including within its definition of acts which constitute transacting insurance business in this State, the act of "transacting or proposing to transact any insurance business in substance equivalent to any of the [enumerated activities] in a manner designed to evade the insurance laws of this State." This artful disguise paved the way for Reeve, McNicoll and Anderson to form or locate shell, fake or fraudulent companies to be used as a facade to illegally sell unauthorized health insurance, which they called "reinsurance," to small businesses in the U.S. to insure the medical expenses of thousands of persons covered under self-insured company group health plans. After substantial premiums were collected and after paying

only some claims, the fraudulent company would always default in the payment of claims. The success of the scam was almost guaranteed because of the cost of pursuing an international insurance fraud case though civil litigation against the principal wrongful actors in their own bailiwick. Thus, when one foreign company failed, a new company, formed or located by the coconspirators, would then step in to take its place. This ERISA health insurance scam was repeated by the same principal actors for a decade before it was finally shut down.

37.     Specifically, the evidence established Defendants McNicoll, Anderson and Reeve executed an ERISA health insurance scam in the United States in which NAI, a fraudulent and undercapitalized Belgian[36] reinsurance company, established as a front to perpetuate the repetitive ERISA health insurance scam, failed to pay over $10,000,000 in medical claims of approximately 12,0000 employees and their dependents who were covered under the fake health plan which was purchased by approximately 409 U.S. companies located throughout the United States.

38.     In South Carolina, the NAI-related ERISA health insurance scam affected five (5) South Carolina companies, 384 South Carolina plan participants, and left in excess of 2,000 separate claims owed to over 100 medical care service providers.

39.     In regard to the Connelly plan, the ERISA health insurance scam left $984,595.65 in covered medical claims owing to 264 of the 300 CMEWBP plan participants.

40.     The ERISA health insurance scam, which was repetitively executed by essentially the same principal actors for approximately a decade resulted in tens of millions of dollars[37] in

---

[36]  Belgium is not in North America. All of the risks insured by NAI were located in the U.S. The use of the geographic location of "North America" in name "North American Indemnity, N.V." is indicative of the fact the company purposefully directed its business activities toward the U.S.

[37]  Patricia Lupher, who served as Head of Claims for AHHA, the company the conspirators used to adjudicate claims, testified in her video deposition that the scam left "10's of millions" of dollars in unpaid claims.

unpaid medical claims incurred by the employees of small businesses in the U.S.

42.    The precise role of Defendants McNicoll, Anderson, Reeve, Marsh, McSooner, St. John, MT and MTFS in the execution of the ERISA health insurance scam is discussed fully in Section III, Findings of Fact and Conclusions of Law.

42.    NAI collected in excess of 15 million dollars in premiums from approximately 409 U.S. companies.  Premiums were moved to offshore accounts in the Bahamas, Belgium and Luxembourg.  The premium money which was siphoned from NAI was secreted.  NAI then defaulted in the payment of claims.  NAI was stripped of its assets, which contrary to NAI's financials, appear to have consisted only of 10 million shares of worthless stock in Marsh, a closely-held Bahamian company, and the current premium income which had been moved to offshore accounts during the execution of the carefully orchestrated scam.

43.    The ERISA health insurance scam utilized a benefit concept called the "single-employer self-funded ERISA plan" which was sold as a package deal and consisted of a Master Plan Document, an Administrative Agreement and a so-called "Reinsurance Agreement."  The concept called for a small business to act as "plan sponsor" and "plan administrator" and adopt a Master Plan Document which set forth the medical benefits which the company employees and their dependents were to receive.  Those medical benefits were similar to those provided by a traditional health insurance policy and involved a "co-pay" by the employee.  The concept called for the small business to enter into an Administrative Agreement with AHHA.  AHHA was a Texas-based third-party claims administration company which served as "contract administrator" and purported to act as an ERISA fiduciary which administered benefits for the company group health plan.  AHHA, for an administrative fee of 25% to 30% of the premiums collected, (which were referred to as

"contributions"), would adjudicate the medical claims filed with AHHA by the employees and their medical care providers. The remaining 65% to 70% of the premiums collected by AHHA were wire transferred by AHHA to the foreign unlicensed reinsurer or its intermediary which AHHA had located to provide reinsurance to the plans so it could market its product. The concept required the small business to enter into a so-called "Reinsurance Agreement." In each instance, the foreign reinsurance company was unlicensed and defaulted in the payment of claims. The Reinsurance Agreement provided that the reinsurance company, in exchange for the payment of a monthly reinsurance premium, "agreed to accept 100% of the [employer's] liability in terms of the Plan" for the term of one (1) year. The single-employer self-funded ERISA plan with the 100% reinsurance was sold as a package deal. AHHA administered claims and sent them to its captive foreign unlicensed reinsurer. The foreign unlicensed reinsurer was to provide AHHA with 100% of the money to pay the claims filed with AHHA by the employees or their medical care providers and submitted by AHHA to the foreign unlicensed reinsurer for payment under the Reinsurance Agreement. The faulty legal premise upon which the single-employer self-funded ERISA plan with the foreign reinsurance component was based was that -- the product being sold was "reinsurance" as opposed to "insurance" because the employer that self-funded the plan was itself an insurer. From this faulty legal premise it incorrectly followed that the transaction was a reinsurance transaction because the foreign reinsurance company sold the product to an employer that the conspirators claimed was in the business of insurance. ERISA §514(b)(2)(B) expressly states that ERISA benefit plans are not in the business of insurance for purposes of any State law. 29 U.S.C. §1144(b)(2)(B). This directly rebuts the conspirators' incorrect legal assertion that they were promoting "reinsurance" because the plans were allegedly "self-funded" and acting as insurers to

their participant beneficiaries.  Of course, that contention is also contrary to the face of the purported "Reinsurance Agreement" itself, which assumes 100% coverage and not coverage at some attachment point.  As a matter of law, the plans are not insurers.  Thus, NAI and MT could not have reinsured anyone consistent with ERISA.[38]  Rather, NAI and MT were acting as unauthorized insurers.  In actuality, AHHA, disguised[39] as an ERISA fiduciary, was controlled by one or more coconspirators and acted as an agent for NAI and MT, its captive unlicensed foreign reinsurers, in the unlawful sale of an unauthorized group health insurance policy.

44.     NAI , MT and MTFS sold the unauthorized health insurance through AHHA, a third-party claims administrator acting as an ERISA fiduciary which disguised within the confines of its customer relations department  its true role which was to act as agent for NAI and MT, unlicensed foreign insurers, in the sale of an unauthorized policy of health insurance.  AHHA had developed a network of insurance agents, or unlicensed "producers," who were to be paid a commission, which was called a "service fee" to refer business to AHHA.  The Plan functioned very much like a

_____

[38]  See, USDOL Advisory Opinion 92-21A which stated that the foreign unlicensed reinsurance companies which provided 100% reinsurance to the single-employer self-funded ERISA plans (then administered by Wilkinson who was represented by Mr. Claro) were not employee benefit plans as defined by ERISA and the foreign reinsurer was subject to regulation by state departments of insurance.  See also, USDOL Advisory Opinion 2003-03A, directed to Mr. Claro, which stated "[w]ith regard to state regulation of AHHA and the selected 'reinsurance company,' we note that section 415(b)(2)(A) of ERISA saves from preemption under section 514(a) state laws regulating insurance.  It also stated " . . . section 514(a) of ERISA would not provide a basis for preempting the application of State laws which regulate insurance to AHHA or the selected 'reinsurance company."  Id.

[39]  On December 18, 2002 an e-mail written from Claro to AHHA President Jack Ferguson stated: "Does the term being an 'Agent for an Unauthorized Insurer' have any meaning to you?  This totally undermines every single aspect of personal legal protection I have attempted to construct for you . . . [I] . . .  "went to a lot of time and trouble to inform all of you how to disguise such an operation within the corporate confines" [of the third-party administration company] in a 'New Customer Relations' Department" . . . The whole idea was not to have any third party parading around in public as your paid agent,  selling a 'package plan' which I am sure (now) contains what everybody would consider a 'solicitation' for the sale of a Reinsurance Contract from a company which is not regulated or licensed.  (Makes our statement that 'we are not responsible for a carrier's lack of compliance with State law, a little hard to make, much less to make in a believable manner."  This e-mail is a description of how the unauthorized sale of insurance by AHHA was disguised.

traditional health insurance policy. Each covered employee and his other dependents received what appeared to be an insurance card. The Plan provided for prescription drug benefits. Hospital visits required pre-certification. The Plan utilized a network of approved medical care providers. The medical care providers or the employees were to submit their claims to AHHA. AHHA was to adjudicate the claims and provide a "claims run" to the foreign reinsurer. The foreign reinsurer was to provide AHHA with the money to pay the claims. AHHA was to issue checks in payment of the claims and mail them to the medical care providers. In summary, in exchange for the payment of a premium, 100% of the medical claims covered under the small business group health plan were, in theory, to be paid by the reinsurance company.

45.     In fact, the benefit concept was designed to "disguise" the unlawful and unauthorized sale of insurance by an unlicensed company. 100% reinsurance of medical benefits is health insurance. Home Healthcare Aff. *et al.* v. American Heartland*, et al.*, case number 01-CV-489, United States District Court, Northern District of Mississippi (Eastern) filed December 26, 2001; USDOL Advisory Opinion 2003-03A; and USDOL Advisory Opinion 92-21A. AHHA acted as agent for NAI in the sale of unauthorized health insurance. Id. Reinsurance is sold to insurance companies, not to small businesses. The legally incorrect premise upon which the benefit concept was based was that the arrangement as structured did not involve the sale of health insurance regulated by state departments of insurance. The standard documents falsely promoted the benefit concept as an ERISA plan which could only be regulated by the USDOL. The sale of the product involved the unauthorized transaction of the business of insurance in a manner designed to evade the insurance laws of this State. ERISA specifically does not preempt the States' regulation of insurance within the scope of the McCarran-Ferguson Act. See, 29 U.S.C. §144(b)(2). Federal

courts have held that employers claims against reinsurers for denial of reinsurance benefits are not preempted by ERISA because they concern garden variety, state law insurance claims against non-plan fiduciaries. See, Vescom Corporation v. American Heartland Health Administrators, Inc., 251 F.Supp. 950, 964 (D. Maine 2003) citing Union Health Care, Inc. v. John Alden Life Ins. Co., 908 F.Supp. 429, 433-36 (S.D. Miss. 1995) (reasoning that reinsurer is not a plan fiduciary, the reinsurance relationship is a standard commercial relationship that does not implicate any special ERISA concerns, ERISA would not otherwise afford any remedy for this simple contract dispute, and non-recognition of such contract claims would be deleterious to ERISA's goals because plan sponsors could no longer rely on reinsurance contracts for the fiscal stability of their plans).

46.    It followed from the legally incorrect premise that the benefit concept was not subject to state regulation because it was an ERISA plan that a foreign unlicensed reinsurer could engage in business in the U.S. nationwide without any state in which it transacted business having the authority to accredit, license or regulate the foreign reinsurance company. This allowed an operator with virtually no capital to enter the reinsurance business. The legally incorrect premise upon which the benefit concept was based paved the way for operators of fraudulent companies to quickly make a lot of money by cheating a lot of small businesses and their employees through the use of this illegal benefit concept to sell fake health insurance. The problem was described by the U.S. Senate Permanent Subcommittee on Investigations Report "U.S. Government efforts to combat fraud and abuse in the insurance industry," March 1992 as follows:

> For almost 18 years now, con men, crooks, and hucksters have been able to take advantage of a continuing regulatory vacuum (be it actual or perceived) in the area of self-insured employer sponsored health benefit programs to fleece unsuspecting employers and their employees of hard-earned premium dollars. They have built their lavish lifestyles on the shattered lives of innocent men, women and children while regulators have argued with one another over who has jurisdiction and whether

the problem has already been solved.[40]

47.     The ERISA health insurance scam alleged in Plaintiffs' complaint has been repeated by the same principal actors for over a decade using essentially the same structure. A foreign reinsurance company is formed by the actors, often in Belgium were regulation of reinsurance companies is "notoriously lax."[41]  In almost every instance, McNicoll was the individual that executed the Reinsurance Agreement on behalf of the foreign company. In most instances, the reinsurance companies were capitalized in kind by worthless stock, by non-existent capital, by capital of questionable value, or capital which is quickly stripped from the company after it appears on the company's financial statement. In most instances, the new company, by way of a portfolio transfer, took over the ERISA plans administered by AHHA which were then reinsured by another reinsurance company which had defaulted in the payment of claims. Premiums were collected through intermediaries, which are other companies formed by the principal actors, and then moved though banking channels established by the actors or through foreign venues, such as Luxembourg, which have strict banking secrecy laws. Asset protection was set up so that when the planned default occured the money was sufficiently protected. Initially some claims were paid so that additional premiums could be collected. After 6 to 8 months the reinsurance company defaulted in the payment of claims. The reason given for the default was  improper claims handling or bad underwriting.  The crooked business plan called for the reinsurance company to delay or deny benefits to insured persons even in those instances where payment of benefits is clearly warranted.

---

[40]  This report is cited in "Association Health Plans: Loss of State Oversight Means Regulatory Vacuum and More Fraud" Mila Kofman, J.D., (Summer 2005), Georgetown University Health Policy Institute.

[41]  See, Docket Entry 314 and 315, September 27, 2001 "Non-Exclusive List of Pertinent Factors to be Considered by ERISA Plan Sponsors When Choosing Between Reinsurance Companies."

The instant the default was planned to occur, the principal actors had another reinsurance company lined up to provide reinsurance to the existing ERISA plans.  In this manner, the ERISA health insurance scam was proliferated.

48.    In evaluating the propriety of asserting personal jurisdiction over the defaulting Defendants, the Court must determine under the South Carolina long-arm statute if Plaintiffs' claims against the defaulting Defendants arise from the defaulting Defendants, either directly or through an agent, transacting insurance business in this state, committing a tort in whole or in part in this state, or entering into a contract to be performed in whole or in part in this state.  S.C. Code Ann. § 36-2-803(1).

49.    McNicoll, Anderson, Reeve and others created NAI, a sham unlicensed company, which McNicoll and Anderson used as a front to solicit, negotiate and sell unauthorized health insurance to Connelly in South Carolina.  The evidence of this is the undisputed fact that McNicoll and Anderson signed the Connelly Reinsurance Agreement on behalf of NAI, the sham unlicensed company, which  was formed to perpetrate the ERISA scam.  McNicoll and Anderson caused NAI to issue the unauthorized policy of health insurance to Connelly which failed to pay Plaintiffs' medical claims causing damage in this State.  Reeve and McSooner, as described hereafter in more detail, acted as reinsurance brokers or intermediaries in the formation of NAI, and were part of the conspiracy to use NAI to defraud Plaintiffs.  Reeve and St. John solicited, negotiated and sold the deal by which MTFS wholly owned subsidiary MT, Cypriot companies not licensed to sell health insurance in any state of the United States,  sold or assumed the unauthorized health insurance policy which also failed to pay Plaintiffs' medical claims causing damage in this state.  The evidence of this is contained in the documents by which Reeve, acting as broker of record, proposed the

Connelly Reinsurance Agreement and other business to MTFS and MT. McNicoll and Anderson took or received an application for a policy of insurance for Connelly with NAI, either directly or through their agent AHHA. McNicoll and Anderson advertised in the U.S. and in South Carolina that they would write business for NAI. Reeve advertised that he would act as worldwide representative for MT to develop its non-life insurance business in international markets. McNicoll and Anderson delivered the NAI Reinsurance Contract to Connelly in South Carolina. McNicoll and Anderson received and collected a premium of insurance from Connelly. Reeve and St. John received, collected or transmitted a premium of insurance from Connelly. Reeve, on behalf of MT, evaluated claims submitted by Connelly.

50.     Plaintiffs allege McNicoll, Anderson and Reeve are personally liable for the unpaid medical claims pursuant to S.C. Code Ann. § 38-25-360 because they are persons who, directly or indirectly, assisted in any manner in the procurement of a contract of insurance for an unauthorized insurer. This statutory cause of action arose in South Carolina by virtue of McNicoll, Anderson and Reeve having transacted as principals the business of insurance "effected by mail or otherwise by or on behalf of an unauthorized insurer" in South Carolina in violation of S.C. Code Ann.§ 38-25-110. McNicoll, Anderson, Reeve, Marsh, McSooner, St. John, Reeve & Associates, MT and MTFS engaged in the unauthorized business of insurance in South Carolina by making, as an insurer, an insurance contract, by receiving or collecting premiums, by the delivery of contracts of insurance to residents of this State, and/or by assisting a person or insurer in the transaction of insurance with respect to subjects of insurance resident, located or to be performed in this State.[42]

---

[42] A person or company which engages in the unauthorized business of insurance in this State is deemed to have irrevocably constituted the Chief Insurance Commissioner as his true and lawful attorney in fact upon whom service of any and all processes, pleadings, actions, or suits arising out of the policy or contract in behalf of the insured may be made and subject said person and company to the personal jurisdiction to the courts of this State

51.     McNicoll, Anderson and Reeve transacted as principals the unauthorized business of insurance in this State.  The defaulting Defendants engaged in conduct which constitutes the unauthorized business of insurance in South Carolina.  As a matter of law, they are deemed to have appointed the Secretary of State and the Chief Insurance Commissioner as their attorney in fact for service of lawsuits arising out of the unauthorized insurance contract.  S.C. Code Ann. §38-25-110, §38-25-510, §38-25-520 and §15-9-285.  A person who by virtue of having transacted business in this state is deemed to have appointed an agent in this state for service of process is subject by virtue of their conduct and contacts to the personal jurisdiction of the courts of this State.  The evidence establishes that this Court has specific jurisdiction over McNicoll, Anderson, Reeve, Marsh, McSooner, MT and MTFS pursuant to the long-arm statute, S.C. Code Ann. §36-2-803(1)(a), arising from their having transacted the business of insurance in this state.  Plaintiffs' statutory claim and Plaintiffs' civil conspiracy claim arise out of the Reinsurance Agreement, which was an illegal contract of insurance sold by an unauthorized insurer and procured by the said Defendants in violation of S.C. Code Ann. §38-25-110 and §38-25-360.  The Reinsurance Agreement was the instrumentality which the principal actors in the civil conspiracy utilized in a manner designed to evade the insurance laws of this State.

## F.    Commission of a Tort in Whole or in Part in this State

52.     The acts by which McNicoll, Anderson, Marsh, McSooner,  Reeve, St. John, Reeve and Associates, MT and MTFS directly or through agents, transacted as principals the unauthorized business of insurance in this State, effected through the mails or otherwise, in execution of a civil

pursuant to S.C. Code Ann.  §15-9-285 (1976 , as amended) and by virtue of Public Law 79-15, 79th Congress of the United States, Chapter 20, 1st Session, S. 340, 59 Stat. 33; 15 U.S.C., Sections 1011 to 1015, inclusive, as amended, which declares that the business of insurance and every person engaged therein are subject to the laws of the several states.

conspiracy to perpetrate an ERISA health insurance scam on Connelly, was a tort committed in whole or in part in this state. "Under traditional South Carolina choice of law principles, the substantive law governing a tort action is determined by the state in which the injury occurred." Lister v. NationsBank, 329 S.C. 133, 143, 494 S.E.2d 449, 454 (S.C.App. 1998) (internal citations omitted). In the case of a fraudulent misrepresentation, the law of the place of the wrong (lex loci delicti) controls. Hester v. New Amsterdam Casualty Co., 287 F.Supp. 957 (D.S.C. 1968), affirmed as to conflict of laws, 412 F.2d 505 (4th Cir. 1969). The place of the wrong is not where the misrepresentations were made but where the plaintiff, as a result of the misrepresentation, suffered a loss. Id. In this case Plaintiffs suffered a loss in South Carolina when the fake health insurance McNicoll, Anderson and Reeve conspired to create which was sold to Plaintiffs failed to pay Plaintiffs' claims. The Fourth Circuit has held explicitly that an individual may be subject to personal jurisdiction in a particular forum if he commits a tort in the forum. Columbia Briargate Co. v. First Nat'l Bank, 713 F.2d 1052 (4th Cir. 1983), cert. denied, 465 U.S. 1007 (1984). "In certain instances, an out-of-state defendant may be subject to jurisdiction under a long-arm statute on the theory that his co-conspirator conducted activities in a particular state pursuant to the conspiracy." Hammond v. Butler, Means, Evins & Brown, 300 S.C. 458, 388 S.E.2d 796, 798, cert. denied 498 U.S. 952 (1990). "A state has an especial interest in exercising judicial jurisdiction over those who commit torts within its territory. This is because torts involve wrongful conduct which a state seeks to deter, and against which it attempts to afford protection, by providing that a tortfeasor shall be liable for damages which are the proximate result of his tort." Keeton v. Hustler Magazine, Inc., 465 U.S. 770, 104 S.Ct. 1473 (1984) (quoting Restatement (Second) of Conflict of Laws §36, Comment c (1971)). The evidence establishes that this Court has specific personal jurisdiction over McNicoll,

Anderson, Reeve, Marsh, McSooner, MT and MTFS  pursuant to the long-arm statute, S.C. Code Ann. §36-2-803(1)(c), because they committed the tort of civil conspiracy to defraud Plaintiffs through the execution of an ERISA health insurance scam in this State.

### G.  Personal Liability of Defendants for Torts Committed in Whole or in Part in this State

53.    Plaintiffs' tort claim against McNicoll, Anderson and Reeve seeks to recover damages proximately caused by multiple overt acts performed in furtherance of  the tort of civil conspiracy directly and personally effected by McNicoll, Anderson and Reeve in the execution of a common design to effectuate an ERISA health insurance scam on Plaintiffs in South Carolina. Plaintiffs assert McNicoll, Anderson and Reeve are personally, and jointly and severally, liable in their individual capacities, for their tortious conduct as co-conspirators.[43]  A number of corporations were used by McNicoll, Anderson and Reeve to execute the ERISA health insurance scam, and other individuals participated in multiple overt acts in furtherance of the civil conspiracy resulting in damage to Plaintiffs in this state.[44]  Those corporations include Defendants Marsh, McSooner and St. John.

54.    In South Carolina, there is a strong presumption that "an officer or a director of a corporation is not, merely as a result of his standing as such, personally liable for torts" of the

---

[43]  When two or more are engaged in an unlawful enterprise, which causes damage to another, each is individually responsible for all injuries committed in this prosecution, and this, although the specific injury was done by one of the parties alone, the liability of the other being founded upon concert of action.  See, Williams v. Cape Fear Lumber Co., 176 N.C. 174, 96 S.E. 950 (1918); Skipper v. Hartley, 242 S.C. 221, 130 S.E.2d 486 (1963).

[44]  "Because a corporation can act only though its officers and agents, and because no entity can 'conspire' with itself, a corporate entity cannot 'conspire' with its own officers and employees." Sadighi v. Daghighfekr, 36 F.Supp.2d 279 (D.S.C. 1999).  " . . . [N]o conspiracy can exist if the conduct challenged is a single act by a single corporation acting exclusively through its own directors, officers, and employees, each acting within the scope of employment."  McMillan v. Oconee Memorial Hosp., Inc., ___ S.E.2d ___, WL 3719636 (S.C. 2006).  This case involves multiple acts of multiple corporations and individuals in furtherance of the object of the conspiracy.

corporation.  Hunt v. Rabon, 275 S.C. 475,272 S.E.2d 643, 644 (1980).  However, in those rare cases where a corporate director has "in some way participated in or directed the tortious act," personal liability will attach."    Steinke v. Beach Bungee, Inc., 105 F.3d 192 (4th Cir.1997), citing Hunt, supra; Rowe v. Hyatt, 468 S.E.2d 649, 650 (S.C. 1996); Tillman v. Wheaton-Haven Recreation Association, Inc., 517 F.2d 1141, 1144 (4th Cir. 1975).   "An agent's liability for his own tortious acts is unaffected by the fact that he acted in a representative capacity." Lawlor v. Scheper, 232 S.C. 94, 98-99, 101 S.E.2d 269, 271 (1957).  The South Carolina rule on the liability of an agent for torts committed in his fiduciary capacity either in a suit against him individually or in a joint suit against him and his principal renders the agent liable when the tort was committed or participated in by the agent. Columbia Briargate Co. v. First National Bank in Dallas, 713 F.2d 1052, 1055 (4th Cir. 1983).  If a "director or officer commits or participates in the commission of a tort, whether or not it is also for the corporation, he is liable to third persons injured thereby, and it does not matter what liability attaches to the corporation for the tort." Hunt, supra,  272 S.E.2d at 644.

55.    McNicoll, Anderson and Reeve personally participated in and directed the acts which lead to the formation of NAI as a fraudulent and undercapitalized reinsurance company and the use by that company of a Reinsurance Agreement to sell fake health insurance to Connelly pursuant to the illegal objective of the conspiracy which was to collect and siphon premiums through intermediaries and from NAI and then deny benefits to insured persons even where payment of benefits was clearly warranted in furtherance of the execution of the ERISA scam, all of which caused damage to Plaintiffs in this state.  This is not a case in which corporate directors reasonably relied upon the competence of an employee or subordinate to do a task.  This is not a case were a company simply became insolvent and unable to perform a contract.  The facts tell a far different

story. NAI's directors, owners and its only employees, Anderson and McNicoll, personally directed and participated in the acts of NAI in the execution of the fraudulent ERISA scheme, which included the actions taken to establish NAI with the essentially worthless stock of Marsh, and in the sale of the fake health insurance to Connelly, in the pre-planned default in the payment of claims, in the siphoning of premiums and in the stripping of assets. Marsh's owners, Anderson and McNicoll, personally directed the acts by which the essentially worthless stock of Marsh was used to capitalize NAI. MK's owners, Reeve acting through his Bahamian company McLater, Inc. and McNicoll acting through McSooner, personally structured and then executed the business plan to form NAI to act as a front to sell the fake health insurance to Connelly and others. Reeve and St. John then contacted Mr. Panos Joannou, managing director of MT in Cyprus. Reeve stated to Mr. Joannou he had known the ERISA program for 10 years and that it provided "excellent cash-flow . . . with claims being relatively small in individual amounts . . ." MT and MTFS took over the AHHA ERISA business when NAI exited the market.

56.     "Generally the reason for the creation of a corporation is to limit liability." Hunt, supra 272 S.E.2d at 644. However, personal liability for a tort will attach where a corporate director "in some way participated in or directed the tortious act." Steinke, supra at 195. In Columbia Briargate, surpra, the Fourth Circuit stated: "[m]ost courts have held that the commission of a single tortious act is a sufficient contact upon which to base the assertion of in personam jurisdiction. And, this is particularly so when the tortious act arises out of a contract which had substantial connection with that State. Id. 713 F.2d at 1058 (internal citations omitted). The Reinsurance Agreement which insured the medical expenses of Plaintiffs in this State is a contract which has a substantial connection with the forum state. Plaintiffs' tort claim arises out of the use of the Reinsurance

Agreement and an instrumentality used to further the object of the conspiracy. "In such a case the agent has availed himself of the privilege of conducting activities within the forum State and by that act he has clear notice that he is subject to suit there. There is no distinction made in these cases of the role in which defendant performed his tortious acts, whether for his personal benefit or for the benefit of an employer or third party." Id.

57.     Plaintiffs allege a tort. As discussed, under the doctrine of lex loci delicti, a tort arises in the place where the damage was suffered, not where McNicoll, Anderson and Reeve plotted or prepared to execute the ERISA scam. McNicoll and Anderson were the individual actors behind NAI, the fake reinsurance company, used to effect the sale of the unauthorized insurance product to Connelly in South Carolina. Reeve and his company McLater and McNicoll and his company McSooner acted through their company Montgomery Kent to effect the formation of NAI of which McNicoll and Anderson acted as directors. The stock of Marsh was used to capitalize NAI. The direct and personal involvement of McNicoll, Anderson and Reeve in the tortious conduct is causally related to Plaintiffs' injuries. Under the fiduciary shield doctrine, "when a non-resident corporate agent is sued for a tort committed by him in his corporate capacity in the forum state in which service is made upon him without the forum under the applicable state long-arm statute as authorized by Rule 4(e), he is properly subject to the jurisdiction of the forum court, *provided the long-arm statute of the forum state is co-extensive with the full reach of due process*." Columbia Briargate Co. v. First National Bank in Dallas, 713 F.2d 1052 at 1064 (4th Cir. 1983) (emphasis in original). Stated more precisely, "when a tort is committed within the forum state it is unimportant whether one was acting in a corporate or personal role." Id.

58.     McNicoll, Anderson and Reeve in their individual capacities are not parties to the

Reinsurance Agreement. The Reinsurance Agreement, backed by NAI, a fraudulent company, was the vehicle McNicoll, Anderson and Reeve used to execute the civil conspiracy to defraud Plaintiffs. See, Williams v. Modern Home Life Ins. Co., 260 F.Supp. 649 (D.S.C. 1966) (action for fraudulent breach of an insurance contract "arises out" of contract); Dawkins v. National Liberty Life Ins. Co., 252 F.Supp. 800 (D.S.C. 1966) (ex delicto actions can "arise under" a policy of insurance). As discussed above, the personal direction and participation of McNicoll, Anderson and Reeve as principal actors in the civil conspiracy to defraud Plaintiffs through the sale of fake health insurance by NAI gives rise to their individual liability to Plaintiffs. In addition to the law which makes McNicoll, Anderson and Reeve personally liable for the tort of a corporation in which they participated or directed, South Carolina recognizes the equitable tool of "piercing the corporate veil." Sturkie v. Sifly, 280 S.C. 453, 313 S.E.2d 316 (1984). In Sturkie, the Court of Appeals of South Carolina set out a two-pronged test for courts to use in determining whether corporate entities should be disregarded. Id. at 318-19. The first prong is a multi-factor test designed to analyze the corporation's adherence to the corporate form, and it includes questioning: (1) whether the corporation was grossly undercapitalized; (2) its failure to observe corporate formalities; (3) non-payment of dividends; (4) insolvency of the debtor corporation at the time; (5) siphoning of funds of the corporation by the dominant stockholder; (6) non-functioning of the officers or directors; and (7) whether the corporation was merely a facade for the operations of the dominant stockholder. The second prong of the Sturkie test mandates that "there be an element of injustice or fundamental unfairness if the acts of the corporation be not regarded as the acts of the [shareholders]." Id. at 318.

59.     NAI was stated to have been capitalized by an in kind contribution of 10,000,000 shares of stock in Marsh, a company incorporated by Anderson. The stock was represented to be

worth $US10,000,000 because Marsh was represented to have $7,000,000 in cash deposits and hold title to $3,000,000 in value of real estate. The stock of Marsh was essentially worthless thereby making NAI grossly undercapitalized to underwrite the medical expenses of approximately 409 small businesses and approximately 12,000 participants. Alternatively, if NAI, capitalized by the Marsh stock, had any value either when it undertook the risks or by virtue of the current premium income transferred to it after NAI undertook the risks, the dominant shareholders siphoned the funds from NAI and Marsh in order to render NAI and Marsh insolvent in an effort to avoid payment of the valid medical claims of the Plaintiffs and others. The corporations, NAI, Marsh, McSooner, McLater and Montgomery Kent were instrumentalities used by Anderson, McNicoll and Reeve, their respective dominant shareholders, to perpetrate a civil conspiracy to defraud third persons who purchased medical insurance from NAI. These closely held corporations were merely used as a conduit for the transaction of the unauthorized business of insurance by McNicoll, Anderson and Reeve. These corporate entities should be disregarded. Therefore, McNicoll, Anderson and Reeve are individually liable for their knowing and intentional use of these companies as part of a civil conspiracy to perpetrate fraud on Plaintiffs. It is indisputable that NAI and MT transacted the business of insurance in South Carolina. Therefore, the evidence establishes that this Court has specific personal jurisdiction over McNicoll, Anderson and Reeve pursuant to the long-arm statute, S.C. Code Ann. §36-2-803(1)(c), arising out of their commission, in whole or in part, of a tort in this state.

### H.    Entry into Contract to be Performed in Whole or in Part in this State

60.    The Reinsurance Agreement was a contract of health insurance to be performed in whole or in part in this state. It was a contract formed, made and entered into in this State because

it insured lives and interests in this state.  S.C. Code Ann. §38-61-10.  McNicoll and Anderson signed the Reinsurance Agreement as directors of NAI.  Reeve represented MT in the assumption of the Reinsurance Agreement.  Plaintiffs' claims against McNicoll, Anderson and Reeve arise out of the fact that the Reinsurance Agreement was the instrumentality used by McNicoll, Anderson and Reeve to perpetrate the ERISA scam to sell fake health insurance to Connelly.  See,  Williams v. Modern Home Life Ins. Co., 260 F.Supp. 649 (D.S.C. 1966) (action for fraudulent breach of an insurance contract "arises out" of contract); Dawkins v. National Liberty Life Ins. Co., 252 F.Supp. 800 (D.S.C. 1966) (ex delicto actions can "arise under" a policy of insurance).  This product was delivered to Connelly in this State and its breach caused damage to Plaintiffs in this State.  Plaintiffs' civil conspiracy claim, is ex delicto, not ex contractu, but it arises out of or relates to the Reinsurance Agreement.  McNicoll, Anderson and Reeve, directly or indirectly, assisted NAI, an unlicensed insurer, in the sale of the insurance contract to Connelly.  Connelly is a South Carolina corporation.  Between the dates of January 1, 2001 and December 31, 2001 $1,184,132.05 in health insurance premiums were collected from Connelly and the CEWBP participants.  AHHA records reflect that $505,117.06 in reinsurance premiums was paid to NAI and $220,994.12 in reinsurance premiums was paid to MT.  AHHA records reflect that the remainder of the premiums were retained by AHHA.  All premiums called for by the Reinsurance Agreement were timely paid by Plaintiffs.  The claims were to be paid to medical care providers in this State.  All of the benefits listed in the Master Plan Document were for the benefit of the approximately 300 covered employees of Connelly and their covered dependants who resided in South Carolina.  The network of medical care providers designated for use by Plaintiffs was located in South Carolina.  All of the risks covered by the Reinsurance Agreement were located in South Carolina.  All of the covered claims arose in

South Carolina.  All of the medical claims were to be paid to medical care providers in South

Carolina.  The Reinsurance Agreement was signed by McNicoll and Anderson and delivered to

Connelly in South Carolina.  No agent or employee of Connelly engaged in any activities in Belgium

where NAI was incorporated, or in Cyprus where MT and MTFS were incorporated.  Plaintiffs'

claims against McNicoll, Anderson and Reeve arise from the use of the Reinsurance Agreement as

the instrumentality to execute the plan to obtain Connelly's premiums and not pay Connelly's

claims.  The evidence establishes that this Court has specific personal jurisdiction over McNicoll,

Anderson, and Reeve  pursuant to S.C. Code Ann. §36-2-803(1)(g), because the claims arise out of

a contract entered into by a fraudulent company used as a facade by McNicoll, Anderson, Reeve and

others in furtherance of the object of the conspiracy to effect an ERISA health insurance scam on

Plaintiffs in South Carolina, by the mails or otherwise,  in violation of S.C. Code Ann.§ 38-25-110.

## I.     Choice of Law Applicable to Reinsurance Agreement

61.     Even though Plaintiffs' claims are not based in contract, it is necessary to determine

what law would be applicable to the Reinsurance Agreement since the Reinsurance Agreement was

used to further the object of the conspiracy to effect an ERISA health insurance scam on Plaintiff.

First, as discussed below, the terms of the Reinsurance Agreement provide that it is to be construed

and enforced pursuant to the law of the United States.[45]  This narrows the scope of the inquiry to this

country.  However, in the absence of Federal ERISA preemption, state laws regulate insurance.

---

[45] Forum selection clauses are *"prima facie* valid and enforceable when made at arm's length by
sophisticated business entities, absent a compelling reason for abrogation." Republic Leasing Company, Inc. v.
Haywood, 329 S.C. 562 at 566 (1998) (citing M/S Bremen v. Zapata Off-Shore Co., 407 U.S. 1, 10 (1972)).  Courts
must scrutinize forum selection clauses for fundamental fairness.  Carnival Cruise Lines, Inc. v. Shute, 499 U.S. 585,
595 (1991).  "A clause establishing *ex ante* the forum for dispute resolution has the salutary effect of dispelling any
confusion about where suits arising from the contract must be brought and pretrial motions to determine the correct
forum and conserving judicial resources that otherwise would be devoted to deciding those motions." Republic
Leasing Company, Inc. v. Haywood, 329 S.C. 562 at 567 (1998) (quoting Carnival Cruise Lines, 499 U.S. at 593-
594 (1991).

Claims made by an ERISA plan or plan sponsor against a reinsurance company are not pre-empted

by ERISA.  See, <u>Vescom Corporation v. American Heartland Health Administrators, Inc.</u>, 251

F.Supp.2d 950, 964 (D.Maine 2003).  Therefore, the Court must apply the choice of law principles

as recently articulated in the case of <u>Okatie Hotel Group, LLC  v. Amerisure Insurance Company</u>,

2006 WL 91577 (D.S.C.):

> This court has diversity jurisdiction pursuant to 28 U.S.C. § 1332.  In a diversity
> case, a federal court must apply the choice of law rules of the state in which it is
> located.  See <u>Klaxton Co. v. Stentor Elec. Mfg. Co.</u>, 313 U.S. 487, 496, 61 S.Ct.
> 1020, 85 L.Ed. 1477 (1941); see also <u>Heslin-Kim v. CIGNA Group Ins.</u>, 377
> F.Supp.2d 527, 530 (2005); <u>Spartan Iron & Metal Corp. v. Liberty Ins. Corp.</u>, 6 Fed.
> Appx. 176 (4th Cir.2001); <u>Bowman v. The Cont'l Ins. Co.</u>, No. 99-2540, 2000 WL
> 1173992, at 3 (4th Cir. June 7, 2000).
>
> South Carolina choice of law encompasses both the traditional *lex loci contractus*
> doctrine and S.C. Code Ann. § 38-61-10.  Historically, South Carolina courts
> followed the rule of *lex loci contractus* and applied the law of the state where the
> insurance contract was formed.  <u>See, e.g. Bowman</u>, 2000 WL 1173992, at 3 (holding
> that, under the traditional *lex loci contractus* rule in the absence of § 38-61-10, the
> contract was governed by the law of the place where it was formed, despite the
> insured's move into South Carolina where the action was brought) (citing <u>Jones v.
> Prudential Ins. Co.</u>, 210 S.C. 264, 264, 42 S.E.2d 331, 333 (1947)); <u>Unisun Ins. Co.
> v. Hertz Rental Corp.</u>, 312 S.C. 549, 551, 436 S.E.2d 182, 184 (S.C.Ct.App.1993)
> (holding that a contract for insurance is governed by the law of the state where the
> application was made, the policy was delivered, and the contract was formed).
> However, a statute enacted in South Carolina in 1947, S.C.Code Ann. § 38-61-10,
> modified the traditional rule of *lex loci contractus*.  This statute provides the
> following:
>
>> All contracts of insurance on property, lives, or interests in this State
>> are considered to be made in the state and all contracts of insurance
>> the applications for which are taken within the State are considered
>> to have been made within this State and are subject to the laws of this
>> State. S.C.Code Ann. § 38-61-10.
>
> "Where this statute applies, it governs as South Carolina's rule of conflicts."
> <u>Sangamo Weston Inc. v. Nat'l Surety Corp.</u>, 307 S.C. 143, 147, 414 S.E.2d 127, 130,
> (1992).

62.    S.C. Code Ann. §38-61-10 is applicable under the facts of this case because the

subject of the insurance contract is located in South Carolina.  The insurance contract is a contract that insures the payment of medical expenses of Plaintiffs in South Carolina.

63.     The Court concludes that South Carolina has a significant contact or significant aggregation of contacts creating state interest to allow  for the application of South Carolina law without offending the Full Faith and Credit Clause or the Due Process Clause.

64.     Were this Court bound to apply the traditional  lex loci contractus and apply the law of the State where the contract was formed this Court would have concluded that the Reinsurance Agreement, which is a contract of insurance, was formed in South Carolina because the application was made in South Carolina and the Reinsurance Agreement was delivered in South Carolina.

65.     The Connelly Reinsurance Agreement, which was signed by McNicoll and Anderson on behalf of NAI,[46]  was a contract "to be performed in whole or in part" in South Carolina. Plaintiffs' statutory and tort claims arise out of the use of the Reinsurance Agreement as part of a civil conspiracy to defraud Plaintiffs through the sale of fake health insurance.  The evidence establishes that this Court has jurisdiction over McNicoll, Anderson, Reeve, MT and MTFS pursuant to the long-arm statute, S.C. Code Ann. §36-2-803(1)(g), because of their use of a contract, to be performed in whole or in part in South Carolina, as an instrument to injure Plaintiffs in South Carolina.

66.     After NAI failed to pay Plaintiffs' claims, Reeve's London-based brokerage

---

[46]  As discussed more fully herein McNicoll, Anderson and Reeve are personally liable for the unpaid claims because they are persons who assisted, directly or indirectly, in the procurement of an insurance contract for an unauthorized insurer.  South Carolina Code Ann. §38-25-360 (1976, as amended) makes any person who assisted directly or indirectly in any manner in the procurement of an insurance contract for an unauthorized insurer personally liable to the insured for the full amount of the claim or loss in e manner provided by the insurance contract.  Also, state law allows for common law causes of action seeking actual, consequential and punitive damages arising from tortious conduct by agents, brokers or others who aid and abet in an unlawful health insurance scam.

company, St. John, acted as a reinsurance broker to find a reinsurance company to provide replacement reinsurance coverage for the Connelly plan and for the other single-employer ERISA plans administered by AHHA in the United States.  Reeve and St. John located MT.  St. John corporate records reflect that on November 23, 2001 Panos Joannou, Managing Director of MT, was appointed as a director of St. John.  Reeve was the other director of St. John.  On November 29, 2001 the Board of Directors of MTFS announced in a Press Release the purchase of a 20% shareholding interest in St. John and exclusively appointed St. John as the worldwide representative office for MT.  On or about December 7, 2001 a newspaper article appearing in the financial pages[47] announced that MTFS had "signed a group health insurance policy for personnel of small and medium sized companies abroad.  MTFS received £650,000 from the deal while premiums by the end of the year should reach L1.6m.  Premiums next year are expected to range between L7m and L8m.  The contracts will be underwritten by MT and Liberty Life."   MT is a wholly owned subsidiary of MTFS.  Documents indicate Panos Joannou, Managing Director of MT, Christos Patsalides, Christos Christodoulou and Lambros A. Christofi participated in one way of another in involving MT and MTFS in the unauthorized transaction of the business of insurance in numerous states in the United States, and, as it relates to the instant case, in South Carolina.  It was represented that the business undertaken by MTFS and MT in the United States was backed by $42 million in assets.  St. John, MTFS and MT engaged in the unauthorized transaction of the business of insurance in South Carolina.

  67. At the time Reeve proposed the "ERISA" business to MT, Reeve stated in a letter that Reeve had "known the business for 10 years and can provide any back up documentation that may

---

[47] See, Docket Entry 314-315, December 7, 2001 article.

be required.  The business does provide excellent cash-flow as premiums paid monthly." [48]

68.    On behalf of MT Reeve prepared a slip which described the nature of the insurance business being transacted by MT in the United States as "medical expenses incurred under single employer, self funded benefit coverages."  Reeve referred to the business as the "Erisa programme."  The territory of the program was stated to be the Continental United States.

69.    MT appointed St. John to act as the "worldwide representative" of MT  to develop and market a "global portfolio" of general non-life insurance products in "International markets."

70.    MT acquired an ownership interest in St. John.[49]

71.    Effective as of September 1, 2001, MT took over the reinsurance of the Connelly plan.  The Court concludes the evidence establishes that this Court has specific personal jurisdiction over St. John, MT and MTFS pursuant to the long-arm statute, S.C. Code Ann. §36-2-803(1)(g).

### J.    Defendants Purposefully Availed Themselves of Protections of U.S. Law

72.    In 1982 the Attorney General for the State of Illinois testified before Congress as follows:

" . . . what is shocking is that the insurance cheats are using the Federal ERISA law and the principle of Federal preemption as an offensive weapon, in court and out, against consumers.  In this way, they have largely avoided regulation, repayment or prosecution.  In my opinion, the insurance trust swindle has the potential to become the most sophisticated and profitable white-collar crime in America. . . . It is high

---

[48]  See, Docket Entry 314-315, September 21, 2001 letter from Reeve to Joannou.

[49]  On November 23, 2001 Panos Joannou of Marketrends Insurance Ltd. was appointed as a director of Saint John Management Services Limited, Reeve's brokerage company.  On November 29, 2001 Saint John Management Services Limited announced that it had been "exclusively appointed the worldwide representative office for MarkeTrends Insurance Limited . . . [to] assist the development and marketing of a global portfolio for general non-life insurance in the International markets."  See, Docket Entry 314 and 315.  On December 7, 2001 the Cyprus financial pages stated Marketrends had acquired 20% of the city of London based company St. John Management and appointed it agent fo MarkeTrends Insurance in international markets.  See, Docket Entry 314 and 315.

profit and low risk crime under existing laws . . . an operator with virtually no capital can go into the ERISA trust benefit business and become a very rich person by cheating people out of their premiums and face almost no chance of going to jail.

73.     The modus operandi of the ERISA health insurance scam perpetrated by McNicoll, Anderson and Reeve on Connelly called for Connelly to adopt a "single-employer self-funded ERISA plan" and at the same time enter into a reinsurance agreement with NAI, a foreign, unlicensed reinsurance company under the terms of which NAI promised to pay 100% of the covered medical claims of Connelly's employees and their dependents who participated in the plan. The standard documents represented that the product being sold to Connelly was an ERISA plan, not a plan of health insurance subject to regulation by state regulatory authorities such as state departments of insurance. In fact, the defaulting Defendants were simply selling health insurance because the Reinsurance Agreement called for the payment of 100% of the covered medical claims.[50] The so-called Reinsurance Agreement delivered by McNicoll and Anderson to Connelly in South Carolina was a contract of health insurance. The delivery of the Reinsurance Agreement by McNicoll and Anderson to Connelly in South Carolina establishes that McNicoll, Anderson and Reeve knew of the existence of Connelly in relation to their actions. For the protection of the public, South Carolina state insurance laws required that health insurance companies be licensed and supervised by the director of the state department of insurance. The standard plan documents used by McNicoll, Anderson and Reeve to market the product to Connelly incorrectly and falsely stated that the single-employer self-funded ERISA plan with 100% reinsurance provided by NAI, an

---

[50] See, Home Healthcare Aff. et al. v. American Heartland, et al., case number 01-CV-489, United States District Court, Northern District of Mississippi (Eastern) filed December 26, 2001. In Home Health Care, supra, the Court stated " . . . labeling its coverage stop-loss or 'reinsurance' does not mask the reality that it is close to a simple purchase of group accident and sickness coverage. Thus, it is not a legitimate stop-loss policy, but is more akin to insurance."

unlicensed foreign company, was not a health insurance plan. The standard plan documents incorrectly and falsely stated that the plans were not regulated by state departments of insurance. NAI, MT, McNicoll, Anderson and Reeve were subject to South Carolina state insurance laws. S.C. Code Ann. § 38-25-110. They violated said laws by acting as principals on behalf of an unauthorized insurance in the procurement of a contract of group health insurance from Connelly.

74.     The standard "Reinsurance Agreement" used by McNicoll, Anderson , Reeve and MT to obtain premiums from Connelly contained a choice of law provision which provided:

> This Agreement shall be construed and enforced according to the laws of the United States of America, and where possible, as that law is applied to ERISA programs, and all provisions thereof shall be administered according to those laws.

75.     The use by McNicoll, Anderson and Reeve of the choice of law provision in the Reinsurance Agreement used as the instrumentality to perpetrate the ERISA scam on Plaintiffs was an attempt to use and assert the Federal ERISA law and the principle of Federal preemption as an offensive weapon, in and out of court, against consumers, including Connelly, to avoid being regulated by state departments of insurance.[51] The use of the conflict of law provision which selected U.S. law, and where possible ERISA, is an express and purposeful availment by McNicoll, Anderson and Reeve of the benefits and protections of Federal ERISA law which said Defendants sought to misuse as the legal foundation upon which the ERISA scam was predicated.[52] Defendants'

---

[51] Section 514(a) of ERISA provides that ERISA preempts "any and all State laws" that "relate to" an ERISA plan. 29 U.S.C. § 1144(a). A state law falls within ERISA's preemptive scope "if it has a connection with or reference to" an ERISA plan. Custer v. Sweeney, 89 F.3d 1156 (4th Cir.1996)(quoting Shaw v. Delta Air Lines, Inc., 463 U.S. 85, 97, 103 S.Ct. 2890, 2900 (1983).

[52] Professor Kofman published an article entitled "Proliferation of Phony Health Insurance: States and the Federal Government Respond" (Fall 2003) in which she described how operators of an ERISA health insurance scam falsely tell state insurance regulators that their product is only subject to regulation by the United States Department of Labor. This results in uncertainty as to who has jurisdiction to regulate the product and ultimately allows the scam to continue to operate while federal and state regulators identify the nature of the product being sold and figure out which regulatory body, or whether both regulatory bodies, have jurisdiction to regulate the product.

express reliance upon ERISA amounts to consent to the jurisdiction of this Court in a dispute arising out of the Reinsurance Agreement.  See, <u>Allen v. Lloyd's of London</u>, 94 F.3d 923, 928 (4th Cir. 1996) (Since its seminal decision in <u>The Bremen v. Zapata Off-Shore Co.</u>, 407 U.S. 1 (1972) the Supreme Court has consistently accorded choice of forum and choice of law provisions presumptive validity).  The choice of law provision used in the Reinsurance Agreement is a clear indication that McNicoll, Anderson and Reeve intended to submit to this Court's jurisdiction.

**K.     Defendants Agreed or Assented to Attorn or Submit to Jurisdiction in US**

76.     The provision of the Reinsurance Agreement which states  it would be  "construed and enforced according to the laws of the United States of America" constitutes an agreement or assent by McNicoll, Anderson and Reeve[53] to submit any dispute arising out of the Reinsurance Agreement to the jurisdiction of a federal court in the United States.  The federal courts of the United States construe and enforce the laws of the United States in cases involving federal law.  28 U.S.C. §1331.  The choice of United States law provision used by McNicoll, Anderson and Reeve in the Reinsurance Agreement, which was the instrumentality used to injure Plaintiffs, amounts to an express agreement by McNicoll, Anderson and Reeve to submit to the jurisdiction of this Court.[54]

---

[53]  Reeve through St. John was originally indicated as the person to sign the Reinsurance Agreements on behalf of MT, but he requested that the reference to Reeve or St. John be removed from the standard Reinsurance Agreement used by MT.  Reeve acted as broker of the deal in which MT took over the reinsurance of the Connelly plan effective September 1, 2001.  The existing NAI Reinsurance Agreement remained in effect and MT received the premium and took over the reinsurance for the Connelly plan under that NAI Reinsurance Agreement rather than execute a new Reinsurance Agreement.  Thus, MT by way of transfer or assumption of the Agreement was also bound by the provision that the Agreement would be "construed and enforced according to the laws of the United States of America" and it likewise attorned and submitted to the jurisdiction of this federal court.

[54]  An insured ordinarily possesses no bargaining power or leverage to dictate the terms of an insurance agreement.  See, <u>Nichols v. State Farm Mut. Auto. Ins. Co.</u>, 279 S.C. 336, 339, 306 S.E.2d 616, 619 (1983).  Plaintiffs possessed no bargaining power to dictate the terms of the Reinsurance Agreement.  Thus, the use of a choice of U.S. law provision by the coconspirators which drafted, selected or used the Reinsurance Agreement as the

The choice of United States law provision is an additional basis for this Court to exercise personal jurisdiction over said Defendants as to Plaintiffs' claims which arise out of the Reinsurance Agreement. South Carolina choice of law rules dictate that if a contract specifies the law that is to govern the contract, then courts must apply the law so specified. Burris Chemical, Inc. v. USX Corporation, 10 F.3d 243, 245 (4th Cir. 1993); Bannister v. Shepherd, 191 S.C. 165, 4 S.E.2d 7, 9 (1939); Livingston v. Atlantic Coast Line R.R. Co., 176 S.C. 385, 180 S.E. 343, 345 (1935).

## L.    General Jurisdiction Exists over Defendants based on Enduring Contacts

77.    The South Carolina general jurisdiction statute, S.C. Code Ann. § 36-2-802, provides for general jurisdiction over a defendant who has an "enduring relationship" with South Carolina. A person who has an enduring relationship with South Carolina is defined by statute as "a person domiciled in, organized under the laws of, doing business, or maintaining his principal place of business in this State. . . ." S.C. Code Ann. § 36-2-802. If a person has an enduring relationship with South Carolina, the person may be sued on any cause of action, whether it arose in South Carolina or elsewhere. Id.

78.    McNicoll, Anderson, Reeve and MT had enduring and continuing contacts and were transacting insurance business in connection with the nationwide marketing and sale of an unauthorized health insurance product which was purposefully directed at the United States and at residents of South Carolina. The enduring and continuing contacts included:

(a)    Reeve and McNicoll had been involved in reinsurance of the portfolio of ERISA plans administered by AHHA in the United States for over a decade.

(b)    Reeve's application for a bank account for McLater and McNicoll's

---

instrumentality to transact the business of insurance in the U.S. is strong evidence of an agreement to assent or attorn to the jurisdiction of U.S. courts in disputes based upon or arising from the Reinsurance Agreement.

application for a bank account for McSooner stated they each expected to deposit into their respective accounts an annual turnover of $80,000 in insurance brokerage commissions received from the United States.

(c)  The NAI - ERISA scam involving McNicoll, Anderson, Reeve and others collected over US$15 million dollars in reinsurance premiums from small businesses, all of which were located in the U.S.

(d)  The MT - ERISA scam involving Reeve, St. John, MTFS and MT collected over US$7,194,742.52 in reinsurance premiums from small businesses, all of which were located in the U.S.

(e)  McNicoll, Reeve and Anderson, through companies they controlled, opened bank accounts in the U.S. to facilitate the movement of the premiums out of the U.S.

(f)  On numerous occasions McNicoll and Anderson conducted the business of NAI in person in the U.S.

(g)  Reeve, McNicoll and Anderson all conducted business in the U.S. and in South Carolina through agents who took applications from South Carolina on behalf of an unlicensed insurer (NAI and MT) and which agents adjusted claims arising under the unauthorized contracts of insurance sold and delivered in South Carolina to South Carolina residents.

(h)  The Connelly Reinsurance Agreement was for the term of one year.  Thus, the sale of the unauthorized health insurance product to Connelly created a legal obligation to pay the covered medical claims of 264 South Carolina residents for services rendered during the one year policy term.  This created continuing relationships and obligations between the defaulting Defendants and South Carolina residents which arose out of the Reinsurance Agreement.

(i)     Over a period of 12 months, on a monthly basis, the defaulting Defendants collected a total of $726,111.18 in premiums from the sale of the unauthorized health insurance product to Connelly, a South Carolina corporation.

(j)     Connelly, with 300 employees,  was one of the largest companies insured by the defaulting Defendants.   Thus, while the defaulting Defendants sold the coverage to approximately 409 companies nationwide, there was a substantial and direct connection to South Carolina.

(k)     At the time NAI stopped paying claims it asserted that it could not fund any claims payments until after it completed a claims audit of AHHA.  McNicoll and Anderson tried to get Connelly and the other plans to hire Managed Healthcare, Inc. ("MHI"), NAI's newly approved claims administrator, to adjudicate Connelly's claims.

(l)     McNicoll and Anderson stated in an "Open Letter to Producers and Agents of NAI's Portfolio" that NAI had "withdrawn its approval of AHHA" as claims administrator effective September 27, 2001.  McNicoll and Anderson stated in the said letter that NAI was "committed to this market and will continue to accept new and renewal business through its newly approved TPA Managed Healthcare, Inc."

(m)     McNicoll and Anderson (through Jameson Corp.)  secretly entered into a letter of intent to purchase MHI, a Texas-based third-party claims administrator, for $1,825,000.  The plan was for McNicoll and Anderson to secretly control the adjudication of NAI claims through MHI while the ERISA plan participants were led to believe their claims were being adjudicated by an independent third-party ERISA fiduciary.  McNicoll and Anderson's actions in expressing their commitment to the U.S. market and in attempting to purchase a claims administration company in

the U.S. is indicative of their efforts to establish an enduring and continuing connection in the U.S.

(n)    Reeve reviewed and questioned the medical bills related to the cancer treatment of CMEWBP participant Ruth Waggoner.

(o)    Reeve was paid monthly commissions for managing the U.S. ERISA business for MT. Reeve's management included handling the premium money and approving the payment of claims. Reeve, as agent for MT, personally directed the sale and administration of the unlicensed health insurance product in the U.S. individually and on behalf of MT. After MT defaulted in the payment of claims, and was the subject of state cease and desist orders, Reeve located another unlicensed fraudulent insurance company to sell the same unauthorized insurance product to residents of South Carolina.[55]

(p)    NAI Directors McNicoll and Anderson commenced civil litigation against AHHA and others in the United States District Court for the Southern District of Texas. In doing so they purposefully availed themselves of the benefits and protections of the laws of the U.S.

79.    The subject litigation to recover damages arising from the ERISA health insurance scam arose as a result of the activities of the defaulting Defendants purposefully directed at the forum state. The evidence establishes that their conduct amounted to a substantial, systematic and continuous connection to this forum. It is presumptively not unreasonable to require them to submit to the burdens of litigations here. Burger King, 471 U.S. at 475-76. This Court has personal jurisdiction over McNicoll, Anderson, Reeve and MT pursuant to S.C. Code Ann. §36-2-802, the general jurisdiction statute, by virtue of their enduring contacts with the forum state.

---

[55]    Centennial Insurance Company, AVV was formed in Aruba. It has never been licensed anywhere in the world. Its original capital was $50,000,000 in Costa Rican rain forest bonds which are a liability not an asset. The assets were at one time said to be a bucket full of uncut diamonds on the floor of CIC's President, Mr. Whitney's lounge.

**M.**     **Defendants Should Have Anticipated Being Haled into Court in SC**

80.     It is well settled that a defendant must have "minimum contacts" with the forum state before that state's exercise of personal jurisdiction satisfies the requirements of due process. International Shoe Co. v. Washington, 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945); World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 291, 100 S.Ct. 559, 564, 62 L.Ed.2d 490 (1980). "[T]he defendant's conduct and connection with the forum State [must be] such that he should reasonably anticipate being haled into court there." World-Wide Volkswagen, 444 U.S. at 297, 100 S.Ct. 567.

81.     ERISA contains a nationwide service of process provision that permits an ERISA enforcement action to be brought in federal court in a district court of the United States where the plan is administered or where the breach took place . 29 U.S.C. §1132 (e)(2).  See, Board of Trustees v. Elite Erectors, Inc., 212 F.3d 1031, 1035 (7th Cir. 2000) (nationwide service of process under ERISA which provides for federal and hence supplemental jurisdiction in a state where a defendant has never been is proper as long as the defendants have adequate contacts with the United States as a whole).  ERISA provides for nationwide service of process based on a defendant's contacts with the United States as a whole, not just a single state.  Thus, the physical presence of McNicoll and/or Anderson in the United States in the States of Texas, California, Oklahoma, Michigan, New York , New Jersey and Florida gives rise to a proper exercise of jurisdiction over said Defendants in South Carolina where the breach took place, and under principles of international law that rely heavily on physical presence of the foreign national in the forum country or state.  The following chart reflects the physical presence of McNicoll and Anderson in the United States for the purpose of transacting the business of insurance on behalf of NAI.

**CHART OF McNICOLL AND ANDERSON PHYSICALLY PRESENT IN THE UNITED STATES CONDUCTING UNAUTHORIZED INSURANCE BUSINESS**

| DATE | PERSON | PLACE | BUSINESS CONDUCTED |
|---|---|---|---|
| August 26, 2000 | McSooner credit card issued to McNicoll | New York City, NY | McSooner credit card used at Macy's Department Store |
| August 27, 2000 | McSooner credit card issued to McNicoll | Elizabeth, New Jersey | McSooner credit card used at Newark Airport Hilton |
| August 30, 2000 | McNicoll | Houston, Texas | McNicoll checked into Room 510 at the Radisson Suite Hotel, Houston West |
| September 3, 2000 | McNicoll | Houston, Texas | McNicoll checked out of Room 510 at the Radisson Suite Hotel, Houston West |
| October 10, 2000 | Anderson | New York | Anderson wrote Mr. Ferguson and stated he that he looked forward to a meeting in "New York in the days ahead..." |
| November 5, 2000 | McSooner credit card issued to McNicoll | Newark, New Jersey | McSooner credit card used at First Bank and Trust |
| November 6, 2000 | McSooner credit card issued to McNicoll | Newark, New Jersey | McSooner credit card used at Sheraton Hotel |
| February 18, 2001 | Anderson McNicoll | Oklahoma City, OK | Anderson and McNicoll meet at Claro's office |
| February 19, 2001 | Anderson McNicoll | Dallas, Texas | Anderson and McNicoll hold meeting at small insurance company called PAIC to discuss possibility of NAI purchasing PAIC |
| February 19, 2001 | Anderson McNicoll | Dallas, Texas | Anderson, McNicoll, Claro and Wilkinson meet with representatives of Nations Personnel at the Hilton |
| February 23, 2001 | McSooner credit card issued to McNicoll | Houston, Texas | McSooner credit card used in Houston, TX |
| May 6, 2001 | McSooner credit card issued to McNicoll | Houston, Texas | McSooner credit card used at the MicroCenter |
| May 9, 2001 | McSooner credit card issued to McNicoll | Miami, Florida | McSooner credit card used at the Publix Supermarket |
| June 20, 2001 | NAI | New York, NY | NAI opened a U.S. dollar clearing account at the KBC Bank, N.V., New York Branch |

| June 25, 2001 | Anderson | Houston, Texas | Anderson checked into Room 1005 at the Lancaster Hotel |
|---|---|---|---|
| June 25, 2001 | McNicoll | Houston, Texas | McNicoll checked into Room 606 at the Lancaster Hotel |
| June 27, 2001 | McSooner credit card issued to McNicoll | Houston, Texas | McSooner credit card used at Best Buy and at Wells Fargo Banks |
| June 27, 2001 | Anderson | Houston, Texas | Anderson checked out of Room 1005 at the Lancaster Hotel |
| June 27, 2001 | McNicoll | Houston, Texas | McNicoll checked out of Room 606 at the Lancaster Hotel |
| September 11, 2001 | Anderson McNicoll | Houston, Texas | Anderson and McNicoll meet with Ed Horn at Managed Healthcare, Inc. |
| September 14, 2001 | McSooner credit card issued to McNicoll | Miami, Florida | McSooner credit card used at Publix Supermarket, Eddie Stephen's Men's Store and Top of the Port Restaurant |
| March 16, 2002 - March 17, 2002 | McSooner credit card issued to McNicoll | San Francisco, California | McSooner credit card used in San Francisco, CA |
| March 18, 2002 - March 19, 2002 | McSooner credit card issued to McNicoll | Sacramento, CA | McSoooner credit card used in Sacramento, CA |
| March 19, 2002 | Anderson McNicoll | Sacramento, CA | Anderson and McNicoll personally served with class action law suit filed in federal court in Indiana |
| March 20, 2002 and March 21, 2001 | McSooner credit card issued to McNicoll | San Francisco, CA | McSooner credit card used at Argent Hotel |
| March 21, 2002 | McSooner credit card issued to McNicoll | Ann Arbor, Michigan | McSooner credit card used in Ann Arbor, Michigan |

82.     The defaulting Defendants' invocation of ERISA and their use of the choice of United States law provision in the Reinsurance Agreement establishes that Defendants should have foreseen being haled into court in any district court in any state of the United States where the plan was administered or where the failure to pay resulting in breach took place.  Also, Defendants, once haled into a United States District Court, should have foreseen that they would also be subject to pendent state law traditional tort claims which can be brought against persons who enable ERISA

Page 59 of  148

health insurance scams. Traditional state common law tort claims, including those seeking damages due to misrepresentation and fraudulent inducement to purchase healt

h insurance and professional negligence of insurance agents or benefit consultants are not preempted by ERISA. See, Coyne & Delany Co. v. Selman, 98 F.3d 1457 (4th Cir. 1996). Under a similar analysis, a state common law tort claim based on civil conspiracy to induce the purchase of fake health insurance is not preempted by ERISA.

83.    The defaulting Defendants transacted the unauthorized business of insurance in South Carolina. There is no doubt that the defaulting Defendants could foresee being haled into court in South Carolina. "Insurance by its nature involves the assertion of claims, and resort to litigation is often necessary." August v. HBA Life Insurance Co., 734 F.2d 168, 172 (4th Cir. 1984). "A health insurance policy is typically sued upon where the insured resides . . ." Rossman v. Consolidated Insurance Co., 595 F.Supp. 505, 509 (E.D.Va. 1984). There is nothing unreasonable about subjecting the defaulting Defendants to jurisdiction in South Carolina. "[B]ecause modern transportation and communications have made it much less burdensome for a party sued to defend himself in a State where he engages in economic activity, it usually will not be unfair to subject him to the burdens of litigating in another forum for disputes relating to such activity." Burger King, 471 U.S. at 474 (internal citations committed)).

84.    The defaulting Defendants used a Reinsurance Agreement which specifically provided it was to be enforced according to the laws of the United States[56] and, where possible, ERISA, a federal statutory law peculiar to the United States. It would not be effective for this

---

[56]    In a diversity case federal law requires that a federal district court sitting in South Carolina must apply the substantive law of South Carolina. Erie R.Co. v. Tomkins, 304 U.S. 64 (1938).

controversy to be resolved in Belgium, where no similar law exists and where the official language is Flemish, or in Cyprus, where no similar law exists and where the two official languages are Greek and Turkish.   Further, under the same due process analysis performed herein, neither Belgium nor Cyprus would have personal jurisdiction over the Plaintiffs.  The laws of Belgium or Cyprus would not apply to the Reinsurance Agreement which was a contract made, or to be performed in the United States, especially where the Reinsurance Agreement used by the defaulting Defendants specifically states it is to be construed and enforced according to the laws of the United States. Where a contract specifies the law that is to govern the contract, then courts must apply the law so specified.  Burris Chemical, 10 F.3d at 245.  McNicoll, Anderson and Reeve chose the format of the contract to be used.  The contract they chose selected the law of the United States.  They cannot now complain that their rights are being adjudicated in accord with the law they chose to apply to a dispute arising out of the contract.

85.    "[J]urisdictional rules may not be employed in such a way as to make litigation 'so gravely difficult and inconvenient' that a party unfairly is at a 'severe disadvantage' in comparison to his opponent."  Burger King Corp. v. Rudzewicz, 471 U.S. 462, 478 (1985) (citations omitted). Plaintiffs' suit arises out of a Reinsurance Agreement issued by a fraudulent company which acted as a facade for McNicoll, Anderson and Reeve, and which failed to pay the medical claims of 264 South Carolina residents.   It cannot be denied that South Carolina has a manifest interest in providing an effective means of redress for its residents when their insurers fail to pay claims.  These residents would be at a severe disadvantage if they were forced to follow the insurance company to a distant country in order to hold it legally accountable.  When claims were small or moderate, individual claimants frequently could not afford the cost of bringing an action in a foreign forum –

thus in effect making the company judgment proof.  See, <u>McGee v. International Life Insurance Company</u>, 355 U.S. 220, 222 (1957).[57]  Thus, jurisdictional rules have long been employed to provide for the exercise of personal jurisdiction over persons which transact the business of insurance in those jurisdictions where they contract with residents and fail to pay claims.  <u>Id.</u>

86.    For all of the reasons stated in Section II of this Order, the Court concludes that it has personal jurisdiction over the defaulting Defendants, John Fowler Anderson, Euan David McNicoll, Marsh Investment Corp., McSooner, Inc., Marketrends Financial Services Ltd., Marketrends Insurance Ltd., Michael Arthur Reeve, Saint John Management Services Ltd. and Michael A. Reeve & Associates.

## IV.    FINDINGS OF FACT AND CONCLUSIONS OF LAW

87.    The defaulting Defendants failed to answer the complaint.  The summons notified them that if they failed to answer judgment by default would be rendered against them for the relief demanded in the Complaint as required by Rule 4, F.R.C.P.  Rule 8 (d), F.R.C.P. provides that "[a]verments in a pleading to which a responsive pleading is required, other than as to the amount of damage, are admitted when not denied in the responsive pleadings.  Rule 8(c), F.R.C.P. requires that certain enumerated affirmative defenses and "any other matter constituting an avoidance or affirmative defense" be raised by Defendants in a responsive pleading.  Failure to assert an

---

[57] One of the primary reasons why McNicoll, Anderson and Reeve structured the ERISA health insurance scam through the use of offshore corporations, offshore banking arrangements and asset protection measures was to make the reinsurer and themselves judgment proof by the time default in the payment of claims was planned to occur.  As documented by Profesor Kofman in her studies on ERISA health insurance scams, the ERISA health insurance scam also capitalizes on the approach that if the default in the payment of claims to any one small business is relatively small that no small business would spend the substantial amount of money it would take to attempt to identify the individual perpetrators of the scheme, trace the money, file and serve a law suit, reduce their claim to a judgment and then try and enforce it internationally.  For example, by cheating 400 companies out of $50,000 an ERISA health insurance scam could bring the perpetrators $20,000,000.  It is likely that no small business would spend the amount of money it would take to attempt to recover on a $50,000 claim.

affirmative defense in a responsive pleading constitutes a waiver of the affirmative defense.[58]  See, Brinkley v. Harbour  Recreation Club, 180 F.3d 598, 612 (4th Cir. 1999) ("[I]t is indisputably the general rule that a party's failure to raise an affirmative defense in the appropriate pleading results in waiver . . . ").  Id.  "It is a frequently stated proposition of virtually universal acceptance by federal courts that a failure to plead an affirmative defense as required by Federal Rule 8 (c) results in a waiver of that defense and its exclusion from the case."  Wright & Miller, Federal Practice and Procedure § 1278 (1990).

88.     Procedurally, this Court could have simply stated that pursuant to Rule 8(d), the factual averments (except as to the amount of damages) in the Plaintiffs' complaint are admitted since the Defendants failed to file a responsive pleading and are in default.  See, North River Insurance Company, Inc. v. Stefanou, 831 F.2d 484, 486 (4th Cir. 1987) (the failure to deny an allegation in a pleading to which a responsive pleading is required constitutes an admission of that allegation).  However, since a foreign court may be requested to register and enforce the final judgment of the United States District Judge as a foreign judgment entered pursuant to this Order, this Court received and reviewed substantial evidence to determine and assess damages.  The reason for this exhaustive review of the evidence is because "[n]either the existence, causation nor amount of damages can be left to conjecture, guess or speculation."  State Farm Fire and Casualty Co. v. Barton, 897 F.2d 729, 733 (4th Cir. 1990) (internal citations omitted)).  Accordingly, this Order sets forth in detail the basis for the litigation so that a foreign court requested to enforce a foreign judgment will be able to determine the basis of the litigation giving rise to the final judgment in

---

[58]  The affirmative defenses which are waived if not raised include payment, res judicata, arbitration and award and any other matter constituting an avoidance or affirmative defense.  Rule 8 (c), F.R.C.P.  An affirmative defense is a defense as to which the defendant bears the burden of proof.

order to apply its rules relating to registration and enforcement of foreign judgments in Scotland, England or wherever Plaintiffs may seek to register and enforce the final judgment. This Order has been issued in accordance with the principles of substantive law and procedure enunciated herein. The rights of the defaulting Defendants were respected.

89.     The direct and circumstantial evidence clearly and convincingly establishes the defaulting Defendants and others engaged in a civil conspiracy to perpetrate an ERISA health insurance scam the ultimate object of which was to specifically injure Plaintiffs. This conclusion is based upon direct documentary and testimonial evidence and upon circumstantial evidence in the record.[59] The Court, in its role as finder of fact, from the direct evidence, has drawn inferences from the nature of the acts done, the relationship of the parties, the interests of the alleged conspirators and other circumstances in accordance with the evidentiary principles which applied to a claim of civil conspiracy set forth in Island Car Wash, Inc. v. Norris, 292 S.C. 595, 600-01, 358 S.E.2d 150 (1987), as follows:

> Conspiracy may be inferred from the very nature of the acts done, the relationship of the parties, the interests of the alleged conspirators and other circumstances. . . . Civil conspiracy is an act which is by its very nature covert and clandestine and usually not susceptible of proof by direct evidence; concert of action, amounting to a conspiracy, may be shown by circumstantial as well as direct evidence . . .

> And in order to establish a conspiracy, evidence, direct or circumstantial, must be produced from which a party may reasonably infer the joint assent of the minds of two or more parties to the prosecution of the unlawful enterprise. Proof showing concert of action in the commission of the unlawful acts, from which the natural or reasonable inferences arise that the acts were in furtherance of the common design

---

[59] An isolated single fact in and of itself may have little probative value. However, a series of independent facts which circumstantially connect the parties, and those advising, encouraging, aiding or abetting in the overt acts committed to carry into effect the object of the conspiracy may be highly probative. "It is well-established that circumstantial evidence alone can be sufficient to support any burden of proof, even where, as in a matter of substantive criminal liability, the prosecution's proof must be beyond a reasonable doubt." United States v. Jones, 31 F.3d 1304, 1316 (4th Cir. 1994).

of the alleged conspirators, is sufficient: at least to establish a *prima facie* case of conspiracy . . .

Moreover, the field of admissibility of evidence is broadened in proof of conspiracy . . . In general broad discretion and great latitude are permitted in the admission of circumstantial evidence tending to establish a conspiracy and to connect those advising, encouraging, aiding, abetting and ratifying the overt acts committed for the purpose of carrying into effect the objects of a conspiracy; the jury should have before them and are entitled to consider every fact which has a bearing on and a tendency to prove the ultimate fact in issue.

90.     The decade-long historical relationship of the parties directly connects those advising, encouraging, aiding,  abetting and ratifying the overt acts committed in carrying into effect the object of the conspiracy  - - which was to perpetrate an unlawful ERISA health insurance scam upon Plaintiffs and others.   The repetitive scam which harmed Plaintiffs in the year 2001 involved essentially the same persons who for a decade had performed essentially the same key roles in the execution of the object of the conspiracy; those being Reeve, McNicoll, Wilkinson, Claro, Ferguson, Ehler and Lupher.[60]  Historically, Reeve, McNicoll and Claro were involved in one way or another in the location or formation of a reinsurance company to reinsure the ERISA plans.  Wilkinson and/or Ferguson through a company served as claims administrator.  Ehler acted as chief financial officer for the claims administrator.  Lupher acted as head of the claims department. McNicoll signed the standard reinsurance agreement.  Claro acted as attorney for the claims administrator or for persons engaged in the formation of the reinsurance company.  Every reinsurer that was involved in the ERISA scam was fraudulent or acted fraudulently and defaulted in the payment of claims.  Over a decade, the repetitive ERISA scam resulted in tens of millions of dollars in unpaid claims.  The ERISA scam always resulted in harm to the small business and employee victims which were

---

[60]  The liability of Wilkinson, Claro, Ferguson, Ehler and Lupher is not before this Court in the context of this Order.  However, their involvement in relation to the liability of McNicoll, Anderson and Reeve is relevant to the case at hand.

left with substantial unpaid medical claims. Telling is the testimony of CFO Ehler which acknowledged he would not buy the "crap" his employer was selling to insure him or his family. Where an ERISA fiduciary has knowledge of a benefit plan's financial problems, failure to notify participants and beneficiaries of such problems is a breach of fiduciary duty. See, Vescom Corporation v. American Heartland Health Administrators, Inc., 251 F.Supp. 950 (D.Maine 2003).

91. The Court has analyzed the direct, documentary and circumstantial evidence to determine if the facts clearly and convincingly establish the allegations of the Complaint which placed the defaulting Defendants on notice of the basis of Plaintiffs' claims and the damages sought. In Paragraph 148 of the First Amended Complaint and Paragraph 207 of the Second Amended Complaint[61] Plaintiffs alleged a civil conspiracy cause of action against the defaulting Defendants McNicoll, McSooner, Inc., Anderson, Marsh , MT, MTFS, Reeve, St. John, Reeve & Associates and others. Plaintiffs alleged the defaulting Defendants combined and conspired " . . . for the purpose of injuring the Plaintiffs through the sale of a failed ERISA plan administered by an incompetent claims administrator and reinsured by a sham reinsurance company which was carried out by, aided and abetted by, and jointly assented to by said parties in the furtherance of the prosecution of said unlawful enterprise which civil conspiracy resulted in special damage to the Plaintiffs in the sum of $927,600.67, which represents the total of unpaid adjudicated claims under the Plaintiffs' ERISA Plan, together with pre-judgment interest, administrative fees, costs and expenses associated with resolution of those claims, accounting fees associated with the resolution of those claims, any and all professional fees, costs or expenses incurred by Plaintiffs in the resolution of said claims, damage

---

[61] Plaintiffs asserted a civil conspiracy cause of action against Defendants Michael A. Reeve, St. John Management Services Ltd. and Michael Reeve & Associates in Paragraph 207 of the Second Amended Complaint. The allegations are identical to those made against the defaulting Defendants in Paragraph 148 of the First Amended Complaint, except the amount of unpaid claims was stated to be $1,011,757.12, rather than $927,600.67.

to the credit reputation of the Plaintiffs, the total failure of benefits for which premiums were paid, and other similar losses, all to the Plaintiffs' actual, compensatory and consequential damage." Plaintiffs also alleged the acts were done in a reckless manner with a wilful and conscious disregard of the rights of the Plaintiffs thereby entitling Plaintiffs to punitive or exemplary damages. The prayer for judgment requested a monetary judgment in an amount of actual and punitive damages to be determined by the trier of fact.

92.     In that the complaint seeks punitive damages, the Court has applied the "clear and convincing" burden of proof in making its findings of fact. The Court finds that Plaintiffs have proven, by clear, cogent and convincing direct and circumstantial evidence, that McNicoll, Anderson, Reeve and others[62] engaged in a civil conspiracy to perpetrate an unlawful ERISA health insurance scam specifically intended to harm Plaintiffs thereby causing the special damages alleged in the complaint.

93.     McNicoll, Anderson and Reeve each performed multiple overt unlawful and tortious acts individually and through separate corporate entities used as a facade in furtherance of a concerted design the primary purpose or object of which was to effectuate an unlawful ERISA scam specifically intended to injure Plaintiffs which proximately caused special damages. The overt unlawful acts performed involved (a) multiple concerted actions taken related to the formation of NAI, a fraudulent undercapitalized company,[63] to act as a reinsurer for Connelly, and the other

---

[62]  The Court has found that other actors either agreed to participate in the wrongful activity or knowingly gave substantial assistance to someone who performed wrongful conduct in the execution of the ERISA scam. However, since their liability is not before the Court at this time this Order does not reach any ultimate conclusions as to their liability. Plaintiffs' claims against Claro and his law firms are the subject of a separate civil action, Connelly Management, Inc., et al. v. John Anthony Claro, et al., 2:03-CV-3005-PMD, filed September 19, 2003.

[63]  A fraudulent reinsurance company is one that is grossly undercapitalized; one that falsely represents it has substantial capital when it does not; strips itself of capital to avoid its legal obligations; and/or a company

single-employer ERISA plans; (b) multiple concerted actions in furtherance of the sale by NAI, a fraudulent, undercapitalized, unlicensed company, of a fake policy of health insurance to Plaintiffs in South Carolina; (c) multiple concerted actions taken in the establishment of offshore companies and banking channels to act as repositories for the premiums obtained from Plaintiffs and others through the illegal sale of an unauthorized health insurance plan; (d) in multiple concerted actions involving the wrongful retention of premiums collected from Plaintiffs; (e) in the multiple concerted actions related to the business plan to deny medical benefits to Plaintiffs where payment of benefits was clearly warranted, through a pre-planned default in the payment of claims; (f) in multiple concerted actions to engage in a series of delays and redundant requests for information made to Connelly and its employees; and (g) multiple concerted actions to use the companies and banking channels which were structured and established to siphon from NAI monies obtained through the unlawful sale of health insurance to Plaintiffs and others and secrete them so they would not be available to pay Plaintiffs' claims because of the siphoning, stripping or fraudulent transfer of assets, each of which proximately caused special damages to Plaintiffs.

94.     McNicoll, Anderson and Reeve, individually and through separate corporate entities which served as a facade for their actions, performed tortious and unlawful acts  in the formation of NAI, a fraudulent, undercapitalized, and unlicensed company, pursuant to an explicit or tacit agreement to effectuate the sale of an unauthorized health insurance product to Plaintiffs, which product, pursuant to an explicit or tacit agreement, would not  pay the valid medical claims of Plaintiffs.  Elaborate steps were taken to use corporate entities to conceal the identity of the persons

---

controlled by directors who from the outset do not intend to pay claims.  This definition was provided to the Court by witness Trevor Jones. See, Docket Entry 166.  The Court reached its own conclusions as to the liability of the defaulting Defendants without regard to the Jones report.

who participated in and directed the unlawful acts. However, the documentary evidence and circumstances clearly and convincingly establishes the corporate entities which were used as a facade and acted under the direction and participation of McNicoll, Anderson and Reeve, to carry out the unlawful acts which proximately caused injury to Plaintiffs.

95.     In the early 1990's Reeve managed Dai Ichi Kyoto Reinsurance Company, S.A. ("Dai Ichi") and McNicoll worked for Dai Ichi. Dai Ichi was a fraudulent reinsurance company incorporated in Belgium. Dai Ichi had a fictitious director and claimed non-existent assets on its financial statement. Dai Ichi provided 100% reinsurance to the single-employer self-funded ERISA plans which were administered by Wilkinson's company, then known as Advanced Administrative Companies, Inc. ("AAC"). On June 2, 1992 Wilkinson sent a memo to Reeve, who approved claims funding for Dai Ichi. Wilkinson advised Reeve "employers are already on edge regarding alien reinsurers." On June 17, 1992 Wilkinson and AAC were enjoined by the Pennsylvania Department of Insurance from selling the single-employer self-funded health plan with 100% reinsurance offered by an unlicensed foreign reinsurer. On October 19, 1992 the USDOL issued Advisory Opinion 92-21A which opined that AAC, who administered the single-employer self-funded ERISA plans, and the foreign companies that had entered into 100% reinsurance agreements with the plans, were subject to state insurance laws which required a license to transact the business of insurance. On January 22, 1993 McNicoll signed a reinsurance agreement on behalf of Dai Ichi. On January 26, 1993, AAC and Wilkinson, represented by Claro, executed a settlement agreement with the Pennsylvania Department of Insurance in which Wilkinson and AAC agreed not to sell the single-employer self-funded product with the 100% reinsurance component without complying with Pennsylvania state insurance laws. The Court finds that the terms of the 100% reinsurance

agreement utilized by Reeve and McNicoll, which on October 19, 1992 was declared to subject a foreign reinsurer to regulation by state departments of insurance, are essentially the same as the terms of the 100% reinsurance agreement sold to Connelly in 2001. Further, McNicoll and Reeve were involved in the ERISA scam at the time the USDOL issued Advisory Opinion 92-21A.

96.    In 1995, McNicoll with the assistance of Claro, formed First Fidelity Reinsurance Company, S.A. in Belgium. First Fidelity, which had no cash and was capitalized by an "in-kind" contribution of stock, was a fraudulent reinsurance company that defaulted in the payment of claims. According to a memo prepared by Claro, Belgium is "notoriously lax" in the regulation of insurance companies. Thus, Belgium was the country of choice for the formation of a fraudulent reinsurance company. According to Claro's deposition testimony, after the failure of First Fidelity, McNicoll worked as a bartender at or near St. Andrews, in Scotland. This is when McNicoll first met Anderson, who was a real estate investor with no experience in the insurance industry.

97.    Between October of 1998 and March of 1999 it appears Anderson, a real estate developer or investor by profession, participated in a transaction in which he made a mortgage loan to McNicoll. The money, apparently provided by Anderson to McNicoll, was to be used by Claro to negotiate the settlement of claims against First Fidelity. On March 19, 1999 Anderson, McNicoll and Claro met in Nassau, Bahamas. On April 5, 1999 Anderson wire transferred $278,206.96 from Credit Agricole Indosuez Luxembourg (then known as Banque Indosuez Luxembourg) to Claro's trust account. Credit Agricole Indosuez Luxembourg (hereafter "CA-LUX") is a bank Reeve, McNicoll and Anderson used and a bank from which Claro received payments. CA-LUX is not in close proximity to Reeve's home in England or the homes of McNicoll and Anderson in Scotland. The CA-LUX bank is located only in Luxembourg and the branch used by all three was located at

39 Allee Schaeffer. Luxembourg has strict banking secrecy laws and does not honor international requests for judicial assistance in providing evidence in civil actions. The Court finds CA-LUX was the bank of choice used by McNicoll, Anderson and Reeve as a repository for the siphoning of premiums in the execution of the ERISA scam.

98.     On April 19, 1999, one month after meeting with McNicoll and Claro in the Bahamas, Anderson signed a letter of instruction directing the law firm of Jerome E. Pyfrom & Co. to incorporate a Bahamian International Business Company (hereafter "IBC"). Anderson's choice of names, in order of preference, were Lyford Investment Corp. (hereafter "Lyford"), Marsh Investment Corp. (hereafter "Marsh") and Grand Harbor Investment Corp. (hereafter "Grand Harbor"). On April 20, 1999 Anderson incorporated Lyford. Anderson would eventually use each of the pre-selected names to incorporate IBCs which played a role in the ERISA health insurance scam that involved Plaintiffs. Anderson would use the stock of Marsh to purportedly capitalize NAI as a Belgian reinsurance company to separately insure each of the single-employer self-funded ERISA plans administered by AHHA. Anderson would use Lyford and Grand Harbor for asset protection. The advance selection of a series of corporate names which were ultimately used in sequence and each played a role in the execution of the ERISA scam is evidence of advance structuring pursuant to a common plan and design to execute an ERISA health insurance scam.

99.     On November 11, 1999 McNicoll and Claro met in Luxembourg. Claro and McNicoll went to CA-LUX and met with banker Simon Mullholland. A check payable to Euan McNicoll in the sum of $93,105.90 was deposited into an account at CA-LUX. On November 18, 1999 Claro sent an e-mail to Mr. Mulholland in which Claro asked if CA-LUX had "wired the funds

in accordance with Mr. McNicoll's instructions."[64]  Claro stated the funds had not "arrived at the destination banks at this time."  On November 18, 1999, Claro instructed John King, a trust officer at Worldwide Trust Services Limited ("Worldwide"), in Nassau, Bahamas,[65] to incorporate McSooner, Inc. for McNicoll and McLater, Inc. for Reeve.  Worldwide had acted as a director for Claro's BVI company, Pezzillo Powerboats Limited ("Pezzillo"), and Claro's Bahamian company, Stanway Investments Limited ("Stanway"), since 1997.  On November 18, 1999 Claro witnessed an "Indemnity" agreement relating to McSooner which was signed by McNicoll.[66]  An identical "Indemnity" agreement relating to McLater which was signed by Reeve also bears the date of November 18, 1999.  On November 23, 1999, Claro received a wire transfer from CA-LUX for $39,974.[67]  On or about November 22, 1999 Claro and McNicoll met Samuel Lohman, a lawyer, in Geneve, Switzerland.  When Claro set up the meeting with Mr. Lohman Claro referred to McNicoll as his "main client (who is from Scotland . . .)."[68]  On November 26, 1999 Stanway received a wire transfer from CA-LUX for $51,595.[69]  On January 5, 2000 McSooner and McLater were incorporated in the Bahamas.  On February 24, 2000 McNicoll, Claro and Reeve were together in the Bahamas.  On March 17, 2000, McSooner (McNicoll) and McLater (Reeve) and Christopher Gascoyne (an employee of a UK corporate formation company) acted as the disclosed stockholders

---

[64]  See, Docket Entry 314-315, November 18, 1999 e-mail from Claro.

[65]  Eventually Worldwide, a very small company operating out of a 2,000 square foot office in Nassau, Bahamas would simultaneously provide director services for Claro, McNicoll, Reeve and Anderson.

[66]  See, Docket Entry 314-315, November 18, 1999 Indemnity.

[67]  See, Docket Entry 314-315, November 23, 1999 Claro bank record.

[68]  See, Docket Entry 314-315, October 26, 1999 e-mail from Claro to Lohman.

[69]  See, Docket Entry 314-315, November 26, 1999 Stanway bank record.

that formed Montgomery Kent Insurance & Reinsurance Services Limited (MK) in England. According to a March 7, 2000 letter signed by Claro, Claro's BVI company, Pezzillo, was a "related entity" that had an "ownership interest" in MK.[70] From credit card records it appears that on April 25, 2000 McNicoll and Reeve met in England.

100.   In May of 2000 the portfolio of single-employer self-funded ERISA plans administered by AHHA was reinsured by United Fidelity Corp., a fraudulent company incorporated in the Cook Islands, pursuant to a deal brokered by Reeve and McNicoll assisted by Claro under which commissions were being paid to McSooner (McNicoll) and McLater (Reeve) at Barclays Bank in Nassau, Bahamas.  As director for both companies, King had signatory authority over both accounts.  On May 15, 2000 Reeve instructed King to wire transfer from McLater the sum of $3,000 to the account of MK at NatWest, Welwyn Garden City Branch, Hertfordshire, England.  Reeve stated the wire transfer was made "in respect of the business development plan I outlined for you." On May 23, 2000 McNicoll requested King wire transfer from McSooner $3,000 to the account of MK at NatWest "in respect of the development of new business in the UK, which I mentioned to you some time ago."  On June 27, 2000 McNicoll sent an e-mail to King which stated "Mike and I are looking at a number of jurisdictions for the creation of a small insurance company.  This would be created to underwrite American Heartland's (AHHA's business).  The reason we want to do this is because the portfolio, known to us for over 10 years now, is extremely profitable." [71] "Mike" was a reference to Michael Arthur Reeve.  McSooner (McNicoll) and McLater (Reeve), in tandem, continued to simultaneously instruct King to transfer monies from their respective accounts at

---

[70]  See, Docket Entry 314-315, March 7, 2000 letter from Claro.

[71]   See, Docket Entry 314-315, June 27, 2000 e-mail from McNicoll.

Barclays to the account of MK at NatWest pursuant to their business development plan. The business development plan referenced by McNicoll and Reeve was their plan to form a reinsurance company to take over the reinsurance of the ERISA plans administered by AHHA.

101.    On July 11, 2000 the McLater credit card issued to Reeve was used in St. Andrews, Scotland. On or about that date, Reeve met with McNicoll and Anderson. According to credit card records, Reeve was also in Scotland on August 1, 2000. On August 2, 2000 Anderson sought to increase the share capital of Lyford from $5,000,000 to $10,000,000. According to Lyford corporate records, the increase in capital was because "the persons with whom [Anderson] was doing business seemed to want to deal with a company with a more substantial capital."[72]

102.    On August 3, 2000 McNicoll instructed King to wire $9,000 from McSooner to the account of MK at NatWest. On August 4, 2000 Reeve instructed King to wire $2,000 from McLater to the account of MK at NatWest. On August 9, 2000, McNicoll requested that Ehler begin making the premium payments related to the AHHA portfolio of ERISA plans (then apparently reinsured by United Fidelity Corp. which was in default in the payment of claims) to MK at Fleet Bank in New York City with the notation "initial deposit to open account for" MK. McNicoll stated MK was his "UK registered broking company." [73] On August 11, 2000 AHHA wired $140,878.86 to MK. On August 22, 2000 credit card records indicate the McLater credit card issued to Reeve was used in Scotland. On August 27, 2000 credit card records indicate the McSooner credit card issued to McNicoll was used in New Jersey. On August 28, 2000 Anderson incorporated Marsh. On August 29, 2000 the stock of Marsh was increased from US$50,000 to US$10,000,000. On August 30, 2000

---

[72]  See, Docket Entry 314-315, August 21, 2000 Memo from Honess.

[73]  See, Docket Entry 314-315, McNicoll e-mail.

a McSooner receipt indicates McNicoll received $5,000 cash from Worldwide.

103.     On September 14, 2000 the plan for NAI, a yet-to-be incorporated company, to take over the portfolio of ERISA plans administered by AHHA and then reinsured by United Fidelity Corp. was hatched.  On this date Claro called McNicoll on the telephone, and on September 15, 2000 Claro called Worldwide and McNicoll.  The structure of the NAI deal called for Anderson and McNicoll to incorporate NAI in Belgium, using the Marsh stock as capital, in essentially the same manner in which McNicoll, assisted by Claro, had formed First Fidelity in Belgium in 1995. On September 18, 2000 McNicoll sent an e-mail to Worldwide which stated "Re John Claro, I know he has been bugging you about an incoming transfer to Stanway Investments.  I told him . . . the transfer got held up at the US correspondent bank . . ."[74]  On October 10, 2000 NAI took over the existing portfolio of ERISA plans administered by AHHA effective as of September 1, 2000.  On October 27, 2000 NAI was incorporated in Belgium.  On November 1, 2000 MK wired $60,000 to the account of Marsh at CA-LUX.  On November 10, 2000 Stanway received a $19,990 wire transfer from an account at CA-LUX.[75]  On December 28, 2000 NAI's capital was stated to be 11,192,000 EURO consisting of US$10,000,000 in value of stock in Marsh which Anderson owned and contributed in kind to NAI to "enforce the financial integrity and financial strength [of NAI] in order to act as a full and stable insurance company in respect to the specific activities and territories" where NAI operates.[76]  The value of the Marsh stock was stated in general terms to be composed 70% of cash and 30% of real estate. NAI had no employees other than McNicoll and Anderson.  It

---

[74]  See, Docket Entry 314-315, September 18, 2000 McNicoll e-mail.

[75]  See, Docket Entry 314-315, November 10, 2000 Stanway bank record.

[76]  See, Docket Entry 314-315, December 28, 2000 entry.

essentially operated out of the homes of McNicoll and Anderson in Scotland, although it did maintain a virtual or registered office at the NCI Business Center, Louise Tower, Avenue Louise, 149 B - 1050, Brussels, Belgium. At the time of formation NAI had no insureds other than the portfolio of ERISA plans administered by AHHA which were reinsured by United Fidelity Corp. and assumed by NAI.

104.    NAI, acting through its directors McNicoll and Anderson, entered into a Reinsurance Agreement with Connelly which insured 100% of the medical claims of the approximately 300 participants covered under the Connelly plan for a term of one year commencing on January 1, 2001. McNicoll and Anderson signed the Reinsurance Agreement for NAI on March 9, 2001. Connelly paid monthly gross premiums of approximately $100,000, making it one of the larger accounts for NAI. The payment of Connelly claims was delayed from the start. It was contended Connelly failed to provide necessary information. Redundant requests for additional documentation were made. AHHA did not begin to process the bulk of the Connelly claims until June or July 2001. The NAI-related ERISA scam utilized a prescription drug card and a provider network and initially paid a portion of the medical claims which made the medical plan appear legitimate. After substantial premiums were collected claims payment was delayed, using redundant requests for information and other excuses. People have grown accustomed to legitimate insurers asking questions and taking time to evaluate claims, especially larger ones. Thus, an initial delay did not immediately raise "red flags." This allowed time to collect millions of dollars in premiums from many small businesses before claims payments stopped altogether. The object of the ERISA scam was to induce Connelly and others to purchase and continue to pay premiums for the fake health insurance for their small businesses so that substantial premiums could be collected, siphoned off and then retained pursuant

to the common plan to deny benefits to insured persons even when payment of benefits was clearly warranted.

105.    The Court finds that after the execution of MK's business development plan -- which was for McNicoll and Reeve to form an insurance company to take over the AHHA administered ERISA plans  -- was effectuated by the formation of NAI by McNicoll and Anderson, it then became Reeve's role in the conspiracy to locate a reinsurer to replace NAI.  In February 2001, McNicoll sent an e-mail to King in which McNicoll stated McNicoll and Reeve's interests "had diverged, somewhat" and that King should tell his colleagues "McSooner and McLater are entirely separate entities and should not be commingled, mixed up or considered enjoined in any way.  This is not intended to reflect negatively on Mike Reeve.  Mike has his own interests which are successful in their own way and I am sure he will continue to transact business with you in respect to his own interests.  However, I would like to make it clear that it is only McSooner in which I am interested, and McLater/Mr. Reeve have nothing to do with McSooner at all."[77]  According to a McNicoll e-mail, Claro advised McNicoll to try to change the name of McSooner before AHHA began to wire substantial premiums to McSooner.[78]  Apparently, the name McSooner had become unacceptable because it was a reference to the "Mc" in McNicoll and the state of Oklahoma, where Claro was from.  On February 13, 1999 AHHA wired $749,474.91 to the account of McSooner.  On March 12, 2001 AHHA wired $792,434.35 to the account of McSooner.  The funds wired to McSooner were then wired to the account of NAI at KBC in Belgium.  NAI then wired those funds, in differing amounts, to CA-LUX.  The funds wired to CA-LUX apparently ended up in the same account MK

---

[77]  See, Docket Entry 314-315, February 6, 2001 McNicoll e-mail.

[78]  See, Docket Entry 314-315, February 12, 2001 McNicoll e-mail.

(McSooner -McNicoll and McLater-Reeve) had been sending the premiums to Marsh during the time MK (McSooner-McNicoll and McLater-Reeve) carried out their business plan to move current premiums from MK to the account of Marsh at CA-LUX.  Apparently, these wire transfers were made in an effort to capitalize Marsh with current premium income so the stock of Marsh could be used to capitalize NAI.  Reeve's "somewhat" of a divergence was short lived.  Reeve began efforts to locate a reinsurer to replace NAI, around the time NAI was formed or shortly thereafter.  Reeve went to Cyprus.  St. John was formed. According to credit card records McNicoll was in Geneve, Switzerland on June 12-14, 2001.  On June 21, 2001 NAI wire transferred SFr8000[Swiss] to Mr. Lohman in Geneve, Switzerland for "general international legal advice."[79]  On June 25, 2001 McNicoll and Anderson were at the Lancaster Hotel in Houston, Texas.  On July 18, 2001 NAI offered to buy AHHA "in a transaction that would involve either a 'pay out' or an "overseas' account."[80]  Reeve kept an eye on the business.  June of 2001 was the first month that the claims submitted by AHHA exceeded the premiums paid to NAI.  On July 24, 2001 Reeve all but predicted the default of NAI.[81]  On August 20, 2001, in an e-mail from McNicoll to Wilkinson, McNicoll complained that claims were not being handled "with enough vigor to keep them at an acceptable level" and if something was not done about it Anderson would "withdraw" or "cease to be involved."[82]  On August 24, 2001 Reeve sent a fax to Claro which stated "re Erisa, . . . I am pleased to say we have located a quality market (Bests A+) in London who underwrite this class and are

---

[79]  See, Docket 314-315, June 21, 2001 entry.

[80]  See, Summary of Facts, July 18, 2001 entry.

[81]  See, Docket Entry 314-315, July 24, 2001 fax from Reeve to Hoskie.

[82]  See, Docket Entry 314-315, August 20, 2001 McNicoll e-mail.

interested in looking at the AHHA business."[83]   On August 30, 2001 Claro sent a letter which appointed St. John as broker of record to solicit reinsurance coverage for the individual ERISA plans administered by AHHA.[84]   On September 25, 2001 Ferguson prepared a draft of a proposed announcement by which AHHA would advise the employers that it had located MT, a foreign reinsurer immediately willing to take on the risk of providing medical insurance to hundreds of employers and thousands of plan participants.  On September 25, 2001 NAI (McNicoll/Anderson) suggested AHHA President Ferguson "fly to Geneva and have a face to face" with them.[85]   On September 27, 2001 McNicoll and Anderson announced they had withdrawn their approval of AHHA as a claims administrator.  On the same day, AHHA announced it had located MT, a new reinsurer who was willing to underwrite the business with effect from September 1, 2001.  After locating MT, Reeve stated in an e-mail to Claro and AHHA President Ferguson, that working "with professionals always paid off." [86]   The "professionals" to whom Reeve referred were professionals at operating the repetitive ERISA health insurance scam which failed to pay tens of millions of dollars in the medical claims of thousands of hard-working employees in the United States.  The record reflects that MT and MTFS corporate officers involved the company in the ERISA scam.  MT and MTFS was an unlicensed health insurer which illegally engaged in the unauthorized sale of health insurance in South Carolina by insuring the Connelly plan between the dates of September 1, 2001 and December 31, 2001.  MT and MTFS subsequently appointed Reeve as its "worldwide"

---

[83]  See, Docket Entry 314-315, August 24, 2001 Reeve fax.

[84]  See, Docket Entry 314-315, August 30, 2001 Claro letter.

[85]  See, Docket Entry 314-315, September 25, 2001 Ferguson e-mail.

[86]  See, Docket Entry 314-315, October 5, 2001 Reeve fax.

representative and announced it had acquired an interest in St. John.[87]  After MT and MTFS failed to pay millions in claims, it attempted to justify its actions by asserting it had not authorized Reeve and St. John to act on its behalf.  The record reflects the direct personal involvement of high level representatives of MT and MTFS in the ERISA business who had actual or apparent authority to involve MT and MTFS in the ERISA business.  The Court finds the briskly timed and apparently seamless transition from NAI to MT and MTFS was part of a professional and carefully orchestrated ERISA health insurance scam.

106.     McNicoll and Anderson set up asset protection while they siphoned an amount estimated to be $7,689,568 in current premium income from NAI, directly or through intermediaries, and moved it to CA-LUX between November 1, 2000 and November 2002.[88]  CA-LUX was  the same bank which had been utilized in the ERISA scam since the early to mid-1990's.  CA-LUX was a bank McNicoll, Anderson and Reeve used as a repository for monies related to the repetitive ERISA scam.  CA-LUX did not honor a request from this Court for international judicial assistance which sought to freeze the identified accounts at CA-LUX and obtain records from CA-LUX.  CA-LUX banker Simon Mulholland dealt with the account or accounts since at least November 11, 1999 when McNicoll and Claro met with him in Luxembourg.[89]  CA-LUX was the bank chosen by McNicoll, Anderson and Reeve as a place, at least initially, to move the current premium income siphoned from NAI, because of Luxembourg's banking secrecy laws.  This Court's request for judicial assistance to CA-LUX was intended to freeze the money in the identified accounts in pari

---

[87]  See, Docket Entry 314-315, November 29, 2001 Press Release.

[88]  See, Docket Entry 314-315, November 7, 2002, Chart.

[89]  See, Docket Entry 314-315, November 18, 1999 Claro e-mail.

passu for the 409 U.S. Companies and their employees affected by the ERISA scam and place CA-LUX on actual notice that those accounts at CA-LUX were being used by McNicoll, Anderson, Reeve and/or their alter ego companies to facilitate the ERISA health insurance scam which harmed Plaintiffs and others in the United States.[90]

107.    The Court concludes that the justifications given by Anderson and McNicoll for NAI's non-payment of claims were contrived and not legally valid.  In fact, the refusal to pay Plaintiffs' medical claims was motivated by the desire of McNicoll, Anderson and Reeve to unlawfully make a large profit through actions specifically intended to injure Plaintiffs by obtaining premium money from Plaintiffs (as well as from other companies and their employees) through the use of NAI, a fraudulent, undercapitalized and unlicensed company which sold an unauthorized health insurance policy which, pursuant to McNicoll, Anderson and Reeve's explicit or tacit agreement, was specifically intended to harm Plaintiffs through the denial of payment of Plaintiffs' medical claims, even when payment of benefits was clearly warranted.  McNicoll, Anderson and

---

[90]   This Court issued requests for international judicial assistance and orders directed at the sequestration of assets for the purpose of trying to freeze and immobilize NAI-related assets which were directly related to the fraudulent insurance scam for the benefit of the 409 U.S. companies and the approximately 12,000 victims which were the subject of the NAI employers class action and the Indiana participants class action, including the Plaintiffs in this action.  Those efforts were primarily undertaken in this case with the Court taking the position that if its orders were successful in freezing and immobilizing those NAI-related assets, upon proper hearing, those assets would be applied in a pari passu environment, which specifically meant that with respect to the ultimate distribution of NAI-related assets from any fund of money frozen or immobilized no victim entitled to receive said NAI-related assets would have any precedence over another also entitled to receive.  Those NAI-related assets, had they been recovered, would have been placed on deposit with the United States District Court Clerk's office.  The Court recognizes that Plaintiffs and their legal counsel have diligently attempted to freeze and immobilize NAI-related assets and unquestionably acted for the benefit of all injured parties in this costly endeavor.  Unfortunately, CA-LUX ignored the Court's sequestration order and the District Court of Luxembourg declined this Court's request for international judicial assistance.  The conspirators were very adept at moving money.  As a result no funds have yet been frozen or immobilized by virtue of this Court's orders.  Also, the secretive nature of the scam was such that it took considerable time and effort to ultimately discover that CA-LUX was a primary repository for the funds.  With respect to the judgment in this case, to the extent it is executed against NAI-related assets in the possession, custody or control of McNicoll, Anderson, Reeve or any company or entity in which they have an interest, the NAI-related assets shall be subject to disbursal in pari passu.  The Court notes, however, that since the records reflect MT and MTFS claimed assets of $42,000,000 when they undertook the unauthorized insurance business in the United States, disbursal in pari passu may not be necessary as to the claims against MT and MTFS.

Reeve acted with actual malice toward Plaintiffs in that they specifically intended to harm Plaintiffs through the sale of an illegal and unauthorized health insurance plan which, after substantial premiums were collected, was never intended, and in fact did not pay the Plaintiffs' covered medical claims. The specific plan to take Plaintiffs' premiums and not pay Plaintiffs' claims is evidence McNicoll, Anderson and Reeve acted with actual malice toward Plaintiffs.[91]

108.    As a first justification for the non-payment of the Plaintiffs' claims, McNicoll and Anderson asserted that claims were not being managed with "enough vigor to keep them at an acceptable level."[92]  This assertion was made in an August 20, 2001 e-mail from McNicoll to Wilkinson, a principal of AHHA. McNicoll stated to Wilkinson  "if we are to progress in business at all and not withdraw" AHHA had to manage claims or Anderson would "cease to be involved." Apparently, the majority of Plaintiffs' claims were not submitted by AHHA to NAI until June or July 2001. The e-mail is evidence of a fraudulent and unlawful express agreement between Wilkinson, Anderson and McNicoll, which was entered into at the beginning of the NAI-ERISA scam, that claims submitted by AHHA in a given month would not exceed premiums paid to NAI. This agreement was unlawful because the amount of future claims was dependent upon whether a plan participant received covered medical care, not upon whether NAI made a profit each month. No crystal ball could predict when one of Connelly's employees would have a heart attack, be diagnosed with cancer or otherwise require medical treatment which would become the subject of

---

[91]  The phrase "actual malice" under South Carolina law "requires that the defendant acted with ill will toward the plaintiff or that [he] acted recklessly or wantonly, meaning with conscious indifference toward plaintiff's rights and requires that at the time of his act or omission to act the tortfeasor be conscious, or chargeable with consciousness of his wrongdoing." Austin v. Torrington Company, 810 F.2d 416 (1987) citing Rogers v. Florence Printing Co., 233 S.C. 567, 577, 106 S.E.2d 258 (1958); Jones v. Garner, 250 S.C. 479, 158 S.E.2d 909 (1968); and Padgett v. Sun News, 278 S.C. 26, 292 S.E.2d 30 (1982).

[92]  See, Docket Entry 314 and 315, August 20, 2001 e-mail from McNicoll to Wilkinson.

a claim.  The Reinsurance Agreement provided claims would be paid within ten (10) days of receipt of a claims run.  The risk that claims would exceed premiums is inherent in the sale of an insurance product; it is the quid pro quo for which the premium is paid.  The unlawful agreement between McNicoll, Anderson and Wilkinson to use AHHA to manage claims, which was made around the time McNicoll, Anderson, and Reeve began to use NAI as a front to take over the reinsurance of the AHHA administered ERISA plans is evidence which establishes from the inception of the plan an understanding and agreement that McNicoll, Anderson and Reeve did not intend to pay Plaintiffs' claims as provided for in the Reinsurance Agreement.  McNicoll's August 20, 2001 e-mail, sent to initially justify the refusal to pay the claims of Plaintiffs and others, is evidence that the unlawful agreement was specifically intended to, and did in fact, proximately cause special damage to Plaintiffs.

109.    The history of involvement of Reeve and McNicoll in the ERISA scam is circumstantial evidence of Reeve's participation in the unlawful agreement to manage or wrongfully deny claims and siphon premiums.  Both the means involved (the unlawful sale of health insurance by a fraudulent company) and the purposes accomplished (the management and wrongful denial of claims to siphon premiums) were promoted by Reeve.  Reeve monitored the amount of NAI premiums collected and the amount of claims paid.  Reeve located MT to replace NAI once NAI, as planned, defaulted in the payment of claims.[93]  The unlawful agreement to manage claims establishes McNicoll, Anderson and Reeve acted with actual malice in that they specifically intended to do the harm to Plaintiffs and the other small businesses from whom they collected premiums from the very beginning.  Their actions were malicious because of their intentional doing

_____

[93]  Exhibit, Summary of Facts, July 24, 2001 e-mail from Reeve to Hoskie.

of an unlawful act which was determined before it was executed.[94]  Their actions were motivated by ill will and were designed to causelessly and wantonly injure Plaintiffs.  The injury which would befall Plaintiffs from NAI's pre-planned failure to pay their medical claims was foreseen and specifically planned, even though the ultimate object of the alleged conspiracy was intended to inflict similar harm to many other small businesses through the same conduct.

110.    As a second justification for the non-payment of claims, McNicoll and Anderson contended that AHHA had not properly adjudicated claims and that a claims audit of AHHA had to be performed.[95]  After the claims audit was allegedly performed, it did not identify any specific medical claim submitted by Plaintiffs that had been adjudicated by AHHA as payable which in fact was not payable.[96]  Also, following completion of the claims audit Plaintiffs' claims were not paid.  Thus, had the claims audit been a true effort to identify specific claims which were not payable, as opposed to a contrived justification for non-payment of Plaintiffs' claims, any claim which was not specifically identified by the audit as not properly payable would have been paid following the completion of the audit.  The Court finds the claims audit was a delay tactic.  Plaintiffs were told that claims would be paid when the audit was completed.  Claims records indicate claims were being held pending an audit.  Claims checks were stated to have been issued, but never mailed.  The use of the audit was a delay tactic.  Plaintiffs continued to pay premiums while the audit was performed.

---

[94]  "While implied malice will support an award of actual damages, punitive damages cannot be recovered in the absence of proof of actual malice.  Actual malice or malice in fact is not presumed and must be proved.  Actual malice means that the defendant was actuated by ill will in what he did, with the design to causelessly and wantonly injure the plaintiff....".  Jones v. Garner, 250 S.C. 479, 158 S.E.2d 909 (1968), citing, Rogers v. Florence Printing Co., 233 S.C. 567, 106 S.E.2d 257 (1958).

[95]  Exhibit, Summary of Facts, September 28, 2001 letter of McNicoll and Anderson to "Producers and Agents of NAI's Portfolio."

[96]  Exhibit, Summary of Facts, December of 2001 (undated) CSRG Claim Administration Audit.

Plaintiffs reasonably relied upon the representations that their claims would be paid when the audit was complete. Therefore, Plaintiffs did not promptly seek other means to pay their medical bills. As a result of the non-payment and delay tactic, medical creditors or their collection agencies placed derogatory entries on many of the Plaintiffs' credit reports. "The covenant of good faith and fair dealing extends not just to the payment of a legitimate claim, but also to the manner in which it is processed." Ocean Winds Council of Co-Owners, Inc. v. Auto-Owners Insurance Company, 241 F.Supp. 572, 576 (D.S.C. 2002). Unreasonable action in processing a claim which causes harm can be recovered as consequential damages in a tort action. Id. AHHA acted as NAI's agent in the collection and transmission of premiums and contracts of insurance. As such, AHHA acted as an agent for an unlicensed, unauthorized insurer. NAI is bound by the acts of its agent. Wilkinson, a principal at AHHA, was a person who agreed to manage the claims for NAI. McNicoll and Reeve were very familiar with Wilkinson and Ferguson, having been involved with them in business for approximately a decade. They knew precisely what they were doing in using AHHA to adjudicate claims. The evidence established McNicoll and Anderson expected that claims would be "managed with enough vigor to keep them at an acceptable level." This meant only one of two things: either the claims would be held back by AHHA resulting in a backlog of unpaid claims, or that valid claims would be denied so that claims would not exceed premiums pursuant to the unlawful agreement reached by Wilkinson, Anderson and McNicoll. McNicoll and Anderson specifically intended that AHHA would not properly adjudicate claims and that the failure of AHHA to properly adjudicate claims caused special damage to Plaintiffs. The unlawful agreement which resulted in a backlog of claims was also used as a justification to not pay claims because ultimately it was asserted by McNicoll and Anderson that AHHA had improperly held onto claims and then unfairly

dumped them on NAI in July or August 2001, thus requiring the audit.  The unlawful agreement also

positioned McNicoll and Anderson to assert that NAI did not have complete or accurate loss

information from which they could pay Plaintiffs' claims.  McNicoll and Reeve knew the AHHA

portfolio of ERISA business had a significant loss ratio and that the only way it could be "extremely

profitable,"[97] as McNicoll put it, was through the non-payment of claims.  The evidence of this

knowledge is the personal involvement of McNicoll and Reeve in the business during the decade

in which tens of millions of dollars of claims were not paid.  McNicoll, Anderson, Reeve, and others

used a series of delays and redundant requests for information[98] as a tool to buy time to collect

additional premiums and move them offshore before the pre-planned default in the payment of

claims.  Evidence of the corporate plan not to pay claims which were clearly due includes evidence

that McNicoll did not think a claim should be paid if the patient died or if McNicoll (who had no

medical training) did not think the medical treatment was appropriate.[99]  McNicoll's requests for

information were for the purpose of delay and denial of claims, not because information was needed

to process and pay claims.  The use of a series of delays and redundant requests for information was

part of the specific agreement that claims would be managed with enough vigor to keep them at an

acceptable level.  After McNicoll and Anderson complained claims were not being handled with

---

[97] Exhibit, Summary of Facts, June 27, 2000 e-mail from McNicoll to King.  As of this time, Dai Ichi (involving Reeve and McNicoll) had defaulted in the payment of claims and was insolvent, First Fidelity (involving McNicoll and others) had defaulted in the payment of claims and was insolvent, Merrion (brokered by McNicoll) had defaulted in the payments of claims.  Not a single reinsurer involved in the business ever made a profit.

[98] Exhibit, Summary of Facts, November 6, 2001.  In an e-mail from Hoskie to Ferguson and Reeve pertaining to Reeve's question about the pancreatic cancer treatment of Connelly employee Ruth Waggoner, Hoskie stated "unlike your prior carrier [referring to NAI], when Mike [referring to Reeve] asks a question about a claim, it's for informational purposes."  The clear import of this statement was that when McNicoll or Anderson asked for information their purpose was for delay.

[99] Exhibit, Summary of Facts, November 6, 2001 e-mail from Ferguson to Hoskie and Reeve.

enough vigor to keep them at an acceptable level, Wilkinson sought to "slow claim production" by not submitting claims while information on the backlog of claims was assembled.[100]  McNicoll and Anderson then asserted claims could not be paid because they needed additional information on the backlog of claims.

111.    After McNicoll and Anderson stated, on August 20, 2001 that AHHA had not managed claims with enough vigor to keep them at an acceptable level, and thereafter that AHHA had not properly adjudicated claims which required that a claims audit be performed before NAI could pay the backlog of claims, on September 27, 2001, McNicoll and Anderson withdrew NAI's approval of AHHA as the approved claims administrator for all of the plans reinsured by NAI (approximately 409 plans covering 12,000 participants) and sought to move the claims administration of all of the plans to Managed Healthcare, Inc. ("MHI"), before the AHHA claims audit was completed.  MHI was a Texas-based company, which McNicoll and Anderson, through Jameson Corp., a Bahamian company controlled by McNicoll and Anderson, had secretly entered into a letter of intent to purchase for $1,825,000.00.  McNicoll and Anderson planned to purchase MHI so McNicoll and Anderson could personally control the adjudication of the claims of the employer victims before they were submitted to their other company NAI.  They sought to reap the financial rewards of their own coverage decisions.  They sought to act as the fiduciary of the Plan's beneficiaries and as the Plan's reinsurer, without disclosure of the clear conflict of interest.  The act of changing Plaintiffs' claims administrator left Plaintiffs in the middle of a manufactured dispute[101]

---

[100]  Exhibit, Summary of Document, September 6, 2001 e-mail from Wilkinson to Lupher.

[101]  It is a manufactured dispute because McNicoll and Anderson told Wilkinson to manage claims to keep them at an acceptable level and when this was done McNicoll and Anderson then complained about the backlog of claims.

between NAI and AHHA.  The manufactured dispute placed into question the handling of all claims.  The manufactured dispute created uncertainty as to whether Connelly should hire NAI's new claims administrator MHI to re-adjudicate the claims of 264 employees, or whether Connelly should stay with AHHA.  On September 27, 2001 (the same day NAI withdrew approval of AHHA)  AHHA announced it located MT to reinsure the NAI plans with effect from September 1, 2001.  The manufactured dispute left Connelly in the position of  having their plan (which was 8 months into a 1 year term) reinsured by MT and hoping NAI would pay its backlog of claims based upon the AHHA claims adjudication which McNicoll and Anderson claimed was inadequate and untrustworthy, or staying with AHHA and having their plan reinsured by MT.  The replacement of the third-party claims administrator and the change from one defaulting reinsurer to another, (from NAI to MT/MTFS), were overt acts in furtherance of the ERISA scam.  The object of these acts was to leave Plaintiffs not knowing who was responsible for the adjudication or the payment of their claims.  These overt acts ultimately required that Connelly use its management level employees and resources, which should have been devoted to management of the nursing home business, to handle the tremendous administrative burden of dealing with the failure of the company health plan because NAI purposefully failed to pay the medical claims of 264 participants through a fraud that was designed to place into question the accuracy of Plaintiffs' claims administered by AHHA, a company run, at least in part, by Wilkinson, which had conspired with McNicoll, Anderson, Reeve and others to commit the fraud.  Of course, it was not until much later that Plaintiffs learned that they had been victims of an elaborate repetitive ERISA scam which had been carried out by the same principal actors in essentially the same manner for a decade.

   112.  The third justification given by Anderson and McNicoll for not paying Connelly's

claims was that the Connelly plan (and the other plans with substantial outstanding claims) were not properly underwritten.   On November 21, 2001 NAI filed a lawsuit against AHHA, Ferguson Wilkinson and Claro in federal court in Houston, Texas.[102]  McNicoll and Anderson alleged that Wilkinson, Ferguson and Claro had represented that the portfolio of AHHA ERISA plans was underwritten and operated at about a 65% loss ratio.   In other words, McNicoll and Anderson asserted they were promised by Wilkinson, Ferguson and Claro that the claims would only amount to 65% of the premiums collected.   McNicoll and Anderson contended that had all or each of the plans been properly underwritten NAI would have received a profit of 35% and that because they did not NAI was justified in not paying the claims of any plan which had losses which exceeded 65% of the premiums paid because of underpayment of premiums.   However, the strategy of NAI's suit was to place the fault of bad underwriting on Plaintiffs (in a suit in which they were not made a party) under the theory that AHHA was responsible to Plaintiffs for underwriting and if AHHA failed in that responsibility (resulting in damage to NAI) it was Plaintiffs' fault.   However, it was AHHA, NAI's agent and which acted through one or more principal co-conspirator in the ERISA scam, which NAI contended had failed to underwrite the plans, thus making the "bad underwriting" suit between NAI and AHHA akin to a dispute over the division of the funds which were the object

_____

[102]  Part of the ERISA scam involved the conspirators' use of the court system to make the dispute over the failure of a reinsurer or the performance of a claims administrator look civil (as opposed to criminal) in nature and to give the victims false hope that there would be a judicial resolution which in time would result in the payment of their claims.  By making it look like the claims administrator was fighting hard to get the claims paid and had saved the day by finding another reinsurer to agree to provide the plan benefits which had been interrupted in the middle of a policy period (usually 6 - 8 months into a 12 month policy term) the conspirators could keep the ERISA business, before the employer got "antsy."  Each time a default occurred a legal dispute which involved allegations of claims mishandling by the TPA, bad underwriting, lack of binding authority, and the like, was used as a justification for the non-payment of claims.  As of October 22, 2001, McNicoll, Anderson, Reeve and Claro (the supposedly disputatious parties) all had their respective Bahamian International Business Companies being directed by Worldwide out of a 2,000 square foot office which was run by John King, Paul King and Richard King.  Worldwide had handled Claro's business in the Bahamas since 1997.

of the conspiracy. According to AHHA records between September 2000 and October 31, 2001 NAI made a profit of $5,077,366.55 and claims as a percentage of premiums was 81.64%. From their false and contrived premise, McNicoll and Anderson asserted that any plan which had submitted claims that exceeded 65% of premiums paid had to pay additional premiums before claims would be paid. NAI retained all Plaintiffs' premiums. It did not seek to rescind or terminate the Connelly reinsurance agreement based on the false and contrived "bad underwriting" theory. If NAI had sought to rescind the Connelly reinsurance agreement based on bad underwriting then it should have tendered back the paid premiums.[103] NAI simply kept (or stated bluntly, stole) the premiums and did not pay Plaintiffs' claims.

113.   The Court finds that Reeve and McNicoll had detailed actual prior knowledge of the history of the AHHA portfolio of ERISA plans; that history being that it provided "excellent cash flow" but the business was _never_ profitable and could only be made profitable by the non-payment of claims. The way the business was made to appear profitable was that a defaulting reinsurer was replaced by another reinsurer leaving substantial incurred but not reported unpaid claims. Only by looking solely at the premiums collected vs. the claims paid (without taking into account the substantial unpaid claims) to determine the loss ratio could the business appear profitable. For a decade, McNicoll and Reeve had detailed actual knowledge of the premiums, paid claims and the millions of unpaid claims. Thus, the Court concludes that the contention NAI undertook the business in reliance upon a representation that the business operated at a 65% loss ratio was false. The profitability of the business relied upon the collection of premiums and the non-payment of claims. Under McNicoll's accounting principles, profitability depended upon when the reinsurance

---

[103]   A party seeking rescission must tender back the benefits received under the contract. See, Dan B. Dobbs, Handbook on the Law of Remedies, §4.3 at 254-255 (West 1973).

company on the risk was replaced; ceased to be involved; exited the market; or in layman's terms -- stopped paying claims. If the reinsurance company exited the market after collecting substantial premiums but before paying all incurred claims it made off with substantial profits at the expense of the employees who paid their premiums but did not get their claims paid. AHHA earned its 25%-30% regardless of whether or not claims were paid. AHHA simply needed any reinsurer to serve as a reinsurance company in order to sell its product. A mere foreign corporate charter of some sort appeared to be sufficient. For a decade, McNicoll and Reeve fulfilled this need, in one way or another. This is the reason that after McNicoll, Anderson and Reeve formed NAI, Reeve's business interests "diverged somewhat" from McNicoll's and it then became Reeve's role in the conspiracy to locate a reinsurer to replace NAI at the same time Reeve's analysis of NAI results appeared to indicate that incurred but not reported claims were mounting.

114.    McNicoll, Anderson, and Reeve, acting through their alter ego NAI, had no intent to pay Plaintiffs' claims. They were simply manufacturing legally insufficient ex post facto excuses to justify a fraudulent conspiracy which ab initio involved a specific plan to deny benefits to insured persons even when payment was clearly warranted. The specific plan to collect premiums and not pay claims was the ultimate object of the conspiracy. To say that McNicoll, Anderson and Reeve acted in "bad faith" is far too mildly stated. "Bad faith is a knowing failure on the part of the insurer to exercise an honest and informed judgment in processing a claim . . . [A]n insurer acts in bad faith where there is no reasonable basis to support the insurer's decision." Doe v. S.C. Medical Malpractice Liability JUA, 347 S.C. 642, 649, 557 S.E.2d 670, 674 (2001) (internal citations omitted)). McNicoll, Anderson and Reeve wanted  the premium money so NAI accepted the risks. AHHA wanted their 25% - 30% off the top so it sent NAI the business. It was the premiums the

conspirators cared about. They did not intend to pay claims. Underwriting was only important as a false ex post facto justification for the non-payment of claims. McNicoll and Anderson simply collected Connelly's premiums and did not pay Connelly's claims and then made up ex post facto false justifications for their actions.

115.     On March 19, 2002, while conducting the business of NAI in Sacramento, California at the office of Mr. Marchese, NAI's California attorney, McNicoll and Anderson were each personally served with a class action law suit filed in federal court in Indiana on behalf of the approximately 12,000 persons who were insured as participants under the NAI Reinsurance Agreements. The participants class action lawsuit named NAI, AHHA, MHI, Marsh, Anderson, McNicoll, Ferguson and Horn. After being served with the participants class action lawsuit, Anderson and McNicoll, aided and encouraged by Marchese and apparently Busschaert, immediately proceeded to take steps to strip NAI of its assets, which apparently consisted only of the current premium income siphoned from NAI and moved to the account of Marsh or others at CA-LUX and 10,000,000 shares of essentially worthless stock in Marsh.

116.     On March 20, 2002 Anderson resigned as a director of Marsh, cancelled the share capital of the company and closed the company down, stating it was no longer trading. On March 22, 2002 Marchese wrote a memo to Anderson and McNicoll which stated NAI's business was largely concluded; NAI's reserves and assets were useless in support of U.S. business; that Marsh no longer had to pledge funds to NAI and could invest elsewhere; that NAI could wind down business and be left as a "shell."[104] On the very same day, Marchese also wrote Connelly and stated

---

[104] Evidence of the direct involvement of Marchese's and Busschaert in the plan to strip NAI of its assets could not have been discovered until May 3, 2004 which is the date Plaintiffs' counsel received the memo in which Marchese encouraged the stripping of assets contained in the records Judge Moulds ordered be produced to Plaintiffs' counsel pursuant to the subpoena issued to Marchese.

NAI did not have the underwriting on the Connelly plan; that in general AHHA had not adjudicated claims in a manner consistent with applicable insurance industry standards; that Connelly had underpaid its premium because it was represented to NAI that the plan operated at about a 65% loss ratio; that proper reinsurance premiums needed to be determined or settled upon; that NAI did not have actual or trustworthy claims submissions; but that NAI was prepared to enter into settlement negotiations whereby the amount of Connelly claims would be stipulated.[105]  As of this date, NAI had received $505,117.06 in premiums and had paid less than $30,000 in outstanding claims.

117.    On March 26, 2002 Mr. Marchese received a wire transfer of $27,932.23 from CA-LUX.  On March 27, 2002 a memo in the Marsh file stated "counsel in Belgium agreed that the capital of [Marsh] should be reduced as soon as possible . . ."[106]  On March  28, 2002, Anderson reduced the share capital of Marsh from US$10,000,000 to US$1,000 "to protect the company's original investors."[107]  In January of 2003, Marsh records state Anderson requested that Mr. Honess of Jerome E. Pyfrom & Co., the Bahamian law firm that incorporated Marsh, issue a letter or certificate "providing ex post facto justification for a decision taken by John Anderson et al."  in March of 2002 to reduce the capital of Marsh.  The law firm refused.  On March 27, 2002 Anderson began to set up the Grand Harbor Trust using the services of Worldwide.

118.    On April 11, 2002 McNicoll and Anderson, their Belgian counsel Busschaert, and their California counsel Marchese, received a legal opinion from the Gardere Law Firm, who they

---

[105]  The fact that on the same day actions were being taken to strip NAI of its assets McNicoll and Anderson also communicated with Plaintiffs who were still trying to get their claims paid is evidence that McNicoll and Anderson were well aware of Plaintiffs existence in relation to their actions to strip NAI of its assets and supports a finding that the primary object of those actions was to injure Plaintiffs.

[106]  See Docket Entry 314-315, March 27, 2002 record.

[107]  See Docket Entry 314-315, March 28, 2002 record.

had consulted for independent legal advice regarding NAI's legal strategy in the litigation NAI had instituted against AHHA and others in federal court in Houston. The independent legal opinion stated "[w]e are very concerned that this conduct [retaining all paid premiums without seeking to terminate the reinsurance agreements and not paying claims] exposes NAI to claims of punitive damages, multiple damages, and claims for actual damages in the amount of claims made and other claims such as business losses occasioned by the lack of medical insurance and indemnity for claims made by insureds for exacerbation of medical conditions, etc. arising of the failure to fund the ERISA plans. . . . It is our recommendation that NAI seek to extricate itself from . . ." the litigation it filed against AHHA and others in federal court in Houston, Texas.[108]

119.    On June 4, 2002 Plaintiffs instituted this civil action, which at the time it was commenced, named NAI, AHHA and Ferguson Marketing as Defendants. On May 6, 2002, in the NAI v. AHHA litigation (which was filed by NAI at the direction of McNicoll and Anderson in federal court in Houston, Texas, on December 21, 2002), the Court set a hearing for May 15, 2002 to determine whether it would certify as a class action the claims of all employer plans that had purchased reinsurance against NAI. On June 20, 2002, NAI filed suit against Connelly Management, Inc. and 34 other employers in Belgium. The Reinsurance Agreements provided they were to be construed and enforced according to the law of the United States. If a contract specifies the law that is to govern the contract, then courts must apply the law so specified. Burris Chemical,

_____

[108]    This document was properly discoverable. First, the attorney-client privilege does not allow a client to use the services of an attorney to commit a fraud. It is a widely recognized rule that the attorney-client privilege does not extend to communications in furtherance of criminal, tortious or fraudulent conduct. See, State v. Doster, 276 S.C. 647, 651, 284 S.E.2d 218, 220 (1981) (internal citations omitted); Ross v. Medical University of South Carolina, 317 S.C. 377, 383-84, 453 S.E.2d 880, 884-85 (1994). Second, the record was obtained pursuant to a valid subpoena issued to Mr. Marchese for NAI corporate records. Mr. Marchese did not make a proper objection to the subpoena and the court which issued the subpoena, after notice and an opportunity to be heard, issued an order which required the production of the record. Plaintiffs' lawsuit seeks those type of damages which McNicoll and Anderson were forewarned would arise from their wrongful actions.

Inc. v. USX Corporation, 10 F.3d 243, 245 (4th Cir. 1993). NAI was a Defendant in the action filed

by Connelly in South Carolina, a Defendant in the Indiana class action (which was personally served

on McNicoll and Anderson while they were in the U.S. on March 19, 2002), and a hearing had been

set in the Houston action filed by NAI to re-align the parties and convert that case into a class action

before NAI filed its case against Connelly Management, Inc. in the Commercial Court in Belgium.

This Court concludes that the Commercial Court in Belgium lacked jurisdiction over NAI's claims

against Connelly Management, Inc. because the Reinsurance Agreement provided it was to be

construed and enforced according to United States law; litigation over the NAI Reinsurance

Agreement[109] was pending in at least three (3) courts in the United States before NAI filed its actions

in Belgium;[110] Connelly Management, Inc. did not have "minimum contacts" with Belgium which

would subject it to suit in Belgium; and, service of the summons and complaint by mail was not

properly perfected on Connelly Management, Inc. because the records relating to the Belgium suit

which were provided to this Court by NAI's Belgian attorney Mr. Busschaert do not reflect a

certified receipt showing acceptance of the certified letter which contained the summons and

complaint from the Belgian Commercial Court signed by an officer, a managing or general agent

---

[109]  It is also noteworthy that NAI sought to arbitrate the dispute relating to the Reinsurance Agreement as part of its strategy in the Houston litigation, and then sought to litigate in Belgium. Once NAI sought to "extricate" itself from the Houston litigation it had initiated, the prospect of arbitration became an impossibility. NAI abandoned and therefore waived its arbitration request thereby requiring that the class action litigation against NAI, which is still pending, proceed as civil litigation and be adjudicated by the Court as opposed to arbitration. Under these circumstances NAI has "by engaging in litigation, implicitly waive[d] its contractual right to arbitrate." Navieros v. Intern-Americanos, S.A. v. M/V Vasilia Express, 120 F.3d 304, 316 (1st Cir. 1997). Regardless, NAI is not a party to this litigation and there exists no agreement to arbitrate between Plaintiffs and McNicoll, Anderson and Reeve.

[110]  The "first-filed" rule provides "[o]rdinarily, the court first acquiring jurisdiction of a controversy should be allowed to proceed with it without interference from other courts and other suits subsequently instituted." Barge v. Daily Journal Corp., 1995 WL 870174 (D.S.C. 1995), citing Carbide & Carbon Chems. Corp. v. US Indus. Chems., 140 F.2d 47, 49 (4th Cir. 1944); see also Allied-General Nuclear Servs. v. Commonwealth Edison Co., 675 F.2d 610, 611 n. 4 (4th Cir. 1982); Elliott Mach. Corp. v. Modern Welding Co., 502 F.2d 178, 180-81 (4th Cir. 1974).

of Connelly Management, Inc. as required by the Hague Service Convention and S.C.R.C.P., Rule 4(d)(8) and 4(d) (3) to perfect service by certified mail on a corporation.[111]   There being no jurisdiction over Connelly Management, Inc. in Belgium, it was not required to respond in any way to those proceedings.[112]   The default judgment entered by the Belgium Commercial Court in favor of NAI and against Connelly Management, Inc. on May 16, 2003 was null and void, and under the doctrine of international comity is not recognized by this Court.  See, Restatement (Third) Foreign Relations Law, §403 (1987).  The harm resulting from the insurance scam took place within the territory of the United States; the extent of the activity which harmed 409 U.S. small businesses and 12,000 plan participants was extensive; issues of expediency and convenience related to the judicial resolution of the dispute called for it to be handled in the United States; the regulation of unlawful sale of medical insurance in the United States by the courts of this country is supreme; and the interest of Belgium in exercising jurisdiction over proceedings related to this matter is not substantial in that Belgium, in the words of the co-conspirators, is "notoriously lax" in the regulation of reinsurance companies.  By virtue of the doctrine of international comity, the "first-filed" rule,

_____

[111] The rules of civil procedure with respect to service of process are mandatory.  Service by mail requires the strictest and most exacting compliance with the rules of service and the failure to comply with the rules renders any attempted service void.  Roche v. Young Brothers, Inc. of Florence, 313 S.C. 356, 358, 437 S.E.2d 560, 561 (1993).  In Roche, there was no in personam jurisdiction over the company because of ineffective service of process.  The summons and complaint were sent by certified mail, addressed to registered agent and marked "restricted delivery," but another employee of the company actually signed the return receipt and there was no showing that the company had actual knowledge of the proceeding against it.  Id. at 358 -359.  "Claims by one to possess authority to receive process or actual acceptance of process by an alleged but unauthorized agent will not necessarily bind the defendant.  There must be evidence the defendant intended to confer such authority."  Id. at 359; Hamilton v. Davis, 300 S.C. 411, 389 S.E.2d 297 (Ct.App. 1990).

[112] It is not necessary for this Court to formally address the issue of whether the proceedings initiated by NAI against Connelly Management, Inc. in Belgium were vitiated by fraud.  The NAI Belgium claim sought over $200,000 in damages from Connelly Management, Inc. notwithstanding that Connelly had paid NAI $505,117.06 in premiums and NAI had paid only $26,693.73 in claims and despite the fact that NAI had no intent to pay Connelly's outstanding claims or to remain in business after Anderson stripped NAI of its assets on March 20, 2002.  By no stretch of the imagination did Connelly owe NAI money.

and because of the absence of personal jurisdiction over Connelly Management, Inc. in the action

filed by NAI against Connelly in Belgium the default judgment of the Belgian Commercial Court

against Connelly is not res judicata or collateral estoppel as to any of the claims or issues litigated

in this previously pending proceedings. Id.

120.     For many working persons, the most important benefit of their employment is the

availability of health insurance coverage.  Insurance, especially medical insurance, is purchased to

provide peace of mind.  Medical insurance is purchased to pay medical bills in the event of sickness

or accident, which, in the absence of medical insurance, could financially devastate an employee and

their family.   Connelly, who has been in the nursing home business for 42 years, always offered

medical benefits to company employees.  Connelly paid a portion of the premium and the employee

paid a portion of the premium.  With the exception of the year 2001 each group health insurance

plan utilized by Connelly had paid the medical expenses of the covered participants.  As described

above, the principals of AHHA and NAI were involved in the civil conspiracy to sell, as a package

deal, the fraudulent insurance product to Plaintiffs.  The package deal called for Connelly to adopt

a single-employer self-funded ERISA plan to provide medical benefits to its employees and their

dependents, and at the same time enter into an Administrative Agreement with AHHA to administer

the claims and at the same time enter into a 100% Reinsurance Agreement with NAI to pay 100%

of the medical expenses covered under the Plan.  Connelly and its employees expected to pay a

premium, and in exchange have 100% of the covered medical expenses paid by the CMEWBP.  The

100% Reinsurance Agreement, which insured Connelly's "liability in terms of the Plan", was a

policy of health insurance.  It was purchased by Connelly for the specific purpose of providing the

funds to CMEWBP to pay the medical bills of the covered employees for their intended benefit.  The

policy also benefitted the Connelly because it shifted 100% of the financial responsibility for the payment of employee medical claims under the CMEWBP from Connelly to NAI and placed the responsibility for the administrative handling, determination and payment of claims upon AHHA.

121.     Inevitably, McNicoll, Anderson and Reeve will argue they have no liability for damages suffered by Plaintiffs because the Reinsurance Agreement was between Connelly and NAI. The claims of Connelly and the CMEWBP are not based upon contract, nor are they against NAI. Plaintiffs' claims are based upon the tort of civil conspiracy. Plaintiffs need not prove privity of contract with NAI in order to prevail against Defendants on their civil conspiracy claim. The tort of civil conspiracy requires that Plaintiffs prove three elements: (1) a combination of two or more persons; (2) for the purpose of injuring the plaintiff; and (3) causing plaintiff special damage. Kuznik v. Bees Ferry Associates, 342 S.C. 579, 538 S.E.2d 15 (Ct. App. 2000). In the case of A Fisherman's Best, Inc. v. Recreational Fishing Alliance, 310 F.3d 183 (4th Cir. 2002), the Fourth Circuit Court of Appeals analyzed South Carolina law on civil conspiracy as follows:

> A civil conspiracy is the combination of two or more parties joined for the purpose of injuring the plaintiff, thereby causing him special damages. See LaMotte v. Punch Line of Columbia, Inc., 296 S.C. 66, 370 S.E.2d 711, 713 (1988). To establish a concert of action a plaintiff must produce direct or circumstantial evidence from which a party may reasonably infer the joint assent of the minds of two or more parties to the prosecution of the unlawful exercise. A conspiracy is actionable only if overt acts pursuant to the common design proximately cause damage to the plaintiff. See, First Union Nat. Bank of S.C. v. Soden, 333 S.C. 554, 511 S.E.2d 372, 383 (1998). Nevertheless, lawful acts may become actionable if the object is to ruin or damage the business of another. See, LaMotte, 370 S.E.2d at 713.

122.     "Because a corporation can act only through its officers and agents, and because no entity can 'conspire' with itself, a corporate entity cannot 'conspire' with its own officers and employees." Sadighi v. Daghighfekr, 36 F. Supp. 2d 279 (D.S.C. 1999). The South Carolina Supreme Court recently held that "...no conspiracy can exist if the conduct challenged is a single act

by a single corporation acting exclusively through its own directors, officers, and employees, each acting within the scope of his employment." McMillan v. Oconee Memorial Hosp., Inc., --- S.E.2d ----, 2005 WL 3719636 (S.C.2006). Plaintiffs have proved that the conspiracy involved the actions of two or more persons and multiple corporations.

123.    Under South Carolina law, "[a] conspiracy is actionable only if overt acts pursuant to the common design proximately cause damage to the party bringing the action." Future Group, II v. Nationsbank, 324 S.C. 89, 478 S.E.2d 45, 51 (1996). Civil conspiracy requires a specific intent to injure the plaintiff. Sizemore v. Georgia-Pacific Corp., 1996 WL 498410 (D.S.C. 1996). The focus of the inquiry is thus on the purpose of the agreement: "the essential consideration is not whether lawful or unlawful acts or means are employed to further the conspiracy, but whether the primary purpose or object of the combination is to injure the plaintiff." Lee v. Chesterfield General Hospital, Inc., 289 S.C. 6, 13, 344 S.E.2d 379, 383 (S. C. App.1986); Sizemore v. Georgia-Pacific Corp., 1996 WL 498410 (D.S.C. 1996). Some evidence that the alleged conspirators "acted with malice towards" the plaintiff is required. Waldrep Brothers Beauty Supply, Inc. v. Wynn Beauty Supply Co., Inc., 992 F.2d 59, 63 (4th Cir.1993) (applying South Carolina law); Sizemore v. Georgia-Pacific Corp.,1996 WL 498410 (D.S.C. 1996). In the case of LaBelle v. Brown & Williamson Tobacco Corp., 1999 WL 33591435 (D.S.C. 1999) this Court held that where "the alleged injury in [the] case was foreseen (and to at least some extent, specifically planned), even though it may not have been the ultimate object of the alleged conspiracy" plaintiffs satisfied the requirement that they plead specific intent to injure plaintiffs. McNicoll, Anderson and Reeve purposefully directed the sale of the unlawful health insurance offered by NAI toward Connelly, a small business, and the CMEWBP, as opposed to its individual employees, because in this manner,

in a single-employer transaction, NAI could begin to collect a substantial stream of premium income. The Reinsurance Agreement contained a chart which established premiums based upon the age and sex of each company employee. McNicoll and Anderson purposefully directed the sale of the unlawful health insurance to Connelly and the CMEWBP to obtain, all at once, the substantial stream of premium income which flowed from providing medical insurance to 300 participant beneficiaries. However, once Connelly purchased the unlawful health insurance to fund the obligations of the CMEWBP to the participant beneficiaries, McNicoll, Anderson and Reeve purposefully directed the focus of their unlawful acts and means to further the conspiracy specifically toward the participants of the CMEWBP. The premiums which McNicoll, Anderson and Reeve converted, or siphoned from NAI, were paid by Connelly and the participants in the CMEWBP. The unlawful agreement to "manage" claims, by creating a backlog of claims, or by denying medical claims which were clearly due, was done with specific intent to injure Connelly and the participants in the CMEWBP. It was the claims of the participants in the CMEWBP for payment for their medical care for heart attacks, cancer, child birth and other personal medical conditions that were delayed and wrongfully denied. The redundant requests for information and the denial of specific medical claims which were clearly due was directed at the participants in the CMEWBP. It was the private and personal medical information of the participants which was the subject of the redundant requests for information. The false promises that the medical claims would be paid after the audit was completed were made to Connelly, the participants in the CMEWBP and to their medical creditors. These acts were designed to "lull" Connelly and the participants in the CMEWBP into thinking claims would be paid and caused them to take no prompt action while their credit was damaged. The medical claims which were not paid were medical claims of the

participants covered under the CMEWBP. The failure to pay those claims adversely affected the participants' relationships with their medical care providers and in some instances resulted in the inability of a participant to obtain medical care. These acts which evidence a specific intent to injure the participants in the CMEWBP establish a sufficient degree of relationship between the participants in the CMEWBP and the co-conspirators to support a claim for civil conspiracy brought by CMEWBP on behalf of the participants. See, Sizemore v. Georgia-Pacific Corp., 1996 W.L. 498410 (D.S.C. 1996) (civil conspiracy requires a specific intent to injure the plaintiffs). McNicoll, Anderson and Reeve were well aware of the existence of Connelly and the participants in the the CMEWBP in relation to their actions. They acted with malice toward Connelly, the CMEWBP and the participant beneficiaries. The alleged injury to Connelly and the participants in the CMEWBP in this case were done with specific intent to injure Plaintiffs, with malice toward Plaintiffs and injury to Plaintiffs was foreseen and specifically planned by the co-conspirators. See, LaBelle v. Brown & Williamson Tobacco Corp., 1999 WL 33591435 (D.S.C. 1999).

124. In the case of Sheek v. Lee, 289 S.C. 327, 345 S.E.2d 496 (1986), the South Carolina Supreme Court defined special damages:

> General damages are those which must necessarily result from the wrongful act upon which liability is based. It is not sufficient to show that the damages sought are the natural result of the breach. "Damages for losses that are the natural and proximate, but not the *necessary,* result of the injury may be recovered only when such special damages are sufficiently stated and claimed." (emphasis added). Hobbs v. Carolina Coca-Cola Bottling Company, 194 S.C. 543, 10 S.E.2d 25, 28 (1940).

> The law implies general damages. Special damages, however, are not implied by law because they do not necessarily result from the wrong. Carolina Life Insurance Company v. Bank of Greenwood, 217 S.C. 277, 60 S.E.2d 599 (1950).

> Special damages must be alleged in the complaint to avoid surprise to the other party. Crozier v. Charleston & W.C. Railway Company, 222 S.C. 121, 71 S.E.2d 800 (1952).

In the case of <u>James v. Pratt & Whitney</u>, 2005 WL 3440868, D.S.C.,2005 the Honorable David C. Norton opined that:

> "special damages are those damages which are of a relatively unusual kind and which, without specific notice to the adversary, may not be understood to be part of the claim." *quoting,* <u>Ellis v. Crockett</u>, 51 Haw. 45, 451 P.2d 814, 819 (Haw.1969).

Wright & Miller define special damages as "those elements of damages that are the natural, but not the necessary or usual, consequence of the defendant's conduct, and typically stem from and depend upon the particular circumstance of the case." Wright & Miller, 5A <u>Fed. Prac. & Proc. Civ.3d</u> 1310 (2005). Plaintiffs have plead and proved special damages as addressed more fully below.

125. NAI accepted 100% of the employers' "liability in terms of the Plan." The liability in terms of the plan was Connelly's liability to the CMEWBP and the liability of the CMEWBP to the participant beneficiaries. The Reinsurance Agreement was intended to shift the liability of Connelly to the CMEWBP to NAI. Once McNicoll, Anderson and Reeve intentionally caused the failure of the CMEWBP by converting and siphoning the premiums and delaying and then not paying claims, they compounded their bad faith actions by having NAI's legal counsel assert that Connelly had not acted lawfully as an employer in the adoption of the CMEWBP because NAI attributed the alleged wrongful acts of AHHA to Connelly and to the CMEWBP. However, McNicoll, Anderson and Reeve conspired with one or more principals of AHHA to injure Plaintiffs. Notwithstanding NAI's protestations, AHHA acted as NAI's agent in the unlawful sale of unauthorized insurance. According to McNicoll and Anderson the alleged failure of AHHA to provide NAI with the underwriting information for the CMEWBP, the alleged failure of AHHA to properly submit the claims and other information for the CMEWBP, and AHHA's alleged use of loss figures which were "untrustworthy" was the fault of Connelly and the CMEWBP thereby

justifying NAI's refusal to pay Plaintiffs' claims. Thus, as a final part of the fraudulent ERISA scheme, when NAI "exited" the market, McNicoll and Anderson suggested the beneficiary participants sue Connelly and the CMEWBP for AHHA's defalcations.

126.    Once Connelly learned that it had been the victim of an elaborate health insurance scam, Connelly notified the participant beneficiaries. Also, Connelly wrote the medical care providers and took financial responsibility for the payment of the claims owed by the CMEWBP. Connelly and the CMEWBP then filed and diligently pursued this lawsuit on behalf of the company, and on behalf of the CMEWBP for the benefit of the participant beneficiaries who were victims of the civil conspiracy. The complaint makes it clear that Connelly and the CMEWBP seek specified damages to the company and to the CMEWBP on behalf of the 264 participant beneficiaries who had unpaid medical claims.[113]

127.    NAI failed to pay the medical claims of the CMEWBP owed to the participant beneficiaries. This action is not against NAI. It is against McNicoll, Anderson and Reeve, individually. The liability of McNicoll, Anderson and Reeve for the unpaid medical expenses of the CMEWBP owed to the participant beneficiaries as one element of damage is based upon two independent legal theories. First, McNicoll, Anderson and Reeve, in furtherance of a civil conspiracy, participated in and directed the wrongful and tortious acts of NAI and Marsh which proximately resulted in the non-payment of Plaintiffs' medical claims thereby causing injury to Plaintiffs and thereby rendering McNicoll, Anderson and Reeve personally liable to Plaintiffs for the medical expenses NAI failed to pay as an element of special damage recoverable on the civil conspiracy claim. Second, McNicoll, Anderson and Reeve were persons who, acting as principals,

---

[113] See, Footnote 3 which addresses the issue of standing.

directly or indirectly, assisted NAI, an unauthorized insurer, in the procurement of the Reinsurance

Agreement (which provided for the payment of 100% of Plaintiffs' covered medical expenses),

which was a contract of insurance[114] issued by NAI, an unlicensed, and hence unauthorized, insurer

in the State of South Carolina.  Therefore, McNicoll, Anderson and Reeve are personally liable to

Plaintiffs for the full amount of the unpaid medical claims in the manner provided by the insurance

contract.  S.C. Code Ann. §38-25-360, entitled "Personal liability on contracts of unauthorized

insurers," provides:

> In the event of failure of an unauthorized insurer to pay any claim or loss within the
> provisions of the insurance contract, a person who assisted or in any manner aided
> directly or indirectly in the procurement of the insurance contract is liable to the
> insured for the full amount of the claim or loss in the manner provided by the
> insurance contract.

128.    Where a party has alternative claims giving rise to alternative remedies, it is

necessary to make an election of remedies unless the claims are different types or the remedies are

complementary rather than conflicting.  F.P. Hubbard & R.L. Felix, The South Carolina Law of

Torts, (2d ed. 1997), at Chapter 1, Section C, Page 30.

> Election of remedies involves a choice between different forms of redress afforded
> by law for the same injury or different forms of proceedings on the same cause of
> action.  It is the act of choosing between inconsistent remedies allowed by law on the
> same set of facts.  Its purpose is to prevent double recovery for a single wrong . . .
> Election of remedies is not applicable where there are two separate causes of action,
> each based on different facts.
>
> A defendant may raise the issue of election of remedies at any stage of the case.
> Indeed, to carry out the doctrine's purpose, the trial judge should on his own motion
> require election if he lets both causes of action go to the jury.  Inman v. Imperial
> Chrysler-Plymouth, Inc., 303 S.C. 10, 15, 397 S.E.2d 774, 777 (S.C.App.1990).

Plaintiffs' civil conspiracy tort claim and Plaintiffs' statutory aiding unauthorized insurer claim are

---

[114]  See, Home Healthcare Affiliates of Mississippi, Inc. vs. American Heartland Health Administrators,
Inc., Civil Action No, 1:01CV489-d-a (USDC, ND Miss., March 21, 2003).

different types of causes of action.  The remedy sought as to each claim is to hold McNicoll, Anderson and Reeve personally liable as an element of damage for  Plaintiffs' unpaid medical claims.  The primary difference between the claims is that the civil conspiracy claim requires a specific intent to injure the plaintiff,[115] while the statutory claim for aiding an unauthorized insurer in the procurement of an insurance contract is in the nature of a strict liability claim.  Thus, Plaintiffs' civil conspiracy cause of action and Plaintiffs' statutory cause of action can alternatively provide a legal basis for liability so long as the assessment of the unpaid medical expense as one element of damage does not result in a double recovery on the unpaid medical expense element of damage.  The Court concludes McNicoll, Anderson and Reeve are liable for the Plaintiffs' unpaid medical claims under the civil conspiracy and statutory causes of action.  The Court has applied the principle of election of remedies in the assessment of the unpaid medical expense element of damage and have only assessed this element of damage against said Defendants one time under the civil conspiracy.

129.    Plaintiffs seek to recover against McNicoll, Anderson and Reeve as an element of damage the full amount of the unpaid medical expenses which were covered under the Reinsurance Agreement and  incurred by Plaintiffs between the dates of January 1, 2001 and December 31, 2001. In the assessment of damages the Court reviewed evidence to determine the "full amount of the [unpaid] claim or loss in the manner provided by the insurance contract" as to the statutory cause of action.  The Court also examined whether Plaintiffs' unpaid medical expenses naturally and proximately resulted from acts done in furtherance of the conspiracy.

130.    The term of the NAI insurance contract was from January 1, 2001 to December 31,

---

[115] Civil conspiracy requires a specific intent to injure the plaintiff.  Sizemore v. Georgia-Pacific Corp., 1996 WL 498410 (D.S.C. 1996).

2001. The evidence established that on or about September 27, 2001, Reeve brokered the deal under which MT took over Plaintiffs' reinsurance with effect from September 1, 2001. According to AHHA, records, Plaintiffs paid to AHHA a "total contribution" of $717,361.75 for the months of January, February, March, April, May, June, July and August 2001 which was split between NAI and AHHA (either 75%/25% or 70%/30%) resulting in NAI's receipt of $505,117.06 and AHHA's receipt of $212,244.69. According to AHHA records, NAI paid $26,693.73 of the medical bills of Connelly's employees. According to AHHA records, NAI's liability to Connelly as reflected in the extract from the unpaid claims report was $688,164.33. According to AHHA records, Plaintiffs paid to AHHA a "total contribution" of $315,705.88 for the months of September, October, November and December 2001 which was split between AHHA and MT (70%/30%) resulting in MT's receipt of $220,994.21 and AHHA's receipt of $110,683.21. According to SPA records, MT paid $22,092.79 of the medical bills of Connelly's employees.

131.     The Court finds NAI did not pay Plaintiffs' medical claims because of the overt acts of McNicoll, Anderson and Reeve in the formation and use of NAI as a facade to collect and siphon premiums in furtherance of an unlawful agreement to "manage," delay and then deny Plaintiffs' clearly valid claims and then exit the market. This conclusion is based on the reasonable assumption that properly capitalized insurance companies run by honest directors pay valid claims. In August 2001 when the default occurred, had NAI been capitalized as represented and not looted, NAI should have had at its disposal 15 million dollars with which to pay claims, which was then approximately 3 times more than all outstanding claims. Nevertheless, insolvency has never been raised as an excuse for nonpayment of claims. The non-payment of Plaintiffs' claims was naturally and proximately caused by the overt acts of dishonesty in the false capitalization of NAI, siphoning of premiums, stripping of assets, and the plan to manage, delay and then wrongfully deny claims

before NAI exited the market in which McNicoll, Anderson and Reeve directed and participated. Therefore, the Court concludes McNicoll, Anderson and Reeve are personally liable to Plaintiffs for the unpaid covered medical expenses as an element of special damage on the civil conspiracy claim.

132.     The evidence established that the replacement of NAI by MT/MTFS was an overt act in furtherance of the conspiracy performed by Reeve who first acted as the broker of the NAI deal and later[116] as broker of the deal in which MT/MTFS became the reinsurer of Plaintiffs' medical expenses.   There exists a legal basis for Plaintiffs to assert, as special damages, as they did in the Complaint, that because the NAI agreement was for the term of one (1) year and the conspiracy called for NAI to exit the market and be replaced by another reinsurer 6 to 8 month into the policy term that McNicoll, Anderson and Reeve are jointly and severally liable for unpaid claims during the entire one (1) year policy term because such damages naturally and proximately resulted from the wrongful acts done in furtherance of the conspiracy.   Plaintiffs' change of reinsurers from NAI to MT/MTFS took place before Plaintiffs knew they had been victims of a repetitive ERISA scam carried out by the same principal actors pursuant to the same common plan and while their conduct was being guided by one or more principals of AHHA who were part of the conspiracy.   The Court concludes Plaintiffs acted in an effort (albeit an uninformed effort) to mitigate their damages by staying with AHHA and obtaining from MT/MTFS replacement insurance cover for the last four (4) months of the one (1) year NAI policy term as a result of NAI's breach occasioned by the wrongful conduct of McNicoll, Anderson and Reeve.   This was done without a formal novation or

---

[116]  Reeve's Bahamian IBC was called McLater.  McNicoll's IBC was called McSooner.  McNicoll attributed these names to Claro.  McNicoll stated that "[t]he McSooner/McLater names were one of John Claro's 'little jokes' which have this awful habit of turning out not to be so funny after all!"

release by Plaintiffs which extinguished the obligation of NAI, McNicoll, Anderson or Reeve.[117]

Therefore, the Court finds McNicoll, Anderson and Reeve are jointly, severally and personally

liable along with Marsh and McSooner, jointly and severally, for the full amount of the Plaintiffs'

unpaid covered medical claims incurred during the entire one (1) year policy term, as an element

of special damage on the civil conspiracy claim. Reeve brokered the NAI deal and Reeve and St.

John brokered the MT/MTFS deal to procure Plaintiffs' insurance contract from September 1, 2001

to December 31, 2001. This is an additional ground which supports Reeve's personal liability to

Plaintiffs for the unpaid medical claims of Plaintiffs incurred during the one (1) year policy term

based upon the statutory claim.

133.    The evidence established MT/MTFS, which appointed St. John and Reeve as its

agent, did not take over Plaintiffs' insurance contract until on or about September 27, 2001, with

effect from September 1, 2001. With effect from September 1, 2001, MT and MTFS, utilizing

Reeve and St. John as its agent, participated in the conspiracy to sell an unauthorized health

insurance policy to Plaintiffs. Therefore, the Court concludes that MT, MTFS and St. John are

jointly and severally liable with McNicoll, Anderson and Reeve for the full amount of Plaintiffs'

---

[117] Under South Carolina law, "[a] novation is . . . a mutual agreement between all concerned parties for the discharge of a valid existing obligation by the substitution of a new valid obligation on" behalf of the parties. Laidlaw Environmental Services, Inc. v. Honeywell, Inc., 966 F.Supp. 1401, 1410 (D.S.C. 1996). To establish a novation the party seeking to extinguish their rights under an existing contract must prove: (1) the existence of a previous valid obligation; (2) agreement of all parties to the new contract; (3) extinguishment of the old contract; and (4) making of a valid new contract. The making of a second contract dealing with the same subject matter does not necessarily abrogate the former contract. Id. The evidence establishes there was an assumption of the Reinsurance Agreement by MT with there being no intent to extinguish the obligation of NAI under its one year Reinsurance Agreement. The assumption of the Reinsurance Agreement by MT and MTFS did not extinguish the obligation of NAI under the Reinsurance Agreement. The breach by NAI, which culminated 8 months into a 12 month contract term, required Plaintiffs to attempt to mitigate their damages by seeking to obtain insurance to cover the NAI obligation for the last 4 months of the 12 month term. Mitigation was proximately caused by the overt acts of McNicoll, Anderson and Reeve in furtherance of the conspiracy. Thus, under tort law principles of damage McNicoll, Anderson and Reeve are liable for the damages which proximately flow from their tortious conduct. Mitigation only resulted in some of the covered medical claims incurred during the final 4 months being paid, for which McNicoll, Anderson and Reeve have received credit.

unpaid covered medical claims for services incurred between September 1, 2001 and December 31, 2001.[118]

134.     In assessing the amount of the unpaid covered medical claims the Court received as evidence the Summary of Invoices, Statements, Notices and Explanation of Benefits and Medical Claims Reconciliations for Connelly Management, Inc. for Employee Health Insurance Liability for the Plan Year January 1, 2001 to December 31, 2001 prepared by certified public accountant Kenneth H. Holcomb, who testified as an expert witness on November 24, 2003 and January 17, 2006.  The Court determined Mr. Holcomb was an expert in the field of accounting, with particular emphasis on healthcare accounting applying the requirements of Rule 702, F.R.E. and Daubert, supra.  Mr. Holcomb and his staff spent considerable time in evaluating and reconciling the available records for the purpose of accurately determining, by participant, the true amount of unpaid covered medical claims incurred by Plaintiffs during the 2001 policy year.  The Court is cognizant of the fact that the civil conspiracy involved the unlawful agreement to manage claims, which either called for their non-submission or outright wrongful denial.  McNicoll and Anderson maintained NAI had not received accurate or trustworthy loss information from AHHA.  Thus, Mr. Holcomb was left to assemble and reconstruct the unpaid medical claims data from various sources which included AHHA, its sister company SPA, the employees, medical care providers and collection agencies.  Mr. Holcomb determined that between the dates of January 1, 2001 and August 31, 2001, NAI failed to pay $793,102.03 in the covered medical claims of Connelly employees.  Mr. Holcomb determined that between the dates of September 1, 2001 and December 31, 2001, MT failed to pay $179,031.43

---

[118] In this case there exists a factual, reasonable and rational basis upon which to make a practical apportionment of that portion of harm to Plaintiffs jointly caused by MT based upon MT joining the conspiracy effective September 1, 2001.  There is no factual, reasonable or rational basis upon which to differentiate the liability of McNicoll, Anderson and Reeve based upon dates of involvement since their combined tortious activity giving rise to their joint liability were performed from the inception of the conspiracy to its conclusion.

in the covered medical claims of Connelly employees.  Mr. Holcomb determined that the total covered medical claims during the 2001 policy term were $972,133.46.  Mr. Holcomb testified, to a reasonable degree of accounting certainty, as  to the amount of medical claims which should have been paid under the Reinsurance Agreement which were not paid.  The evidence produced by Mr. Holcomb enabled this Court to determine and assess the amount of unpaid covered medical claims with reasonable certainty.

135.    The Court concludes that the unpaid medical claims relating to covered charges incurred between the dates of January 1, 2001 and December 31, 2001, which total $972,133.46, are an element of special damage for which McNicoll, Anderson, Reeve, Marsh and McSooner  are jointly and severally liable, to Connelly and CMEWBP for the benefit of the participants, and, MT, MTFS and St. John are jointly and severally liable to Connelly and CMEWBP for the benefit of the participants, to the extent of  $179,031.43, which represents the portion of the unpaid medical claims relating to covered charges incurred between the dates of September 1, 2001 and December 31, 2001.

136.    Plaintiffs seek an award of late fees incurred on the unpaid medical claims as an element of damage.  The failure of NAI and MT/MTFS to timely pay Plaintiffs' medical claims caused Plaintiffs to incur legal liability for late fees or interest charges on the unpaid medical bills owed to medical care providers.  Plaintiffs' liability for late fees is a consequence of the failure to timely pay claims.  The non-payment of Plaintiffs' claims was naturally and proximately caused by the overt acts of dishonesty in the false capitalization of NAI, siphoning of premiums, stripping of assets, and the plan to manage, delay and then wrongfully deny claims before NAI exited the market and wrongfully retained the premiums collected from Plaintiffs, in which McNicoll, Anderson and Reeve directed and participated.  The Court concludes that the legal liability of Plaintiffs to third

parties for late fees or interest charges should be added to the amount of unpaid covered medical

expenses because these late fees or interest charges are injuries which resulted from the wrongful

acts undertaken to further the conspiracy. [119]    Plaintiffs presented testimony that the late fees

---

[119] The fact that a medical care provider or its collection agency, after having been made aware Plaintiffs were victims of an elaborate health insurance scam, may elect or may have already elected to waive late fees, interest or other collection charges, or that a medical care provider, because of the passage of time or otherwise, may negotiate or may have already negotiated, a settlement of its claim against a participant beneficiary for the payment of a covered medical bill for an amount less than the full amount owed, does not diminish any Defendants' liability to Plaintiffs. Such reductions, would be or are, either gratuitous actions of the medical care provider done with an intent to benefit Plaintiffs, or the reductions arose from concessions made in negotiations between the medical care provider and Plaintiffs which did not in any way involve any Defendant. See, e.g., Hueper v. Goodrich, 314 N.W.2d 828 (Minn. 1982), in which the court applied the collateral source rule where the plaintiff was treated at a charitable hospital that would not charge patients or accept the proceeds of insurance policies). If it could be characterized as such, any settlement reached between Plaintiffs and medical care providers would be collateral, not involve Defendants. Defendants cannot claim credit for a settlement in which they did not take part. A tortfeasor is not entitled to have its liability for damages reduced because of volunteer payments. The "collateral source rule" prevents the defendant from claiming an offset from compensation already received by the plaintiff from a different source when this source is collateral to the defendants. Any gratuitous waiver of late charges or negotiated reduction of a medical bill made by any medical care provider after Defendants executed the ERISA scam would not have been made by or on behalf of any Defendant wrongdoer. The collateral source rule "is a well-established rule in the law of damages [which provides] a wrongdoer is not entitled to have the damages to which he is liable reduced by proving that the plaintiff has received or will receive compensation or indemnity from a collateral source, wholly independent of him, or stated more succinctly, the wrongdoer may not be benefitted by collateral payments made to the person he has wronged." Collins v. Bisson Moving & Storage, Inc., 332 S.C. 290, 305, 504 S.E.2d 347, 355 (Ct. App. 1998). This rule has been applied liberally in South Carolina to preclude the reduction of damages. Id. The only requirement for qualification as a collateral source is that the source be "wholly independent of the wrongdoer." Id. Therefore, the Court must assess the full measure of damages owned by Defendants without reference to what gratuitous concessions or negotiated reductions Plaintiffs have or may be able to obtain from a medical creditor or its collection agency. These sources are collateral sources wholly independent of Defendants. The Court must determine the full measure of damages without regard to benefits Plaintiffs have or might receive from a source independent of Defendants. Compensation from collateral sources is disregarded in assessing tort damages. United States v. Price, 288 F.2d 448 (4th Cir. 1961). The reason for this rule is that to credit a wrongdoer with payments from a source other than the wrongdoer would grant the wrongdoer relief from full responsibility for the wrongdoing. 22 Am.Jur.2d Damages §392 (West 2005). Defendants cannot diminish their liability by arguing that Plaintiffs have gratuitously obtained or negotiated for Plaintiffs' own benefit the reduction of any medical bill. After the court assesses the full measure of damages without regard to collateral sources it then can address the question of whether the defaulting Defendants acted as joint tortfeasors with a settling Defendant and whether the defaulting Defendants are entitled to claim an offset against the full measure of damages because of payments made in settlement by a joint tortfeasor for common damages arising from a single, indivisible harm. In examining the issue of offset, the Court is not required to examine how the Plaintiffs applied the settlement funds in their post-settlement dealings with third parties, only whether the full measure of damages are common damages arising from a single indivisible harm caused by joint tortfeasors. It should be noted that mitigation of damages and offset are affirmative defenses upon which the Defendants have the burden of proof. The affirmative defenses of mitigation of damages or offset were not raised and were therefore waived by the defaulting Defendants when they failed to answer the complaint. F.R.C.P., Rule 8(c). However, since the defaulting Defendants may try to assert these issues post-judgment, they have been addressed in this Order.

charged on medical care and related services is 18% per annum, although in some cases it is more or slightly less. The Court concludes that an outstanding medical bill is an obligation to pay a sum certain in money on an account stated from the time payment is demandable, which is usually at the time medical services are rendered or shortly thereafter. Therefore, the Court concludes that the overt wrongful acts which caused the non-payment subjected Plaintiffs to legal liability for interest at the legal rate of eight and three-fourths percent per annum to be charged on the unpaid medical bills pursuant to S.C. Code Ann. §34-31-20.

137.    The Court concludes that McNicoll, Anderson, Reeve, Marsh and McSooner are jointly and severally liable to Connelly Management, Inc. and CMEWBP for the benefit of the participants, for liability for late fees incurred by Plaintiffs on the unpaid covered medical bills of $972,133.46 from March 1, 2002, (which in the light most favorable to Defendants is the date all medical claims should have been paid), to March 1, 2006 at the legal rate of interest of eight and three fourths (8 3/4%) percent per annum, which late fees equal $387,892.05, plus $265.67 in interest per day thereafter to date of judgment, and, that MT, MTFS and St. John are jointly and severally liable to Connelly and CMEWBP for the benefit of the participants, for liability for late fees incurred by Plaintiffs on the unpaid covered medical bills of $179,031.43 from March 1, 2002, (which in the light most favorable to Defendants is the date all medical claims should have been paid), to March 1, 2006 at the legal rate of interest of eight and three fourths (8 3/4%) percent per annum, which late fees equal $71,435.53, plus $48.92 in interest per day thereafter to date of judgment.

138.    Plaintiffs seek an award of  pre-judgment interest as an element of special damage recoverable on their civil conspiracy claim. This claim is based upon the theory that McNicoll, Anderson, Reeve, MT and MTFS  have had the use or detention of monies which should have been

used to pay Plaintiffs' medical claims[120] and that the Plaintiffs are entitled to compensation for the loss of use of money due as damages from the time their claim accrued until judgment is entered. "In diversity cases, state law governs an award of prejudgment interest." United States of America v. Dollar Rent A Car Systems, Inc., 712 F.2d 938, 940 (4th Cir. 1983); Liberty Mutual Insurance Company v. Employee Resource Management, Inc., 176 F.Supp.2d 510 (D.S.C. 2001). Prejudgment interest is allowed on obligations to pay money from the time when, either by agreement of the parties or operation of law, the payment is demandable, if the sum due is certain or capable of being reduced to certainty. The fact that the sum is disputed does not render the claim unliquidated for the purposes of an award of prejudgment interest. The proper test for determining whether prejudgment interest may be awarded is whether or not the measure of recovery, not necessarily the amount of damages, is fixed by conditions existing at the time the claim arose. Apac Carolina, Inc., v. Town of Allendale, South Carolina, 41 F.3d 157 (4th Cir. 1994); Liberty Mutual Insurance Company v. Employee Resource Management, Inc., 176 F.Supp.2d 510, 541 (D.S.C. 2001); Babb v. Rothrock, 426 S.E.2d 789 (S.C. 1993). These rules require the Court to separately analyze the different elements of damages claimed by Plaintiffs. The unpaid covered medical expenses claimed by Plaintiffs as an element of special damage are sums that are certain or capable of being reduced to certainty. The Reinsurance Agreement provided the covered claims would be paid within ten (10) days of AHHA providing NAI with a claims run which included on it the claim to be paid. All of the claims which are the subject of this lawsuit were for services rendered between January 1, 2001 and December 31, 2001. McNicoll, Anderson and Reeve conspired to siphon premiums from NAI

---

[120] In Nichols v. State Farm Mutual Automobile Insurance Co., 279 S.C. 336, 340, 306 S.E.2d 616, 619 (1983) the Court stated: "[A]bsent the threat of a tort action, the insurance company can, with complete impunity, deny any claim they wish, whether valid or not. During the ensuing period of litigation following such a denial, the insurance company has the benefit of profiting on the use of the insured's money." In this case that money was siphoned off as described in this Order allowing the co-conspirators to profit from the use of Plaintiffs' money.

and then strip NAI of its assets thereby resulting in the conversion of the funds that should have been used to pay Plaintiffs' covered medical claims in the sum of $972,133.46. This conversion was complete on March 22, 2002, the date on which Anderson closed down Marsh and reduced its share capital from 10,000,000 shares to 1,000 shares. The failure of NAI to pay Plaintiffs' covered medical claims resulted from the siphoning of premiums and stripping of assets. "The general rule is that in actions for conversion of property, interest on the value of property converted may be recovered. Prejudgment interest is allowed on liabilities to pay money from the time payment was demandable, if the sum is certain or capable of being reduced to certainty." Robbins v. First Federal Savings Bank, 294 S.C. 219, 225, 363 S.E.2d 418, 421 (S.C.App. 1987). A sum is certain and payment is demandable at time of conversion. Id. The measure of damages for money which has been converted is its amount with legal interest from the date of conversion. Mack v. Riley, 282 S.C. 100, 316 S.E.2d 731 (Ct. App. 1985). The legal rate of interest is eight and three fourths (8 3/4%) per cent per annum. S.C. Code Ann. §34-31-20 (A). The Court concludes prejudgment interest is recoverable on the unpaid medical expense component of Plaintiffs' claims for damage. Plaintiffs' other claims for special damage, such as administrative losses and damage to credit reputation are unliquidated. The Court must assess those damages. Therefore, prejudgment interest is not recoverable on those claims.

139.    The Court concludes that prejudgment interest computed at the legal rate of interest of eight and three fourths (8 3/4%) percent per annum assessed upon the unpaid medical claims relating to charges incurred between the dates of January 1, 2001 and December 31, 2001, which total $972,133.46, computed from March 1, 2002 though March 1, 2006, which pre-judgment interest equals $387,892.05, plus $265.67 in interest per day thereafter, until entry of judgment at which time the judgment rate of interest set forth in S.C. Code Ann. §34-31-20 (A) shall apply, is

recoverable as an element of actual, consequential or special damage for which Defendants McNicoll, Anderson, Reeve, Marsh and McSooner are jointly and severally liable, to Connelly and CMEWBP for the benefit of the participants, and, for which MT, MTFS and St. John are jointly and severally liable to Connelly and CMEWBP for the benefit of the participants, to the extent of prejudgment interest computed at the legal rate of interest of eight and three fourths (8 3/4%) percent per annum assessed upon the sum of ($179,031.43), which represents the portion of the unpaid medical claims for covered charges incurred between the dates of September 1, 2001 and December 31, 2001, computed from March 1, 2002 though March 1, 2006, which pre-judgment interest equals $71,435.53, plus $48.92 in interest per day thereafter until entry of judgment, at which time the judgment rate of interest set forth in S.C. Code Ann. §34-31-20 (A) shall apply.

140.     Connelly seeks to recover as an element of special damage the administrative costs it paid to have the company health plan administered by AHHA between the dates of  January 1, 2001 through December 31, 2001. Connelly entered into an Administrative Agreement with AHHA which called for AHHA to handle all administrative duties related to the company health plan using AHHA's administrative personnel and resources.  AHHA acted as agent for NAI, an unauthorized insurer, and conspired with McNicoll, Anderson and Reeve to manage, delay and wrongfully deny Plaintiffs' claims.  The unlawful agreement to manage claims called for either their non-submission or outright wrongful denial.  McNicoll and Anderson maintained NAI had not received accurate or trustworthy loss information from AHHA.  Thus, the conspiracy intentionally placed into question the accuracy of the administrative services rendered by AHHA in relation to the CMEWBP.  It also has and will require that Connelly incur additional expense to perform the administrative functions which were to have been performed by now-bankrupt AHHA.  The conspiracy also involved the replacement of claims administrator AHHA with claims administrator MHI for the purpose of

creating uncertainty as to which claims administrator was responsible for the ultimate processing and payment of CMEWBP's NAI-related claims. MHI is now bankrupt. Principals of AHHA were indicted and records were seized.[121] Thus, as a direct and proximate result of the civil conspiracy AHHA's administrative services performed between January 1, 2001 and December 31, 2001 either failed of their essential purpose or were not performed. In a civil conspiracy action the damages that are recoverable are measured by the extent of the injury suffered by the plaintiff, not by the benefit to the alleged conspirators. Wright v. Cies, 648 P.2d 51 (Okla App 1982). Under many factual situations, however, the financial benefit to the coconspirators will provide a means of measuring the plaintiff's losses. Id. For the one (1) year term of the Administrative Agreement Connelly paid AHHA a total of $322,927.90. For the NAI-related months of January 1, 2001 to August 31, 2001 Connelly paid AHHA $212,244.69 to perform administrative services during that time period. For the MT-related months of September 1, 2001 to December 31, 2001, Connelly paid AHHA $110,683.21 to perform administrative services during that time period. The services included the performance of the administrative tasks associated with the payment of $972,133.46 in covered claims which were not paid. These administrative services failed of their essential purpose as a result of the overt acts which furthered the civil conspiracy. The Court concludes Connelly was damaged in the sum of $322,927.90 which is the amount Connelly paid for past administrative services which should have been performed by co-conspirator AHHA during the dates of January 1, 2001 and December 31, 2001, which as a result of the civil conspiracy, failed of their essential purpose. Connelly is entitled to recover $322,927.90 for past administrative expenses as special damages.

---

[121] See, United States of America v. John Anthony Claro, et al, CR-H-04-126 (S.D. Texas, Houston Division).

141.    The Court concludes McNicoll, Anderson, Reeve, Marsh and McSooner are jointly and severally liable to Connelly in the sum of $322,927.90, as special damages sought on the civil conspiracy claim for past administrative expenses relating to the dates of January 1, 2001 to December 31, 2001, and, that MT, MTFS and St. John are jointly and severally liable to Connelly in the sum of $110,683.21 which represents past administrative expenses relating to the dates of September 1, 2001 to December 31, 2001.

142.    The Court finds that Connelly paid Elliott & Davis, LLC the sum of $38,492.08 to prepare the Summary of Invoices, Statements, Notices and Explanation of Benefits and Medical Claims Reconciliations for Connelly Management, Inc. for Employee Health Insurance Liability for the Plan Year January 1, 2001 to December 31, 2001.  The Court concludes this expense was reasonable and necessary for Connelly to begin the process of taking over the adjudication of claims for the CMEWBP.  These costs were caused by the overt acts of the conspirators which sought to place into question accounting functions of the Plan.

143.    The Court concludes McNicoll, Anderson, Reeve, Marsh and McSooner are jointly and severally liable to Connelly in the sum of $38,491.08, as special damages sought on the civil conspiracy claim for preparation of the Summary of Invoices, Statements, Notices and Explanation of Benefits and Medical Claims Reconciliations for Connelly Management, Inc. for Employee Health Insurance Liability for the Plan Year January 1, 2001 to December 31, 2001 and that MT, MTFS and St. John are jointly and severally liable to Connelly for the sum of $9,622.77 which represents one-fourth (1/4th) of the said expenses, the same being related to their involvement in the conspiracy from September 1, 2001 to December 31, 2001.

144.    Connelly seeks as special damages the administrative costs and expenses of Connelly associated with the failure of the CMEWBP which were incurred in house by Connelly between the

last quarter of 2001 and November 24, 2003, which was the date of the first default judgment damages hearing.  Connelly was in the nursing home business.  It managed nine (9) nursing homes with approximately 300 employees.  The focus of Connelly's business was on managing its nursing home business.  In the year 2001 Connelly adopted a group health plan to cover its 300 employees. All of the claims administration and claims payment obligations were outsourced and the financial obligation for claims payment was provided for by the payment of $1,049,039.00 in premiums.  The evidence established that in the fall of 2001 the delay in claims payment became serious.  In September 2001, McNicoll and Anderson issued reassurances which lead Connelly, the CMEWBP and its participants to believe that claims would be paid once the audit was completed.  After problems surfaced and as the problems escalated, Connelly devoted more time and more effort of its key management personnel toward the business of dealing with the medical problems of its employees who were the participants in the CMEWBP.  As a company, Connelly, instead of devoting the time and efforts of its key management personnel toward the business of managing nine (9) nursing  homes, key personnel became actively involved, for periods of time on a daily basis, in dealing with the medical issues of 264 participants, their various medical care providers and later their collection agencies on the problems and issues related to the failure of the company health plan. None of these problems would have arisen had Connelly not been a victim of an ERISA health insurance scam.  Connelly could have paid out of pocket all of the $972,133.46 of its participants' covered medical claims in the year 2001 with the $1,049,039 in premiums Connelly paid.

145.     Once Connelly learned it and the CMEWBP had been the victim of a scam, it notified the participant beneficiaries and their medical care providers that Connelly took responsibility for the participants' covered medical expenses.   Connelly took over the administration of the CMEWBP.  This made Connelly the point of contact for every employee, medical care provider and

collection agency for each of the 264 participants as to $972,133.46 in outstanding covered medical claims. In fact, the scam itself was purposefully designed to get the premium money from Connelly, not pay medical claims and then place the responsibility for the failure of the CMEWBP on Connelly. However, McNicoll, Anderson and Reeve conspired with one or more principal actors at AHHA to injure Plaintiffs. Notwithstanding NAI's protestations, AHHA acted as NAI's agent in the unlawful sale of unauthorized insurance. According to McNicoll and Anderson, the alleged failure of AHHA to provide NAI with the underwriting information for the CMEWBP, the alleged failure of AHHA to properly submit the claims and other information for the CMEWBP, and AHHA's alleged use of loss figures which were "untrustworthy" was Connelly's fault thereby justifying NAI's refusal to pay CMEWBP's claims.

146.    Connelly continued to manage this colossal problem as it continued its efforts to seek a recovery from those at fault. Connelly, through its key management personnel, undertook the task of unraveling a purposefully created administrative nightmare. At one of the hearings, the Court received and reviewed evidence of the percentage of time which Connelly's key personnel devoted to the administrative handling of the crisis which arose from the failure of the company health plan. The evidence of time spent enabled the Court to determine the amount of the special damage with reasonable certainty. The key Connelly personnel that devoted their efforts to this problem were an administrative assistant, a human resources employee, two persons from the accounting department, in-house general counsel, the company president and vice president, and the company's director of operations. The Court finds that the evidence established that Connelly lost $696,000, which is the amount of money it paid its key personnel to perform tasks directly related to the failure of the CMEWBP, between the last quarter of 2001 and November 24, 2003. These special damages for administrative expenses are precisely the kind of "business losses occasioned by the lack of medical

insurance" which McNicoll and Anderson were advised by their independent counsel on April 11, 2002 would be inflicted upon Connelly and others as a result of their conduct. The Court concludes that Connelly is entitled to recover as special damages $696,000 in administrative losses.

147.    The Court concludes McNicoll, Anderson, Reeve, Marsh and McSooner are jointly and severally liable to Connelly for special damages for administrative expenses incurred between the last quarter of 2001 and November 24, 2003 in the sum of $696,000, and that MT, MTFS and St. John are jointly and severally liable for $174,000, which represents one-fourth (1/4th) of the said expenses, the same being related to their involvement in the conspiracy from September 1, 2001 to December 31, 2001.

148.    CMEWBP seeks to recover special damages for injury to the credit reputation of the participant beneficiaries. Plaintiffs offered expert testimony from Michaele Russell Pena, who is the director of Consumer Credit Counseling Services. She prepared a report related to future damage to the credit of the participants in the CMEWBP as a result of negative information contained in their personal credit profiles due to unpaid medical bills related to the failure of the CMEWBP in the year 2001. A portion of Mrs. Pena's testimony and report involved an explanation of the credit rating system, which system provided the basis for the rational assumptions and opinions rendered in her report. An individual's credit reputation is reflected in their credit rating or credit score. A credit rating is a statistical method to determine the likelihood of an individual paying back money he or she has borrowed. Most countries use a scale of 0 - 9 to rate personal credit. Each creditor will issue its own rating for individuals. The score of 1 indicates an individual pays credit back within 1 month. The score of 9 indicates the individual officially has a bad debt (default). Three national credit reporting agencies, TransUnion, Experian, and Equifax, collect credit information and assign credit scores, and publish ratings to lenders and their other member

organizations. While there are 5 factors that make up an individual's credit score, the most heavily weighted is previous credit performance. Previous credit performance makes up 35% of the overall credit score. Thus, the placement of a bad debt entry has the most adverse effect on an individual's credit score. An individual's credit rating is checked when he or she applies for a credit card, mortgage, rental apartment, telephone hook-up and often times when he or she applies for a job or purchases insurance. Depending on the credit score, lenders, landlords and employers will determine what risk the individual poses to them. 92 of the 100 largest personal automobile insurance companies now use credit data in underwriting new business. According to financial theory, increased credit risk means that a risk premium must be added to the price at which money is borrowed. Individuals with poor credit will be charged a higher rate. Individuals with awful credit will be shunned. Landlords may choose not to lease an apartment to a tenant with a shaky credit history. Likewise, an employer may not want to hire someone who does not demonstrate financial responsibility. CMEWBP purchased medical insurance to timely pay the medical bills of the participants. When the bills were not paid, the participants found themselves caught in the crossfire between NAI and AHHA's manufactured dispute. The fact that CMEWBP and the participants were first assured that the medical claims would be paid when the audit was complete was a fabrication intended to pacify and suggested payment was forthcoming. Quite logically, initially CMEWBP and the participants refused to pay; after all, they were insured and their insurer promised prompt payment. Secondarily, CMEWBP and the participants did not learn that the medical bills had not been paid until it was too late. Most of the medical care providers turned the unpaid medical bills over to a collection agency which then reported the unsatisfied debt as delinquent to the credit reporting agencies – Experian, TransUnion and Equifax. As to those providers which did not report the unpaid medical bills to collection, participants with unpaid bills

nevertheless suffered credit damage with respect to that provider.  In many instances the provider with whom the participants' credit reputation had been damaged was the participants' primary care provider or a small community hospital.   Even though the CMEWBP and the participants had insurance, they were ultimately responsible for the medical bills.  Once a medical bill is reported as a bad debt that blemish appears on a participant s' credit report and stays there for seven (7) years unless the CMEWBP or the participant could prove that the entry was a factual error or it is retracted by the provider that made the entry.[122]  The seven (7) year effect of a bad debt entry is a function of federal law. 15 U.S.C. §1681(c).  Exacerbating this injury is the fact that the same law creates a situation such that once the medical bill is paid it refreshes the debt.  This means that if the CMEWBP or a participant paid a medical bill which had already been reported as delinquent, that the payment of the delinquent bill would refresh the bad debt entry on the participant's credit report and thereby start anew the seven (7) year period which the bad debt entry would remain on the credit report.  According to Mrs. Pena, the fact of damage occurs to an individual's credit reputation when the medical debt is reported as a bad debt on an individual's credit report.  Even if the person had less than perfect credit to begin with, the new entry of a bad debt will cause that individual to be viewed as a greater risk to lenders, landlords, employers and insurance companies, thereby increasing the cost of obtaining credit, and making the individual less attractive to lenders, landlords, employers and insurance companies.  The damage to credit reputation will last for seven (7) years.  Thus, a person with bad credit will have worse credit and bad credit longer.  There is no rule of "no harm no foul" under the credit reporting system.  Mrs. Pena reviewed a sampling of participant credit reports to confirm her opinion that the participants' credit was most probably damaged

---

[122]  See, Docket Entry 166 and 314-315.

because of derogatory entries related to unpaid medical bills. Her follow-up review of a sampling of participant credit reports confirmed her opinion to a reasonable degree of credit counseling certainty that derogatory entries related to the unpaid medical claims had been made. The Court concludes that the fact of credit damage was complete either when an individual participant's medical bill became delinquent with his or her medical care provider, or at such time as a derogatory entry was placed upon his or her credit profile.

149.     The Court must determine whether the damage to credit proximately resulted from overt acts in furtherance of the conspiracy. In tort actions, damages may be recovered for all injuries which proximately follow the injurious act, whether or not such injuries could have been anticipated or contemplated. In breach of contract actions, only such damages as may reasonably be supposed to have been in the contemplation of both parties at the time the contract was made may be collected. In a tort action, damages which are anticipated and contemplated by the actor as flowing from its conduct are _ipso_ _facto_ proximately caused. Here we have a medical insurance contract (albeit a fraudulent one) issued for a specific purpose, which purpose was well known to both the insurer and the insured. The medical insurance contract was an instrumentality of the conspiracy. The purpose of the contract was to assure payment of Plaintiffs' medical claims such that the financial obligation of Plaintiffs for covered medical claims would be timely paid. Where money "was to be paid for a special purpose which was known to the party agreeing to make the payment, damages directly and naturally resulting from the breach and therefore supposed to have been in the contemplation of the parties may be given in addition to interest." Hutson v. Continental Assurance Company, 269 S.C. 322, 333, 237 S.E.2d 375, 379 (1977). Plaintiffs specifically pleaded damage to credit reputation as special damages. The Court finds that damage to credit reputation was contemplated and anticipated and that it naturally, logically, necessarily and proximately

resulted from the non-payment of medical bills as a result of the overt wrongful acts of the defaulting Defendants in furtherance of the civil conspiracy. The Court concludes Plaintiffs have proved the fact that damage to the credit reputation of the participants was caused by the wrongful acts of McNicoll, Anderson and Reeve as part of their common plan to siphon premiums, strip assets, manage, delay and then wrongfully deny their medical claims.

150. The Court must assess the amount of damage to credit reputation. The general rule for recovery of damages requires that "the evidence should be such as to enable the fact finder to determine the amount of damages with reasonable certainty. While proof with mathematical certainty is not required, the amount of damages cannot be left to conjecture, guess or speculation." Minter v. GOCT, Inc., 322 S.C. 525, 528, 473 S.E.2d 67, 70 (1996). The amount of damages need not be proved with great exactitude if the fact of damage has been proved with certainty. Bulova Watch Company v. Rogers-Kent, Inc., 181 F.Supp. 340 (D.S.C. 1960). Future damages need not be exact, as long as they have a reasonable basis. City of Greenville v. W.R. Grace & Company, 640 F.Supp. 559 (D.S.C. 1986); International Wood Processors v. Power Dry, Inc., 593 F.Supp. 710 (D.S.C. 1984). The acceptance of plaintiff's damage evidence is proper where defendant presents no evidence on which to fashion a meaningful alternative. Clichfield Railroad Co. v. Lynch, 784 F.2d 545 (4th Cir. 1986). "The court cannot afford to gamble with justice or with the future of the plaintiff. He has but one day in court. A negligent defendant cannot breathe a sigh of relief because an injured plaintiff is denied the ability to present to the court a crystal ball into which the court can gaze and discover with certainty the future damages sustainable . . ." Steeves v. United States, 294 F.Supp. 446, 457 (D.S.C. 1968). The South Carolina Supreme Court expressed a similar view in Hyde v. Southern Grocery Stores, Inc., 197 S.C. 263, 15 S.E.2d 353, 360 (1941), cautioning that in reviewing future damage awards, "all that the Court should do is to see the jury approximates a sane

estimate, and does not exceed a rational appraisal." On occasion, the South Carolina Supreme Court has gone even further and allowed juries to award future damages in both personal injury and property damage cases without any firm estimates in evidence. See, e.g. Kelly v. Brazell, 253 S.C. 564, 172 S.E.2d 304 (1970) (personal injury); Heirs v. Southeastern Carolinas Telephone Co., 216 S.C. 437, 58 S.E.2d 692 (1950) (business damage). The touchstone for future determining damages is that they need not be exact, as long as they have a reasonable basis. International Wood Processors v. Power Dry, Inc., 593 F.Supp. 710 (D.S.C. 1984); Charles v. Texas Co., 199 S.C. 156, 18 S.E.2d 719 (1942), cf., Bray v. Shenandoah Fed. Sav. & Loan Assn., 789 F.2d 1085 (4th Cir. 1986) ("Predictions of any variety are never totally reliable . . .").

151.    The Court received evidence on the damage to credit issue from Debbie Stevens, Ruth Waggoner, Ernest Riddle, Jim Connelly, Sally Young and Beatrice McGirth. The past damage to credit reputation affected some participants in that they either did not receive medical treatment because of unpaid medical bills owed their provider (Ms. McGirth) or they changed medical care providers (Ms. Stevens) because of the embarrassment or humiliation associated with having an unpaid medical debt. There was also testimony which established that participant beneficiaries received harassing and distressing calls from creditors seeking to collect the unpaid medical bills. Embarrassment and humiliation naturally and proximately resulted from the injury to credit reputation. Connelly, as plan sponsor and plan administrator and the CMEWBP took responsibility for the payment of the past due debts of the plan participants and beneficiaries, which were in large part owed to the participants' local community hospitals which were the same hospitals that referred patients to Connelly's nine (9) local nursing homes.

152.    Mrs. Pena made a number of logical assumptions based upon industry standards in connection with her testimony which aided the court in determining the amount of future damages

sustained because of a derogatory entry on an individual's credit report. First, she relied upon South Carolina state census figures which reflected a per capita disposable personal income of $22,708, which she found to be reflective of salaries earned by the participant beneficiaries who worked in the Connelly nursing homes. She relied upon credit and loan industry standards which provide that a healthy credit profile is one where an individual does not have more than 20% of their annual income ratio profile. She relied on credit industry standards which dictated that 35% of an individual's credit score was made up of previous credit performance. Ms. Pena then examined other credit industry standards, which she referred to as responsible for creating the credit domino effect. She testified that a late payment on one account can result in higher rates and fees on all accounts -- from credit cards, to auto loans, to auto insurance. She then examined, under credit industry standards, the effect that a derogatory entry on a person's credit report would have on a person's credit card interest and upon the rate charged for a car loan, those being common examples of credit available to persons with per capita disposable income of $22,708. She analyzed the effect on persons with excellent credit and on persons who marginally qualified for credit. She analyzed the effect it would have on existing accounts and on accounts opened after the derogatory entry was made. Based on this analysis she rendered the opinion, to a reasonable degree of credit counseling certainty, more probably than not, that each beneficiary participant with unpaid medical claims could expect to pay anywhere from $8,000 to $12,000 more than a person who has a good credit rating based on any new accounts they open (new car loans, credit cards) over a 5 year period. This estimate of future damage to credit reputation provided the Court with a rational appraisal from which to proceed to assess damage to credit reputation. Mrs. Pena did not attempt to quantify the future damage caused to the participant victims by virtue of the likely publication of the derogatory credit information to insurance companies, landlords, or to future employers, or the amount of

damage to be assigned to the embarrassment or humiliation associated with having a bad debt with a local doctor or local hospital in the town where the participant lived and would potentially need to return for future medical care, or stress associated with threatening calls from creditors, leaving the ultimate assessment of damage to credit reputation to be performed by the Court.

153.    In the case of Holroyd v. Requa, 361 S.C. 43, 603 S.E.2d 417 (S.C.App. 2004), a plaintiff who was insured under a company health plan brought an action against an insurance agent for misrepresentation, fraud and negligence in the sale of a failed health plan to his employer. Plaintiff's unpaid medical bills were $65,000.  The jury awarded Plaintiff $365,000 in actual damages.  The Defendant appealed, claiming the jury's award of $365,000 in actual damages was unsupported by the evidence.  The Court of Appeals of South Carolina affirmed, stating:

> Requa first claims the jury's award of $365,000 in actual damages is unsupported by the evidence because Respondents only presented evidence of $65,000 in unpaid medical bills.  The evidence offered by Respondents not only included unpaid medical bills, but also included embarrassment, humiliation, credit problems, increased future insurance premiums, stress, premiums paid, and decreased coverage due to pre-existing conditions in a new policy.

In Holroyd, supra, the jury was permitted to consider that unpaid medical bills could affect plaintiffs' credit rating without any evidence of what the credit rating was or any changes to the rating.  Also, the jury was allowed to consider future increases in insurance premiums without any evidence of the precise amount of the "hefty" premium increases.  Id. at 361 S.C. at 63; 603 S.E.2d 428.  The award was upheld based upon the South Carolina law of future damages.  The Court stated:

> Under current South Carolina law, the standard of admissibility of evidence for future damages is 'any evidence which tends to establish the nature, character, and extent of injuries which are the natural and proximate consequences of the defendant's acts . . . if otherwise competent. ' Id. 363 S.C. at 62, 603 S.E.2d at 427 (internal citations omitted).

In assessing damage to credit reputation the expert testimony of Mrs. Pena, and of the employees on the issue of future damage to credit reputation, as well as laws relating to credit and credit industry standards which mechanically operate to cause damage, is evidence which tends to establish the nature, character and extent of damage to credit reputation injuries which were the natural and proximate consequence of the acts of the defaulting Defendants.  In awarding actual damages in a tort case arising out of the failure of a company health plan, the Court is not limited to consideration of the amount of unpaid medical bills.  Id.  In awarding actual damages in a tort case arising out of the failure of a company health plan, the Court may consider credit problems giving rise to humiliation, embarrassment and stress.  Id.  The Court finds that the sum of $12,000 per CMEWBP participant which had unpaid medical claims listed on the Holcombe report is a fair and reasonable award for future damage arising from injury to credit reputation based on the totality of the evidence, including the likelihood that the injury to credit reputation will potentially last for seven (7) years, and would be extended by ultimate payment of any medical debts in connection with a recovery in this action, and that the bill involved was likely owed to a local medical care provider in the participant's home town.  This is an assessment of damages which does not exceed a rational appraisal and which has a reasonable evidentiary basis in the record.

154.    The Court concludes McNicoll, Anderson, McSooner, Marsh and Reeve are jointly and severally liable to pay to CMEWBP for the benefit of the participants the sum of $3,168,000 as special damages for past and future[123] damage to credit reputation, which is ($12,000 as to each of

---

[123]  The Court recognizes that future damages should technically be discounted to present value and then increased for inflation.  The Court has reasonably assumed that these two factors would offset.  Therefore, the use of non-discounted, non-inflated figures is proper.  See, City of Greenville v. W.R. Grace & Company, 640 F.Supp. 559, 570 (D.S.C. 1986); Aldridge v. Baltimore and Ohio R.R. Co., 789 F.2d 1061 (4th Cir. 1986).

the 264 participants who had unpaid medical claims listed on the Holcomb report), and, that MT, MTFS and St. John are jointly and severally liable to pay to CMEWBP for the benefit of the participants the sum of $792,000 which represents one-fourth (1/4th) of the said past and future damage to credit reputation, the same being related to their involvement in the conspiracy from September 1, 2001 to December 31, 2001.

155.    Plaintiffs also sought to recover as special damages the expenses associated with future administrative and accounting services required to satisfy the unpaid medical expenses and to undertake efforts to repair the credit of the 264 participants who had unpaid medical claims listed on the Holcomb report to attempt to avoid refreshing the bad debt for another seven (7) years at such time as the debt is satisfied.  Since under the law the future payment of an unpaid medical bill which was reported as a bad debt against an employee's credit rating would refresh the debt and cause it to appear on the credit report for an additional seven (7) years, Plaintiffs also sought to recover as special damages the expense of administrative and accounting services to attempt to repair the credit damage, or at least alleviate the refreshment of the debt at the time when payment on the unpaid medical debt is made.  Plaintiffs presented evidence to the Court on the steps which would need to be taken to accomplish this task, the time involved, and the cost involved.  The evidence established that this future task would require:

1.    Obtain HIPPA authorization to act on behalf of each covered plan participant to enable accounting firm to obtain information about their medical bills.

2.    Provide authorization to each medical care provider in order to get exact amount of medical bill, including late charges (pay-off information).

3.    Prepare a check to each medical care provider, which references the outstanding invoice number and other pertinent information.

4.      Reimburse employees for amounts they paid in excess of their deductibles and co-insurance to collection agencies.

5.      Obtain from the provider a receipt indicating that the invoice has been satisfied.

6.      Provide documentation to employee that the invoice has been satisfied.

7.      Obtain each covered participant's credit report.

8.      Attempt to negotiate with each medical care provider an agreement for the provider to execute a Form I-9 which will allow action to be taken to attempt to repair the credit of each covered plan participant.

9.      Serve the Form I-9 on each covered participant's local credit bureau, and the big 3 national credit bureaus.

10.     Obtain each covered employee's credit report to verify that the credit has been repaired.

11.     Provide proof to each covered employee that their credit has been repaired.[124]

Mr. Holcomb provided a breakdown of the cost to perform the tasks related to payment of past due medical bills and attempt to repair credit records for all affected persons, which totals $446,337. This equates to $1,690.67 as to each of the 264 participants for which this task would likely need to be performed.   This is a rational appraisal of the cost of these future administrative and accounting expenses.  The Court finds this amount to be fair and reasonable in light of the amount of time it will likely take to perform these future administrative and accounting tasks.  The Court further finds that Plaintiffs are entitled to recover as special damages $446,337 in future administrative and accounting expenses.

156.    The Court concludes McNicoll, Anderson, Reeve, Marsh and McSooner are jointly and severally liable to pay to Connelly the sum of $446,337 as special damages for future

_____

[124]  See, Docket Entry 166.

administrative and accounting expenses and that MT, MTFS and St. John are jointly and severally

liable to pay to Connelly the sum of $111,584.25 which represents one-fourth (1/4th) of the said

future administrative and accounting expenses, the same being related to their involvement in the

conspiracy from September 1, 2001 to December 31, 2001.

    157.    A recapitulation of the special damages awarded is as follows:

**A.**    <u>Awarded to Connelly Management, Inc. and/or Connelly Management Employee
Welfare Benefit Plan, for the benefit of the 264 participants with unpaid medical
claims listed on the Holcomb Report:</u>

| | | |
|---|---|---|
| **Unpaid Covered Medical Claims:** | | **$972,133.46** |
| **to Connelly and CMEWBP** | | |
| | | |
| McNicoll, Anderson, Reeve, Marsh | $972,133.46 | |
| and McSooner (joint & several) | | |
| | | |
| MT , MTFS & St. John (joint & several - 9/1/01 to | | |
| 12/31/01 actual): | $179,031.43 | |
| | | |
| **Late Charges on Unpaid Medical Claims:** | | |
| **$387,892.05** | | |
| **to Connelly and CMEWBP** | | |
| | | |
| McNicoll, Anderson, Reeve, Marsh | | |
| and McSooner (joint & several) | | |
| 8 3/4% on $972,133.46 from 3/1/02 to | | |
| 3/1/06: | $387,892.05 | |
| | | |
| MT, MTFS & St. John (joint and several): | | |
| 8 3/4% on $179,031.43 from 3/1/02 to | | |
| 3/1/06: | $ 71,435.53 | |
| | | |
| **Prejudgment Interest on Wrongfully Retained Funds** | | **$387,892.05** |
| **to Connelly and CMEWBP** | | |
| | | |
| McNicoll, Anderson, Reeve, Marsh | | |
| and McSooner (joint & several) | | |
| 8 3/4% on $972,133.46 from 3/1/02 to | | |
| 3/1/06: | $387,892.05 | |

MT , MTFS & St. John  (joint & several):
8 3/4% on $179,031.43 from 3/1/02 to
3/1/06:                                                    $ 71,435.53

**Damage to Credit Reputation Awarded to CMEWBP**                    **$3,168,000**

McNicoll, Anderson, Reeve, Marsh          $3,168,000
and McSooner (joint and several)

MT , MTFS & St. John (joint & several)     $  792,000

**TOTAL:**                                                      **$4,915,917.56**

**B.**     Awarded to Connelly Management, Inc.

**Past Administrative Expenses (1/1/01 to 12/31/01)**               **$327,927.90**

McNicoll, Anderson, Reeve, Marsh          $327,927.90
and McSooner

MT, MTFS & St. John  (joint & several - as to 1/4th)$110,683.21

**Expenses to Prepare Summary of Unpaid Claims**                  **$ 38,492.08**

McNicoll, Anderson, Reeve, Marsh          $ 38,492.08
and McSooner (joint & several)

MT, MTFS & St. John (joint & several - as to 1/4th) $   9,623.02

**Connelly Administrative Expenses (9/01 to 11/24/03)**             **$696,000.00**

McNicoll, Anderson, Reeve, Marsh          $696,000.00
and McSooner (joint & several)

MT, MTFS & St. John (joint & several – as to 1/4th): $174,000.00

**Future Administrative and Accounting Expenses**                  **$446,337.00**

McNicoll, Anderson, Reeve, Marsh          $446,337.00
and McSooner (joint & several)

MT, MTFS & St. John (joint & several - as to 1/4th): $111,584.25

**TOTAL:**                                                          **$6,424,674.46**

158.     No portion of the total assessment of liability for special damages of $6,424,674.46

involves multiple damages.  The total assessment of liability for special damages is compensatory

in nature.

159.     Plaintiffs seek an award of attorneys' fees.  Ordinarily, an attorney must look to his

client for compensation for services performed by his employment.  Duke Power Company v. South

Carolina Public Service Commission, 284 S.C. 81, 100, 326 S.E.2d 395, 406 (1985), citing

Caughman v. Caughman, 247 S.C. 104, 146 S.E.2d 93 (1965).  The Supreme Court of South

Carolina has clearly defined the occasions when an award of counsel fees may be made.  As a

general rule, attorneys' fees are not recoverable unless authorized by contract or statute.  Id.

Plaintiffs' claim against McNicoll, Anderson, Reeve, St. John, Reeve & Associates, MT and MTFS

is a state common law tort claim seeking damages for civil conspiracy.  It is not based upon a

contract or statute which authorizes the recovery of attorneys' fees.  In its discretion, a court may

award reasonable attorneys' fees and costs to a prevailing party in an ERISA action.  See, 29 U.S.C.

§1132(g)(1) (2005) and Quesinberry v. Life Ins. Co. of North America, 987 F.2d 1017, 1029 (4th Cir.

1993 (en banc).  However, Plaintiffs' claim against the defaulting Defendants is not based upon

ERISA.  The state law civil conspiracy claim against the defaulting Defendants is not preempted by

ERISA's express preemption clause.  LeBlanc v. Cahill, 153 F.3d 134, 148 (4th Cir. 1998).

Plaintiffs' common law civil conspiracy claim against the defaulting Defendants is predicated upon

a traditional state-based law of general applicability that does not implicate the relations among the

traditional ERISA plan entities, including the principals, the employer, the plan, the plan fiduciaries,

and the beneficiaries.  Id.  Thus, ERISA does not provide a statutory basis for this Court to require

the defaulting Defendants to pay Plaintiffs' attorneys' fees.  The fact Connelly or CMEWBP may

be subject to ERISA is of no consequence to their common law civil conspiracy claim against the defaulting Defendants.  Id.  With respect to this claim, Connelly and CMEWBP are simply in the role of a victim allegedly wronged by an insurance scam.  Id.   Because there is not an applicable contract or statute which supports Plaintiffs' claim for attorneys' fees against the defaulting Defendants, Plaintiffs are not entitled to recover attorneys' fees against the defaulting Defendants.

160.    Plaintiffs entered into voluntary settlements with the Ferguson Defendants and the Mid-South Defendants (hereafter the "settling Defendants") in this action.  The settlements resolved pending claims upon which attorneys' fees were sought or could have been assessed by the Court had the matter been contested and adjudicated by the Court as opposed to voluntarily settled.  The settlement agreements were contracts that included as part of their consideration payment by the settling Defendants allocable to Plaintiffs' attorneys' fees.  The Court only has jurisdiction or discretion to determine the amount of attorneys' fees in those cases where attorneys' fees are claimed as part of an award in a contested case based upon a contract or statute, or if otherwise provided by law.  American Federal Bank v. Number One Main Joint Venture, 321 S.C. 169, 175, 467 S.E.2d 439, 442 (1995) (when a contract provides for attorneys' fees in contested litigation, the award of attorneys' fees is left to the discretion of the trial judge); Mitchell v. Fortis Benefits Insurance Company, 2005 WL 1793641 (4th Cir. 2005) (a court may award to the prevailing party, in its discretion, in contested litigation, reasonable attorneys' fees and costs in an ERISA action based upon the five factors articulated in Quesinberry, supra.).  Since the attorneys' fees claimed by Plaintiffs were recovered as part of voluntary settlements with the settling Defendants, and not awarded by the Court,  nor subject to the requirement that they be approved by the Court, the amount of the attorneys' fees was strictly a matter of private contract.  Therefore, the Court concludes that for purposes of determining whether the defaulting Defendants are entitled to an

offset for settlement payments made by the settling Defendants, the defaulting Defendants are only entitled to offset the net recovery, which is the amount paid by the settling Defendants after the subtraction of Plaintiffs' attorneys' fees, which were properly the subject of a contingent fee agreement.  Where plaintiff sues several defendants, alleging different kinds and types of damages, some being common to all defendants and others not, plaintiff must only give credit to a non-settling defendant for that part of the damages which he or she receives from settling defendants that are applicable to all equally. C.J.S. Damages §171 (West 2005).  A non-settling defendant is only entitled to an offset of damages it owes because of payments to plaintiff from a prior settlement between plaintiff and a third party if "common damages" result from a "single, indivisible harm" where offset is necessary to prevent plaintiff from recovering twice for the same damages, or recovering twice for the same assessment of liability. Chisolm v. UHP Projects, Inc., 205 F.3d 731, 737 (4th Cir. 2000).  Plaintiffs settled claims against the settling Defendants which sought the payment of Plaintiffs' attorneys' fees.  Plaintiffs' claim upon which this Court has assessed liability against the defaulting Defendants does not provide for the payment of attorneys' fees.  Thus, the assessment of liability against the defaulting Defendants and the voluntary payment by the settling Defendants is not the same; in fact, attorneys' fees were excluded from the assessment against the defaulting Defendants.  Offset only applies to those damages for which all tortfeasors are equally liable.  Plaintiffs' recovery of attorneys' fees from the settling Defendants but not from the defaulting Defendants would not result in Plaintiffs' recovering twice for the same assessment of liability for common damages.  Plaintiffs' recovery of attorneys' fees from the settling Defendants but not from the defaulting Defendants does not result in overcompensation, windfall or unjust enrichment, nor does it provide Plaintiffs with a double recovery.  Plaintiffs are entitled to achieve a total recovery.  A total recovery includes an award of attorneys' fees which in this case is

predicated upon a voluntary settlement of claims between Plaintiffs and the settling Defendants. By handling the issue of offset in this manner, Plaintiffs will receive a judgment which provides for a full (and not a double) recovery and the defaulting Defendants will have the benefit of offsetting against their liability only those itemized damages which are common to those paid by the settling Defendants. The Court concludes this is a fair way in which to handle the issue of offset, especially in light of the fact the settlement agreements provided they were not intended to be paid as consideration for a release or discharge of any party except the settling Defendants. Offset only applies to actual, and not to punitive, damages. C.J.S. Damages §171 (West 2005). A claim of offset must be properly raised by the defaulting Defendants at the time its assets are applied in satisfaction of the judgment.

161.     Plaintiffs seek punitive damages. For claims based on diversity of citizenship, substantive state law governs the nature of the damages. University Medical Associates v. Unumprovident Corporation, 335 F.Supp.2d 702, 709 (D.S.C. 2004). Under traditional South Carolina choice of law principles, substantive law governing a tort action is determined by the state in which the injury occurred. Lister v. Nationsbank of Delaware, N.A., 329 S.C. 133, 143, 494 S.E.2d 449, 453 (S.C.App. 1998). In the case of a fraudulent misrepresentation (or a conspiracy to defraud) the place of the wrong is not where the misrepresentations were made but where the plaintiff, as a result of the misrepresentation, suffered a loss. Id. Hester v. New Amsterdam Casualty Co., 287 F.Supp. 957 (D.S.C. 1968), affirmed in part, 412 F.2d 505 (4th Cir. 1969). The right to recover punitive damages in a tort action is controlled by the law of the place where the tort occurred. Id. at 972. Wright v. American Flyers Airline Corporations, 263 F.Supp. 865 (D.S.C. 1967). Thus, South Carolina law governs Plaintiffs' right to recover punitive damages in this case.

162.     In order for a plaintiff to be entitled to an award of punitive damages it must be

proven, by clear and convincing evidence, the conduct of the defendant causing injury was reckless, willful, or wanton.  S.C. Code Ann. §15-33-135; Taylor v. Medenica, 324 S.C. 200, 479 S.E.2d 35 (1996).  Conduct is deemed reckless, willful, or wanton, when it is committed in such a manner or under such circumstances that a person of ordinary reason and prudence would have been conscious of it as an invasion of the plaintiff's rights.  A conscious failure to exercise due care constitutes wilfulness.  Welch v. Epstein, 342 S.C. 279, 536 S.E.2d. 408 (Ct.App. 2000).  If an insurer denies coverage or fails to pay valid claims in willful or reckless disregard of the insured's rights, the insurer can be held liable for punitive damages.  Cropf v. Prudential Insurance Company of America, 918 F.2d 955 (4th Cir. 1990), citing Nichols v. State Farm Automobile Ins. Co., 279 S.C. 336, 306 S.E.2d 616, 619 (1983).

163.    In South Carolina, "punitive damages are allowed in the interest of society in the nature of punishment and as a warning and example to deter the wrongdoer and others from committing like offenses in the future."  See, Gamble v. Stevenson, 305 S.C. 104, 406 S.E.2d 350, 354 (S.C. 1991) citing  Laird v. Nationwide Ins. Co., 243 S.C. 388, 396, 134 S.E.2d 206, 210 (1964).  Moreover, they serve "as a vindication of private rights when it is proved that such have been wantonly, willfully or maliciously violated."  Harris v. Burnside, 261 S.C. 190, 196, 199 S.E.2d 65, 68 (1973).  Punitive damages may be awarded only upon a finding of actual damages.  Carroway v. Johnson, 245 S.C. 200, 139 S.E.2d 908 (1965).

164.    The Court in State Farm Mutual Auto. Ins. Co. v. Campbell, 538 U.S. 408, 426 (2003) set out a list of considerations for courts to employ in assessing the degree of reprehensibility of a defendant's conduct which include: (1) whether the harm caused to the plaintiff was physical or merely economic; (2) the conduct evinced an indifference to or a reckless disregard for the health or safety of others; (3) the plaintiff had financial vulnerability; (4) whether the conduct causing harm

involved repeated actions or was a single isolated incident; and (5) whether the harm was the result of intentional malice, trickery, or deceit, or was merely an accident.

165.    The due process clause of the Constitution of the United States prohibits the irrational and arbitrary deprivation of property through the award of punitive damages by juries and by judges and therefore the Courts "must ensure that the measure of punishment is both reasonable and proportionate to the amount of harm to the plaintiff and to the general damages recovered." Campbell, supra at 426.  In determining whether due process has been afforded a defendant when sanctioned by the imposition of a punitive damage award the Court is to take into consideration "(1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between actual and potential harm suffered by the plaintiff and the punitive damage award; and (3) the difference between punitive damages awarded . . . and the civil penalties authorized or imposed in comparable cases." Id. at 409.  The United States Supreme Court has held that "the degree of reprehensibility of the defendants's conduct" is "the most important indicium of reasonableness of a punitive damage award . . ." BMW of North America, Inc. v. Gore, 517 U.S. 559 (1996).  The  Court explained: "[I]nfliction of economic injury, especially when done intentionally through affirmative acts of misconduct, or when the target is financially vulnerable, can warrant a substantial penalty." Id. at 576.

166.    The instant harm caused the failure of the CMEWBP which left 264 persons without medical insurance.  Medical insurance provides financial security and peace of mind.  The harm was purposefully directed at the Plaintiffs' medical insurance coverage, which was obtained to provide health-related benefits.  Thus, the harm caused by the conduct of the defaulting Defendants evinced an indifference to and a reckless disregard for the health and welfare of Plaintiffs by directly affecting their financial ability to obtain medical care and treatment.  Connely, a small business, and

the employees who were the participants in the CMEWBP, were financially vulnerable. This financial vulnerability was exploited by the defaulting Defendants, who pursuant to a common plan to effect a health insurance scam, collected and then siphoned off premiums, delayed and then wrongfully denied the medical claims of employees of small businesses. The scam left the CMEWBP in a financial position in which it had paid $1,049,039.00 in premiums, but it owed $972,133.46 in covered claims. CMEWBP could have paid all its claims with the premiums it paid. However, the defaulting Defendants conspired to take those premiums and not pay claims. The conduct causing harm to Plaintiffs involved a repetitive ERISA insurance scam which was carried out by the same principal actions in essentially the same manner for a decade and which resulted in the nonpayment of tens of millions of dollars in medical claims owed to the small business and employee vicitms of the scam. The harm was the result of intentional malice. The evidence established that McNicoll, Anderson and Reeve intended to manage, delay and then wrongfully deny Plaintiffs' medical claims. The harm was caused by trickery in that the scam was intended to disguise the unauthorized sale of health insurance to avoid regulation by state departments of insurance. Also, the scam disguised the fact that McNicoll, Anderson and Reeve were acting in concert with one or more principals of an entity which portrayed itself as a fiduciary that acted on behalf of Plaintiffs. The use of multiple foreign corporate entities and essentially worthless stock certificates to form a fraudulent company to serve as a front for the conspiracy to defraud Plaintiffs involved malice, trickery and deceit. In short, the harm caused reeked of fraud. The harm perpetrated on Plaintiffs was not in any way accidental.

167.    The Supreme Court in <u>Campbell</u> stated that "few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process" while at the same time reiterated that "we have consistently rejected the notion that the constitutional

line is marked by a simple mathematical formula, even on that compares actual and potential damages to the punitive award. We decline again to impose a bright-line ratio." Id. at 425. The Court went further and noted that a higher actual to punitive ratio might be necessary where "the injury is hard to detect or the monetary value of non-economic harm might have been difficult to determine." Id. at 425. Notwithstanding the Court's discussion of acceptable punitive to actual damage ratios, the Court went on to state "the precise award in any case . . . must be based upon the facts and circumstances of the defendant's conduct and the harm to the plaintiff." The United States Supreme Court has held that in determining the appropriate measure of punitive damages in relation to actual damages and its relationship to due process "it is appropriate to consider the magnitude of the potential harm that the defendant's conduct would have caused . . . . as well as the possible harm to other victims that might have resulted if similar future behavior were not deterred." TXO Production Corp. v. Alliance Resources Corp., 509 U.S. 443 (1993).

168.    No evidence has been presented to the Court relating to any applicable civil penalties that might be imposed on the defaulting Defendants for the conduct engaged in. The ERISA health insurance scam called for the sham reinsurance company to collect premiums, delay and then deny claims and then exit the market. It called for the sham reinsurance company to go out of business. The repetitive scam called for another reinsurance company to appear the next day under a new company name. The conduct itself was structured to use foreign entities to avoid regulations and licensing requirements that could subject the defaulting Defendants to civil penalties. The harm resulted from the unauthorized conduct of the business of insurance on behalf of a fraudulent unlicensed insurer which was created as a front to execute the conspiracy. If the defaulting Defendants operated a legitimate, licensed insurance company, civil penalties, such as revocation of a license of the  insurance company to do business in a particular state would potentially serve

as a penalty for fraudulent conduct. Revocation of a license to operate would result in a severe sanction, by loss of the ability to operate, and the attendant loss of substantial and significant income derived from the operation of a legitimate insurance company. In this case, however, the defaulting Defendants are immune from civil penalties. Therefore an award of punitive damages is appropriate.

169.    Beginning with the case of Gamble v. Stevenson, 305 S.C. 104 (1991), where the trial judge is acting as the finder of fact, the trial judge should utilize the post-trial procedures for scrutinizing punitive damage awards set forth in Pacific Mutual Life Insurance Company v. Haslip, 499 U.S.1 (1991) in determining the appropriate amount of punitive damages to award. To ensure that a punitive damage award is proper, the trial court should consider the following factors:  (1) defendant's degree of culpability; (2) duration of the conduct;  (3) defendant's awareness or concealment;  (4) the existence of similar past conduct;  (5) likelihood the award will deter the defendant or others from like conduct;  (6) whether the award is reasonably related to the harm likely to result from such conduct;  (7) the defendant's ability to pay;  and finally, (8) as noted in Haslip, "other factors" deemed appropriate. Upon completing this review, and dedicated to the postulate that no award be grossly disproportionate to the severity of the offense, the Court shall set forth its findings on the record.

170.    Applying the law to the facts of the case sub judice, each of the Gamble factors support an award of punitive damages. In assessing the degree of culpability, Reeve had the most experience in the insurance industry. He was involved in the repetitive insurance scam for almost a decade. McNicoll was also involved in the scam for a decade. He understood precisely what he was doing in the execution of the calculated plan to collect premiums and not to pay claims. It appears that Anderson became involved with McNicoll in 1999 and as a principal actor in the scam in the fall of 2000. MT and MTFS were Cypriot companies located by Reeve. They participated

in the scam from September of 2001 through December of 2001.  MT and MTFS knew or should

of known it was illegal to sell health insurance in South Carolina and in other states without being

accredited or licensed by the department of insurance in those states.  MT and MTFS ratified their

illegal actions by continuing to do business in the United States after state departments of insurance

ordered MT or its agents to cease and desist from the unlawful sale of insurance.  Ultimately, MT

and MTFS refused to pay Plaintiffs' medical claims, contending they had not authorized Reeve to

involve the companies in the business.[125]  Reeve continued to be involved in the scam after NAI and

after MT exited the market by brokering a deal for Centennial Insurance Company, AVV, another

fraudulent company, to provide reinsurance to the plans after AHHA, NAI and MT were subject to

multiple cease and desist orders.  Centennial too, failed to pay claims.  The involvement of the co-

conspirators essentially continued until McNicoll, Reeve and others were indicted for conspiracy,

mail fraud, monetary transactions with criminally derived property and money laundering in the

Southern District of Texas.[126]

---

[125]  Documents indicate Panos Joannou, Managing Director of MT, Christos Patsalides, Christos Christodoulou, and Lambros A. Christofi participated in one way of another in involving MT and MTFS in the unauthorized transaction of the business of insurance in numerous states in the United States, and, as it relates to the instant case, in South Carolina.  Joannou was a director of St. John.  MTFS owned an interest in St. John.  MT and MTFS are bound by the acts of their agents.

[126]  On July 20, 2005 the Honorable Lynn N. Hughes dismissed the criminal indictment in the case of United States v. Claro, McNicoll, Reeve et al., H-04-CR-126 (S.D. Texas, Houston Division), without prejudice. The dismissal of the criminal indictment does not in any way alter or affect the civil liability of Reeve, McNicoll or Anderson for the payment of monetary damages to Plaintiffs arising from their unlawful and tortious conduct.  Based on evidence, this Court has concluded their conduct gives rise to civil liability for monetary damages caused to Plaintiffs.  The Court in this Order has assessed the amount of those damages.  It would be inaccurate for McNicoll, Anderson or Reeve, or their counsel, to assert, in this or any other court, that the dismissal without prejudice of the criminal indictment filed against McNicoll, Reeve and others operated to condone their conduct or otherwise relieved them in any way from the civil liability for the damages their conduct caused the Plaintiffs.  However, this Court did consider the fact that Reeve and McNicoll could be re-indicted or Anderson could be indicted and thereafter criminally punished for their conduct and for this reason this Court has limited its award of punitive damages against them to  1.5 times the total compensatory damages as to these Defendants.  For purposes of limiting and mitigating the amount of punitive damages this Court exercised restraint in light of the outstanding possibility there still could be criminal sanctions on the defendants for their conduct.  See, Pacific Mut. Life Ins. Co. v. Haslip, 499 U.S. 1 (1991) (criminal sanctions mitigate award of punitive damages).  In that MT and MTFS do not

171.    The scam was structured to conceal the unlawful sale of insurance, to conceal the identity of the principal actors, to conceal the capital of the front companies, if any, and to conceal the assets and premiums stripped and siphoned from the front companies.

172.    The past similar conduct is substantial. It involved fraudulent companies, usually set up in Belgium, capitalized by worthless stock, that collected and siphoned premiums, often by moving them to CA-LUX. It always used ERISA to disguise the unlawful sale of health insurance by an unlicensed foreign insurer. It always involved a default in the payment of claims. It always damaged the small businesses and employees that purchased the product. Over a decade it left tens of millions of dollars in unpaid medical claims of small businesses and their employees.

173.    A substantial punitive damage award is necessary to deter the defaulting Defendants and others from like conduct. A substantial punitive damage award would be reasonably related to the substantial harm caused by the scam.

174.    The defaulting Defendants appear to have the ability to pay. Reeve and McNicoll have been involved in this business for a decade and likely reaped financial benefits derived from the long history of unpaid claims. Reeve lives in a substantial home in Chipstead, Surrey, works in the Minories financial district in London and drives a Mercedes. McNicoll lives in a substantial home in Scotland, which he renovated during the scam, and he drives a Mercedes. Anderson lives in a substantial home in Scotland, which he sold to Lyford Investment Corp. during the scam. Anderson also reportedly contributed $10,000,000 in value of stock of Marsh which consisted of $7,000,000 in cash and $3,000,000 in value of real estate to form NAI and was instrumental in the siphoning of $7,717,361.75 in current premiums from NAI to CA-LUX. Anderson later closed

---

face the same spectre of criminal sanctions the court has awarded punitive damages of 1.5 times portion of compensatory damages for which MT was held jointly and severally liable.

down Marsh and stripped Marsh and NAI of its assets. There should be, somewhere, approximately 15 million dollars which is directly related to the ERISA health insurance scam and which was represented to have been placed at risk in connection with the fraudulent venture. MT and MTFS are Cypriot companies. At the time MTFS and MT became engaged in the business its agent reported it had an asset base of $42,000,000.

175. <u>Gamble</u> allows the Court to consider "other factors" deemed appropriate in the assessment of punitive damages. <u>Id.</u>, 305 S.C. 104 at 112 (1991). An additional factor which justifies an award of punitive damages is that the scam utilized the judicial system and purposefully misused the law to mislead vulnerable persons and to perpetrate the scam. The scam sought to legitimize the product by falsely claiming the product was an unregulated component of a legal ERISA employee welfare benefit plan. It sought to use the judicial system to make the dispute over the failure of the reinsurance companies appear to be a civil business dispute based upon bad underwriting, bad claims adjudication and illegal actions of employer victims. It relied upon the theory that if the scam cheated 400 small businesses out of $50,000 each, $20,000,000 could be obtained and no single employer could afford to pursue and collect upon a judgment because of the use of multiple foreign entities for asset protection and secret bank accounts.

176. The Court also considered additional factors in making its punitive damage award. McNicoll, Anderson and Reeve engaged in conduct calculated to make a profit for themselves that exceeded the compensation payable to Plaintiffs. Their conduct was a civil conspiracy to effect an ERISA health insurance scam on Plaintiffs which tortiously interfered with Connelly's business relationship with its employees.[127] Connelly provided its employees with medical insurance benefits

---

[127] Plaintiffs' claim is based upon civil conspiracy to effect an ERISA health insurance scam. The reference to "tortious interference with business" is made in the context of an "other factor" to be considered in an award of punitive damages. This "other factor" is considered since the courts of England and Wales restrict the

as part of their employment.  McNicoll, Anderson and Reeve were aware of this fact.  They exploited this aspect of the business relationship between Connelly and its employees.  They directed their actions in furtherance of the ERISA health insurance scam toward Connelly, in the first instance so they could obtain the premiums paid for the insurance of the company health plan.  They knew that these premiums were paid for the benefit of  all of the company employees who participated in the company health plan.  It was reasonably certain that absent the failure of the company health plan caused by the intentional misconduct of the co-conspirators, Connelly, the Plan and the employees would have continued in their business relationship and that they would have received the expected benefits.  The civil conspiracy to effect the ERISA health insurance scam was intentionally carried out in a manner to purposefully create a situation where the company's employees would blame Connelly for the failure of the company health plan, thereby damaging the employer-employee relationship.  McNicoll and Anderson furthered the conspiracy by falsely attributing the unlawful acts and defalcations of AHHA to Connelly.  It was intended that this blame shifting would conceal the fact that it was the coconspirators who set up a fraudulent, undercapitalized company to insure the company health plan, with the actual malicious intention of

---

award of punitive damages to cases that meet the "categories test" and the "cause of action test."  The causes of action include tortious interference with business.  A civil conspiracy is a tort action in which the plaintiff must prove a combination of two or more persons, for the purpose of injuring the plaintiff; and causing special damage.  The gravamen of the tort is the damage resulting to the plaintiff from an overt act done pursuant to the combination . . . A civil conspiracy may be furthered by an unlawful act.  However, an unlawful act is not a necessary element of the tort.  An action for conspiracy may lie even though no unlawful means are used and not independently unlawful acts are committed.  A plaintiff may not recover damages resulting from the conspiracy and from the underlying tort.  Thus, a conspiracy can involve an unlawful agreement for the purpose of injuring plaintiff which causes special damages through multiple unlawful and multiple tortious acts, including acts which tortiously interfere with business causing special damage.  In order to recover those damages, Plaintiffs must specifically plead and prove the business related damages as special damages in their civil conspiracy claim.  Plaintiffs specifically plead and proved as special damages administrative expenses of the business as compensatory damages to the company as a result of the failure of the company health plan.  To the extent that the courts of England and Wales consider, from the standpoint of public policy, that punitive damages should be limited to cases where the harm is tortious and intentionally interferes with business, this Court, in its award of punitive damages, has explicitly considered as a factor that the conduct of the defaulting Defendants was a civil conspiracy which was furthered by overt acts which were specifically intended to injure Connelly's business.

delaying and then denying valid medical claims of the employees so that premiums could be siphoned and assets stripped, and they were in fact responsible for the failure of the company health plan.  The object of the conspiracy was to leave Connelly and the CMEWBP to deal with the economic injury resulting from civil conspiracy to effect the ERISA health insurance scam, when McNicoll, Anderson and Reeve exited the market.  Thus, this Court has considered as an "other factor" in the award of punitive damages that McNicoll, Anderson and Reeve intended to harm the business relationship between Connelly, CMEWBP and its employees.

## V.     JUDGMENT TO BE ENTERED AGAINST THE DEFAULTING DEFENDANTS

177.    IT IS ORDERED THAT a final judgment be entered against the defaulting Defendants as follows:

(a)     A default judgment be entered against McNicoll, Anderson, Reeve, Marsh and McSooner, jointly and severally, in favor of Plaintiffs, Connelly Management, Inc. and Connelly Management Employee Welfare Benefit Plan for the benefit of the participants, in the sum of $972,133.46 for covered medical claims, in the sum of $387,892.05 for late charges on covered medical claims, in the sum of $387,892.05 for prejudgment interest, and in the sum of $3,168,000 for damage to credit reputation, for a total judgment amount in the sum of  $4,915,917.56 in special damages; and,

(b)     A default judgment be entered McNicoll, Anderson, Reeve, Marsh and McSooner, jointly and severally, in favor of Plaintiff, Connelly Management, Inc. in the sum of $327,927.90 for past administrative expenses from 1/1/01 to 12/31/01, in the sum of $38,492.08 for expenses to prepare summary of unpaid claims, in the sum of $696,000 for administrative expenses from 9/01 to 11/24/03 and in the sum of $446,337.00 for future administrative and accounting expenses for a

total judgment amount in the sum of $1,508,756.90 in special damages; and,

(c)    A default judgment be entered against McNicoll, Anderson, Reeve, Marsh and McSooner, jointly and severally, in favor of Plaintiffs, Connelly Management, Inc. and Connelly Management Employee Welfare Benefit Plan for the benefit of the participants in the sum of $7,373,876.34 in punitive damages; and,

(d)    A default judgment be entered against McNicoll, Anderson, Reeve, Marsh and McSooner jointly and severally, in favor of Plaintiffs, Connelly Management, Inc. in the sum of $2,263,135.35 in punitive damages; and,

(e)    A default judgment be entered against MT, MTFS and St. John, jointly and severally, (jointly and severally with McNicoll, Anderson and Reeve), in favor of Plaintiffs, Connelly Management, Inc. and Connelly Management Employee Welfare Benefit Plan for the benefit of the participants in the sum of $179,031.43 for unpaid covered medical claims, in the sum of $71,435.53 for late charges, in the sum of $71,435.53 for prejudgment interest and in the sum of $792,000 for damage to credit reputation for a total judgment amount of  $1,113,902.49 of the $4,915,917.56 in special damages referenced in the award contained in section (a) above; and,

(f)    A default judgment be entered against MT, MTFS and St. John jointly and severally, (jointly and severally liable with McNicoll, Anderson and Reeve), in favor of Plaintiff Connelly Management, Inc. in the sum of $110,683.21 for past administrative expenses (1/1/01 to 12/31/01), in the sum of $9,623.02 for expenses to prepare summary of unpaid claims, in the sum of $174,000 for administrative expenses from 9/01 to 11/24/03 and in the sum of $111,584.25 for future administrative and accounting expenses of for a total judgment amount in the sum of $405,890.48 of the $1,508,756.90 in special damages referenced in the award contained in section (b) above; and,

(g)    A default judgment be entered against MT, MTFS and St. John, jointly and severally,

in favor of Plaintiffs, Connelly Management, Inc. and Connelly Management Employee Welfare Benefit Plan for the benefit of the participants in the sum of $1,670,853.73 in punitive damages; and,

(h)     A default judgment be entered against MT, MTFS and St. John, jointly and severally, in favor of Plaintiff, Connelly Management, Inc. in the sum of $608,835.72 in punitive damages; and

(i)     Plaintiffs shall be awarded costs as provided for by Rule 54 (d), F.R.C.P.; and,

(j)     Upon proper post-judgment motion by the defaulting Defendants, offset against the special damage award of $6,424,674.46 (and not against the punitive damage award), the amount of damages previously recovered by Plaintiffs from the settling Defendants, exclusive of attorneys' fees paid by Plaintiffs.

**IT IS SO ORDERED.**

PATRICK MICHAEL DUFFY
United States District Judge

March 15, 2006

Charleston, South Carolina